# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Kelvin Andre Spotts, et al.

       Plaintiffs

    v.

United States of America

      Defendant

Case No. 1:08-cv-00044

Judge Kollar-Kotelly,
Colleen

**Motion for Leave to File
Second Amended Complaint**

      Plaintiffs, acting through counsel, ask for leave to file a Second Amended Complaint. This lawsuit involves 438 Federal prisoners with claims under the Federal Tort Claim Act. Given this number of claimants, and the necessity of exhausting administrative remedies before becoming eligible to join this lawsuit, the process has required a three step process. Aside from adding new Plaintiffs, all other provisions remain unchanged. A Memorandum in Support and a Proposed Order are attached.

      Respectfully submitted;

      /s/ Norman L. Sirak
      Norman L. Sirak
      Ohio Reg.  OH0038058
      D.C.  Bar  # 162669
      4974 Higbee Ave.  – Suite 203
      Canton, Ohio 44718
      Phone (330) 493 – 7462
      Fax (330) 493 – 7851
      Email nsirak@parolereform.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Kelvin Andre Spotts, et al.

      Plaintiffs

      v.

United States of America

      Defendant

Case No. 1:08-cv-00044

Judge Kollar-Kotelly,
Colleen

**Motion for Leave to File**
**Second Amended Complaint**

---

### Summary of Motion

This is a filing under the Federal Tort Claim Act involving 438 Federal Prisoners. Each claimant had to present their claim to the Federal Agency and await a decision or for the passage of six months before they would be eligible to join this lawsuit. Given this number of claimants, the process has necessitated a three step process for joining them to this lawsuit. Aside from adding new Plaintiffs, all other provisions remain unchanged.

# Table of Contents

1. Table of Contents                                              i

2. Table of Authorities                                          ii

## Table of Authorities

**Federal Statutes**                                    **Page**

1) 28 U.S.C. § 1346(b)                                  1

2) 28 U.S.C. § 2675(a)                                  1, 2


**Federal Rules of Civil Procedure**

1) Rule 15(a)                                           2


**Code of Federal Regulations**

1) 28 C.F.R. § 14.9                                     2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Kelvin Andre Spotts, et al.

       Plaintiffs

     v.

United States of America

       Defendant

Case No. 1:08-cv-00044

Judge Kollar-Kotelly,
Colleen

**Motion for Leave to File**
**Second Amended Complaint**

**Memorandum in Support**

Plaintiffs, acting through counsel, respectfully approach the Court and seek leave to file their Second Amended Complaint. With one exception, the contents of this Second Amended Complaint are identical to the contents of the Original Complaint. The exception is the list of Plaintiffs. In the Amended Complaint and in this Second Amended Complaint, we are adding Plaintiffs. The need to file these Amended Complaints has been prompted by provisions in the Federal Tort Claim Act, 28 U.S.C. § 1346(b).

**Pertinent Facts**

Before filing in District Court, a claimant seeking relief under the Federal Tort Claim Act must exhaust administrative remedies by filing a claim with the Federal Agency responsible, in accord with 28 U.S.C. § 2675(a). If the federal agency denies relief, an applicant has six months to

file their claim in the appropriate U.S. District Court. [1] This six month time

limit is chiefly responsible for these multiple filings of Complaints.

The two year statute of limitation for these claims expired on

September 25, 2007. If an agency fails to make a final disposition of the

claim in six months, pursuant to 28 U.S.C. § 2675 (a), a claimant can

presume it is denied and proceed with a court filing. Six months lapsed on

March 23, 2008. Accordingly, we are now filing all of our remaining claims.

**Applicable Law**

Fed.R.Civ.P. 15(a), in pertinent part, states:

> (a) AMENDMENTS. A party may amend the party's
> pleading once as a matter of course ... Otherwise a party may
> amend the party's pleading only by leave of court or by written
> consent of the adverse party; and leave shall be freely given
> when justice so requires.

**Discussion**

Plaintiffs filed their Complaint on January 9, 2008. One claimant

faced a deadline of January 17, 2008, and this was the event which prompted

the Original Complaint. A second claimant had a deadline of March 9, 2008.

To beat this deadline, Plaintiffs filed an amended complaint on March 6,

2008. At this time, 376 claimants were added. Presently, we are adding five

Plaintiffs. This will bring our total number of claimants up to 438.

---

[1] *See* 28 C.F.R. § 14.9, which states "if a claimant is dissatisfied with the agency action,
he may file suit ... not later than six months after the date of mailing the notification."

2

Plaintiffs submit that these amendments are not calculated to harass, to delay or to confuse any of the matters set forth in our Complaint. If the provisions of the Federal Tort Claim Act would have permitted, we would have included all our claimants with the Original Complaint. To our knowledge, all remaining claimants have now been joined to this lawsuit.

## Conclusion

For the foregoing reasons, we ask the Court to grant us leave to file this Second Amended Complaint, a copy of which is attached with exhibits.

Respectfully submitted;

/s/ Norman L. Sirak

_____

Norman L. Sirak
Ohio Reg.  OH0038058
D.C.  Bar  # 162669
4974 Higbee Ave. – Suite 203
Canton, Ohio 44718
Phone (330) 493 – 7462
Fax (330) 493 – 7851
Email nsirak@parolereform.com

## Certificate of Service

Plaintiffs hereby affirm that a copy of this Amended Complaint has been mailed to the Attorney General at 950 Pennsylvania Ave. N.W., Washington, D.C. 20530 via certified mail, the United States Attorney through the Civil Process Clerk at 555 4th Street N.W., Washington, D.C. 70530 and to the Federal Government Defendant, Federal Bureau of Prisons, 320 First Street N.W., Room 977 HOLC, Washington, D.C., 20534 Attn. Joyce Zoldak, Associate General Counsel, this 2nd day of April, 2008.

/s/ Norman L. Sirak

_____

Norman L. Sirak

4

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Kelvin Andre Spotts, et al.

      Plaintiffs

    v.

United States of America

      Defendant

Case No. 1:08-cv-00044

Judge Kollar-Kotelly, Colleen

**Order**

Plaintiffs have filed a Motion seeking leave to amend their complaint a second time. For good cause, Plaintiffs state that there are 438 claimants involved in a Federal Tort Claim lawsuit. All of these claimants must exhaust their administrative remedies. Given this large number of claimants, adding them has necessitated a three step process. Plaintiffs further state that the addition of new Plaintiffs is the only change, and in every other respect, the Second Amended Complaint is identical to the Original Complaint.

Fed.R.Civ.P. 15(a) states that leave shall be freely given when justice so requires. Since this Second Amended Complaint has been prompted by certain requirements of the Federal Tort Claim Act, and it would certainly be unjust to refuse these last Plaintiffs simply because they are happen to be last in line, for good cause shown, Plaintiffs Motion is granted and Leave is given to file this Second Amended Complaint with its exhibits.

IT IS SO ORDERED.

_____
Judge


Proposed Order
Submitted by Plaintiffs

/s/  Norman L. Sirak

_____

Norman L. Sirak

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Kelvin Andre Spotts   Reg. No. 05613-088** | **Case No. 1:08-cv-00044** |
| **Billy Aguero  Reg. No.  08466059** | **Judge Kollar-Kotelly, Colleen** |
| **Marcus T. Arnold   Reg. No. 11704-078** | |
| **Baena Jose Mendoza  Reg. No. 77382-079** | |
| **Lloyd Battles    Reg. No. 15809-179** | |
| **Jose Baza    Reg. No.  80363-011** | |
| **Solomon T. Burton     Reg. No.  04118-063** | **Second** |
| **Anastacio Cantu   Reg. No. 19200-179** | **Amended Complaint** |
| **Donald Churchill    Reg. No.  27879-177** | |
| **Richard Cruz   Reg. No.  60692-079** | |
| **Garrett Deetz    Reg. No.  43611-008** | |
| **Gabrial Garcia   Reg. No. 15130-180** | |
| **Curtis Greer    Reg. No.  20313-179** | |
| **Jaime Guerrero    Reg. No. 79072-079** | |
| **Earl Ellis Hawkins     Reg. No. 25412-077** | |
| **Cedric Henderson   Reg. No. 56390-080** | |
| **Rafael A. Herrera   Reg. No.  21027-077** | |
| **Odis Jackson    Reg. No. 15806-179** | |

**Tyronne Jackson    Reg. No. 10332-078**

**Samual L. Johnson    Reg. No.  10097-180**

**Odell Jones Jr.    Reg. No.  95923-071**

**Matsukata Keeling    Reg. No. 27964-034**

**Kerry D. Laury    Reg. No. 24149-077**

**Greg C. Laxey    Reg. No.  09953-078**

**Curtis Lindsey    Reg. No.  72793-079**

**John Lockett    Reg. No.  75159-079**

**Oscar Longoria    Reg. No. 14563-424**

**Oscar Martinez    Reg. No. 26438-179**

**Ray McAllister    Reg. No.  28856-180**

**William McCoy    Reg. No.  08220-056**

**Charles Montgomery    Reg. No.  25433-018**

**Brian J. Moroney    Reg. No.  23901-038**

**Gregory Nesbit    Reg. No.  68746-004**

**Michael Neugebauer    Reg. No. 16761-045**

**William Peay    Reg. No.  03533-007**

**Douglas L. Perry    Reg. No.  05841-043**

**John M. Pope    Reg. No.   43067-180**

**Ras Rahim    Reg. No.  54889-019**

2

**Joseph Randall Jr.   Reg. No.  22594-009**

**Francisco Saldana      Reg. No.  49160-004**

**Garrie Samuels      Reg. No.   27012-077**

**Willie May Sanders   Reg. No.  28763-177**

**Paul Santivanez    Reg.  No.  91551-080**

**Richard Allen Smith     Reg. No.  03666-087**

**Michael Starnes   Reg. No.  11642-042**

**Robert Steen     Reg.  No.  12695-180**

**Brenson Stovall      Reg. No.  34009-077**

**Anthony L. Stutson      Reg. No. 18418-001**

**Michael Hugh Surrell     Reg. No. 29493-177**

**Rodney Lee Thompson     Reg. No.  29247-179**

**Leonard T. Tom    Reg. No.  817755-008**

**Darryl Wilkes     Reg. No.  355522-083**

**Chacy S. Williams      Reg. No. 65479-061**

**Adam T. Williams    Reg. No. 06718-027**

**Anthony Woodland    Reg. No. 07927-043**

**Steven Wooldridge    Reg. No. 05381-010**

**All of the above named plaintiffs reside at:**
**USP Beaumont**
**6200 Knauth Road**
**Beaumont, Texas  77705**

**L.C. Brooks   Reg. No.  03553-095**

**The above named plaintiff resides at:**
**USP Pollock**
**1000 Airbase Road**
**Pollock, LA 71467**

**Plaintiffs,**

**Added Plaintiffs**

William Abbott #10442-002,
William Daniels #14748-056, Cruz
Nunez #32314-013, Donnie
Alexander #59920-079, Paul Brewer
#10227-078, John Burton #15696-
058, Victor Hugo Miranda-Calderon
#11404-180, Joseph Colone #09915-
078, Darrell Cribbenden #98731-
079, Daniel Davis #14306-179,
William Dean #56046-180, George
Escamilla #54920-146, Ricky
Estrada #56534-180, Bilal
Farahkhan #72541-079, Darrell
Gittenden #98731-079, Donnell
Graves #79208-079, Ronnie Harris
#66413-079, Brandon Henderson
#3254078, Julio Cesar Hernandez-
Pineda #82937-079, Willie
Holloway #03667-180, Burton Little
John #15696-058, Rogge Leslie
#13915-004, Jorge Levario #03942-
051, Steven Curtis Lewis #03801-
078, David Martinez #45066-079,
Vega Aljandro Morales #14368-179,
Benjamin Navejar #43691-080, Cory
Nixon #26981-177, Leslie Redmond
#31204-177, Clifton Rivers #36491-
180, Rene Rodriguez #11185-040.
Les Rogge #13915-004, Tremayne

Scoggins #22554-009, Welton Scott
#11400-083, Monty M. Shelton
#10426-078, Patrick Sneed #27674-
177, Keith Steel #07224-043,
Ronald Tillman 85375-071, Gilardo
Valarde #10887-039, Rafael M.
Vasques #85731-080, Terrance
Washington #03038-095, Danny
White 05267-078, Joe L. Wigfall
30499-177, Sharkey Elam 99695-
024, Mark Edwards 24328-077, Ha
T Nguyen #28151-034, Delmar
Anton Zeigler #13897-064, Gregorio
V. Castro 11261-179, Anthony
Miller #33648-048, James Olinde
26824-034, QueGeralso Ortiz
#23696-180, Jaime Phillips #12804-
179, Julio Pineda 82937-079,
Terrance Powell 27259-180, Keith
Quinn #86558-011, Jason Bell
#21876-057, Keith Sheel # 07224-
043, Joe L. Alvardo #11079-081,
DeShawn Andrews #44998-079,
Lionel W. Armstrong #37023-053,
William E. Armstrong #76018-011,
Frederick Asberry #29141-077, Jose
Mendosa Baena #77382-079, Mario
R. Baker #03618-061, Craig
Baldwin # 27003-034, Arthur Banks
#29253-034, Willie Jermaine Barnes
#07706-003, Lukel Anthony
Beckford #26117-037, Ron
Brembrey #31292-177, Akim Jamal
Betsey #12094-052, Frankie Dean
Billings #06145-078, Danny Bishop
#35696-180, Antonio Bouce
#11055-171, Eladio L. Bouza
#29645-198, William Marcell Boyce
#03336-088, Phillip Michael Brady
#14929-037, Johnny Brazille

#08439-062, John Patrick Brennick
#21203-038, Robert W. Brewer
#79900-012, Marion Bridges
#40798-133, Christopher Brown
#10980-035, Louis S. Brown
#06478-043, Richard D. Brown
#11923-040, Sean Deqince Brown
#62260-079, Omar Andre Bulah
#85299-020, Jessie L. Cage #22766-
034, Richard Caparella #52564-004,
Matsuda N. Carter #13155-007,
Genaro-Parez Castillo #58293-080,
Damon Anthony Causey #24328-
034, Ezequiel G. Cervantes #09671-
079, Ruben Chapa-Ibarra Sr.
#64530-080, Jamison Shawn Charles
#05020-078, Donald Chew #13080-
007, Byron Shane Chubbuck #
07909-051, Thomas Ciprano
#23148-034, Mark A. Clark #26409-
077, Walter Compton #73124-012,
Fredrick Cooper #20968-009,
Wendell Alboyd Cornett #04675-
081, Glen H. Cotton #29234-077,
Robert Crisostomo #28997-180,
Rodolfo Cuellar #25755-077,
Thomas Shannon Darr #18389-077,
Michael De Angelo  David #24604-
077, Robert T. Day #30797-177,
Bernadino Delgado # 28273-177,
Joseph Deveau #02996-049, Russell
V. Dinovo #19736-038, Emile
Dixon #06411-041, Richard T.
Dorman #13386-057, Darren Edeker
#06015-017, Samuel P. Edmondson
#05102-010, Brian Edwards #69122-
079, John E. Edwards #45100-079,
Juan P. Esquivel #33321-077, Juan
Estrada Jr. #43539-080, Michael
Dean Faver #04920-081, Darron

6

Fields #24511-077, David Lee
Fisher #55967-066, Ronald Fleming
#14586-076, Donnell Bartholo Ford
#09934-424, Charles Edwin Fortes
#10190-158, Steve Foster #90808-
011, Kenneth C. Fragoso #265-
20079, Orenthel J. Francois #10462-
078, Richard Galicia 07709-097,
Everildo Garcia #40677-018, Rico
Wayne Garcia #99521-011, Sammy
Garcia #49058-180, Asencion Garza
#56840-079, David A. Gish #44530-
179, Jaime N. Gomez #48323-054,
Luis Gonzalez #04434-078, Nelson
Gonzalez #03792-131, Arandal
Goodley #76598-080, James Earl
Goolsby #21248-009, Johnny Green
#79344-079, Nakai Gregory #48686-
008, Richard Griego #08906-081,
Brian Hardwick #03330-089, Willie
Henry Harrison #79293-079,
Malcolm Hartzog #02391-043,
Edgar Lee Hayes #34618-118,
Johnny D. Hensley #87864-012,
James Herbert #04134-078, Jason
Hernandez #07031-078, Juan
Herrera #95092-080, Larry E.
Herrera #99686-111, Curley B.
Hicks #97752-079, Jerry Joseph
Higdon #11167-002, Michael L. Hill
#27023-177, Richard Hodges
#29736-177, Michael Holmes
#07030-078, Leon Holt #11022-007,
Raynard H. Hopkins #14079-064,
Christopher Hopson #21763-051,
Harold Howard #13349-007,
Clarence Hunter #04094-180,
Donald Jackson #25664-077, Joseph
Jackson #33186-007, Steven Jackson
#06274-156, Anthony James

7

#56700-097, Cleveland A. James
#49320-004, Herbert James #04134-
078, Allen Jett #32325-037, Bernard
Johnson #22000-016, Perry Johnson
#33609-018, Shaheem Johnson
#19138-057, Stanley J. Johnson
#98687-131, Benjamin Jones
#52366-066, Charles Gregory Jones
#19935-039, Leonard T. Jones
#09022-014, Anthony G. Joyner
#18548-050, Joe L. Kelly #21350-
009, Henry G Laffoon # 32074-177,
Gary Lott #14256-064, Dolandon V.
Mack #23050-009, Michael A.
Mahone #04430-036, David
Marquez #10895-097, Ameein R.
Martin #70881-004, Adam E. Martin
#39706-180, James D. Martinez
#30493-037, Robert B Martinez
#27063-051, Michael Dean Mason
#02027-078, Steven McClarty
#81028-008, David McClurre
#24642-079, Kevin McDonald
#96795-011, Calvin Mcintosh
#26855-177, Jon Wesley Merritt
#05800-017, Gregory Miles #22717-
077, Bernard Montgomery #53653-
146, Edward Moore #19707-056,
Luis Moreno #71492-079, Anthony
W. Morris #03060-031, Carl
Morrisset #05945-003, Gregory
Nakai #48686-008, Harry R. Nelson
#01142-000, Gregory F. Nixon
#09899-078, Michael J. Noil
#25331-034, Nicholas Pablo
#08658-085, Everett Earl Parker
#01574-095, Cory Lee Parton
#12281-052, Steven Patrick #81028-
008, Eugene P. Patterson #36755-
118, Roy Pendroza #11207-179,

Michael Perez #91508-080, Charles
Anthony Perry #14375-064, James
Pickett #32698-077, Andre J.
Pinkston #12783-026, Raphael F.
Porche #02860-095, Trint Lamar
Powell #15936-058, Kirk Pryor
#16835-058, Jackie Lee Pullum
#60433-080, Jose-Cruz Quinlan
#09256-069, Eurique Ramirez
#53450-146, Raul Ramirez #44222-
079, Jimmy Ramos #58020-080,
Orlando Randall #10670-078, David
Rangel #83638-079, Raul Rangel
#39518-180, Arthur Charles Reader
#06769-078, Warnell Reams
#33164-007, Nathaniel Reed
#02844-095, Sylvester Reid #50013-
004, Juan Reyes #07371-040, Luis
Reyes #50411-066, Donald
Richardson #01523-164, Charles
Pernell Riddick #48826-066, Harry
L. Riddick #48116-066, Roberto
Riojas #71509-079, Michael H.
Roberson #60656-080, Crisostomo
Robert #28997-180, Marcus Roberts
#70033-079, Ernest Edward
Robertson #02659-095, Miguel
Anthony Rocha #83176-079,
Christopher Rodgers-Rodriguez
#42910-060, Jose Garcia #13430-
198, Jose Abel Rodriquez #18162-
180, Shawn Rogers #03723-007,
James Roland #32698-077, Herbert
Rozier #55725-004, Samuel Sanchez
#04949-070, Jeff A. Saunders
#36208-004, Earl McRae Scales
#14406-057, Richard A. Schaffer
#18373-047, Reginald Sharp
#13515-179, Keith Lamar Shepard
#13275-051, Jamie C. Sherrod

#19305-076, Ramon Laroi Shorter
#97558-079,  Peter Simpson
#50611-053, Jermaine Jerrell Sims
#34263-083, Robert J Smallwood
#42708-080, Cedric Smith #07790-
035, Joshua Smith #21727-057,
Kelvin D. Smith #01420-000,
Derrick Lamont Smoote #04873-
028, Gilbert S. Soza #57503-180,
Daniel Spence #32723-037, Willie
Joe Spence #11230-007, Tairone
Traniel Stanford #07316-078, Terry
Earl Stewart #46272-080, Shawn L.
Stone #44824-008, Robert Kyle
Sturdy #18616-077, Taylor Taurus
#56195-004, Bruce A. Taylor
#09794-078, Theodore T. Taylor
#04625-003, Plutarco Tello #11583-
045, Darrell Theodore #28382-034,
Eric D. Thomas #70222-079, Jerry
Wayne Thomas #33934-086, Keith
Thomas #22987-009, Lan Ngoc Tran
#38262-053, Joe L. Traylor #03532-
079, William Ivan Turner #88328-
024, Mario Ugalde #39890-180,
Warren Lee Underwood #57245-
097, Roberto Urbina #39608-180,
Adrian Vasquez #31895-180, Arturo
Baldemar Villarreal #40823-115,
Sambrano Villarreal #03367-078,
Gary T. Wade #19578-038, Michael
R. Waggoner #44210-008, Henry L.
Wallace #31038-007, Larry Ward
#26037-044, Marnail Washington
#11175-002, William Washington
#65149-061, David Webb #21291-
009, Thomas Wesson #02870-424,
James R. White #87785-079,
Freddie J. Whitmore #27118-048,
Rayah Markeith Williams #32487-

177, Bryan L. Wilson #55118-079, William Wise #11356-007, Jimmy D. Womack #56187-080, Marco A. Woodson #06166-007, Henry L. Green #09949-035, Fred Nimoy Ceasar #25408-179, Terrence Howard #28602-034,  Travis Jacobs #15648-064, Roberto Lopez #12999-180, Chris Drew #04511-112 – All located at Beaumont

Clifton Adianshingh # 06314-088 – Allenwood,
Ossie Trader #32019-066, Wallace Love #13239-026, Terryonto McGrier #02469-087, Antone White #16047-016 – all located at Atwater USP

Darrell Evans #21232-039, Bryan Maxwell #50539-079 – all located at Big Sandy USP

Andres Aquiar #37249-053 – Brooklyn MDC

Donnell Joseph #01534-112 – Canaan USP

Purvis Ray Cartwright #59478-079 – Cartwright USP

Darren Mozingo #26032-177, Michael Couran #42666-018, Alex Wong #37985-053 – all at Coleman

Jimmy T Moore #11761-042, Jose B. Velasquez #21400-051 – both Deceased

John Lasoya Vela #27131-180 – El
Paso CCM

Donovan Hickman #05891-043,
Jesus Vargas #14039-026 – both at
Forest City FCC

Maurice M. Fife #32191-007 –
Raleigh CCM

Steven Martinez #45757-019,
Timnah K. Rudisill #16854-058 –
both at Hazelton USP
Inocencio Huerta #44518-079, John
B. Gary #96921-071, Kieron
Webber #57489-053 – all located at
Houston FDC

George A. Rohlsen #01308-094 –
Jesup FCI

Terrell Christopher Richardson
#11412-035 – Lee USP

Harold Jackson # 06811-424 –
Lewisburg USP

Randall Midkiff #23193-016 –
Manchester FCI

Bennie Floyd #11978-007 –
McCreary USP

Curtis Hardy #01102-043 –
Memphis FCI

Curtis J. LaVallie #08424-059 –
Minneapolis CCM

Anthony S. Taylor #12191-035 –
New Orleans CCM

Marcus J. Lewis #54567-083, Ricky
Battle #33139-007 – both at
Otisville FCI

Kipley J. Holbrook #17714-047 –
Pekin FCI

Samuel L. Webb #12352-014 –
Philadelphia CCM

Marvin Hendricks Jr. #04886-196 –
Phoenix CCM

Robert Dorsey #47454-066, Calvin
Dyess #03713-088, George Harrison
#20467-016, Enrico D. Hawkins
#50530-019, Charles H. Jackson
#01125-112, Nadir M. Mahdi
#56528-066, Donte T. McFarland
#18900-112, William Mercer
#15996-016, Andra Routt #60985-
079, Jules L. Williams #34444-037,
Nobel John Williams #24113-180,
Omar Avila #21140-424,
Christopher Black #95001-071,
Omar Moreno #69786-080, Patrick
Stewart #15744-064 – all at Pollock
USP

Ricardo Aguilar-Mexicano #09189-
085, Daniel Anderson #11633-052,
Gregory Berry #20993-039, Charles
E. Gibson #26166-016, Anthony J.
Lucas #30893-013, Noel R. Martin
#39461-180, Sirus McDaniel, David
C. McDonald #04950-033, Marcus

Don Paul #14913-047, Najac Paul
#04970-088, Angel A. Ramirez
#34148-179, Roy E. Robertson
#14226-031, Gregory S. Tolley
#04181-046, Kenneth Wheeler – all
Released

Robert Hill #04084-180, Lonnie
Hines #42618-080 – both at  San
Antonio CCM

Michael Grigg #05832-085 –
Sheridan FCI
Michael Jackson #15083-064 –
Springfield USMCFP

Jeffrey Briscoe #11736-078, David
Lee Jackson #13567-039, William
Peay #03533-007 – all located at
Terre-Haute USP

Michael Ellison #15256-180, Duran
Riley #20305-179 – both at Three
Rivers SCI

Grayling Bolston #55704-019,
Reginald Boxley #71875-004,
William Rogers #33495-018 -
located at USP Coleman


Vincent Humphrey #06307-097 –
Victorville USP

Ernest G. Humphries #21395-057 –
Williamsburg FCI

Plaintiffs

vs.

**United States of America**

**Defendant**

On behalf of themselves, Plaintiffs [hereafter *Claimants* or *Plaintiffs*] state the following complaint against Defendant:

## Jurisdiction and Venue

1.  Jurisdiction is conferred upon this court by 28 U.S.C. § 1346(b) [the Federal Tort Claims Act].

2. Venue is proper in this Court because the true party in interest is an agency of the United States, to wit the Federal Bureau of Prisons. Pursuant to 28 U.S.C. § 1391 (e) (1), a civil action may be brought in any judicial district in which a single defendant resides. The headquarters for the Federal Bureau of Prisons is located at 320 First Street N.W., Washington, D.C. 20534, thus satisfying the venue criteria for 28 U.S.C. § 1391 (e)(1).

## Applicable Federal Statutes

3. Plaintiffs bring this action against the United States under the Federal Tort Claims Act, in accordance with 28 U.S.C. § 1346 (b)(2).

4. At all times material to the events referenced hereafter, the individual employees and agents of the Federal Government were acting within the scope of their employment as defined in 28 U.S.C. § 2671.

15

5. All plaintiffs have presented a prior showing of physical injury compounded by both mental and emotional injuries which are inextricably intertwined with these physical injuries and prompted by a common source, namely damage inflicted by Hurricane Rita, in accordance with 28 U.S.C. § 1346 (b)(2). Further, the physical deprivations suffered and experienced were of such a nature as to be shocking to the conscience, and these physical and mental injuries will be lingering and will persist for a long term.

6. If the United States were a private party, it would be liable to Plaintiffs for acts and omissions of its employees and agents under the law of the place where said acts and omissions occurred, to wit in the State of Texas, under common law tort claims for: (1) negligence, (2) intentional infliction of emotional distress, (3) reckless disregard for another's welfare or deliberate indifference, (4) malfeasance, misfeasance and nonfeasance, (5) malice, (6) cruel and unusual punishment as a constitutional tort, and in the case of at least one and possibly two claimants, (7) for wrongful death.

**The Parties**

6. Pursuant to 28 U.S.C. § 2675(a), administrative remedies must be exhausted before seeking relief in a District Court. This statute is jurisdictional and deprives a federal court of jurisdiction until the agency has denied a claim or six months elapsed since the claim was filed. Once a claim

is denied, a lawsuit in District Court must be commenced in six months.

7. There are 438 claimants that have exhausted their administrative remedies. In most cases, their claim has been denied. In all cases, they filed a tort claim at least six months ago and no action has been taken. In some cases, no offers to settle have been submitted since this lawsuit has been commenced. When more than six months have passed, a denial may be presumed pursuant to 28 U.S.C. § 2675(a). Six months lapsed on March 23, 2008 and no settlement offers of any kind have been made. Accordingly, this court has jurisdiction to accept these claims at this time.

8. The 57 claimants referenced in the original complaint have grown to 438 claimants, and these claimants are now added as Plaintiffs. These additional claims are identical in every material respect to the 57 claims referenced as parties in the original complaint.[1]

9. The necessity for this amendment is prompted by the requirement to commence litigation six months after receiving a denial. Claimant William Abbot # 10442-002 is nearing this deadline and that explains the timing of this amendment. Because of the number of claimants, a three step process has been required to add them to this lawsuit.

10. It is also an option for Plaintiffs to file amendments to its existing

---

[1] *See* Exhibit A, listing all 438 claimants. Plaintiffs reserve the right add new qualified claimants over the next 90 days.

complaint periodically, adding names of claimants freshly exhausting their administrative remedies as decisions are issued. 28 U.S.C. § 2675(a) carries a presumption of denial once six months from the filing date has elapsed.

11. Plaintiffs are filing this amendment to add our last five remaining claimants to this litigation. We do not anticipate any additional claimants. No other changes are contemplated in these amendments, beyond adding new parties.

12. All claimants were prisoners housed at the Beaumont Penitentiary located in the city of Beaumont on September 24, 2005. For the most part, Plaintiffs are wards of the Federal Bureau of Prisons, U.S. Department of Justice. However, on the date of Hurricane Rita's arrival, the Beaumont Penitentiary was also acting as custodial agent for the U.S. Marshall Service, U.S. Department of Justice. There were claimants waiting to come to trial.

13. A claimant held by the U.S. Marshall Service was assigned to the Special Housing Unit at Beaumont Prison, where a two person cell was holding three, four and even five people. Because of this overcrowding, all of the deprivations suffered by claimants in the general population were even more severe for occupants in the Special Housing Unit.

14. Defendant is the Unites States Government, under whose auspices the Federal Bureau of Prisons and the U.S. Marshall Service operate the

Penitentiary located at Beaumont, Texas.

## Allegations Common to all Claims

15. The Federal Bureau of Prisons operates four prisons in Beaumont; (1) a prison camp, (2) a Federal Correctional Institution for Low status offenders, (3) a Federal Correctional Institution for Medium offenders, and a Penitentiary. Each of these prisons is under a separate warden. No single warden has line authority over more than one prison. These wardens report to the Dallas Regional Office, and its Director Gerardo Maldonado.

16. The prison camp and the Federal Correctional Institution for Low offenders were evacuated before Hurricane Rita's arrival. The Medium Federal Correctional Facility was not evacuated before the hurricane, but it was evacuated during the week following the hurricane's arrival.

17.. The U.S. Penetentiary at Beaumont was not evacuated before or after Hurricane Rita's arrival.

18. All events which follow spring from one central fact. On September 24, 2005, Hurricane Rita made landfall and the eye of this storm traveled directly over the Federal Prison Complex at Beaumont, Texas. Despite advance warnings of its course and mandatory orders to evacuate issued by the City of Beaumont, by the Governor of Texas and the Federal

Emergency Management Agency of the Federal government, the Beaumont Penitentiary was not evacuated.

19. For all time periods discussed, a fixed and readily ascertainable standard of conduct was set forth locally and nationally. Orders were issued to evacuate. For people electing to stay, orders were issued to stock up on sanitary water, food, medicines and necessary supplies. Agents responsible for the Penitentiary chose to ignore these orders. In the process, they placed the lives of guards and prisoners under their care in jeopardy.

**Prelude to Hurricane Rita - Hurricane Katrina on August 28, 2005**

20. On August 23, 2005, Hurricane Katrina formed over the Bahamas Islands in the Gulf of Mexico, then began a zigzag course which took it first to Florida, than to the Gulf of Mexico, back to land, out to sea, and finally to landfall along the coast not far from New Orleans on August 28th, 2005. Amid all of the criticism over the government's participation in this storm, two agencies, the National Hurricane Center and National Weather Service, were widely commended for accurate forecasts and abundant lead time.

21. President Bush declared a state of emergency 2 days before Hurricane Katrina made landfall. First voluntary and than mandatory evacuation orders were issued for coastal areas in Louisiana and Mississippi.

22. There was saturation news coverage of Hurricane Katrina running for weeks in September. In particular, the news media focused upon the New Orleans Superdome where living without electricity came into sharp focus.

23. Marlin Gusman, Sheriff of Orleans Parish, decided not to evacuate inmates at Templeman I, II and III, part of the Orleans Parish prison system.

24. On August 29th, 2005, one day after Hurricane Katrina hit land, there were no guards in the Templeman III prison. Inmates were left locked in their cells without food or sanitary water. For inmates on the ground floor, water entered the cells and slowly but steadily began to rise.

25. At midnight on August 29th, 2005, Sheriff Gusman reconsidered the wisdom of his initial decision not to evacuate and called for help. On September 1, 2005, the Louisiana Department of Public Safety and Corrections arrived to conduct an evacuation. When they reached inmates locked in cells on Templeman III's ground floor, the water had risen to their necks. Over the next two days, September 1st and 2nd, these inmates were evacuated by boat to the Broad Street overpass bridge and, from there, taken to facilities such as the Rapides Parish Prison outside of New Orleans.

26. On August 29th, 30th, 31st and until rescued either on September 1st or 2nd, these inmates had no food or drinkable water. The toilets backed up, creating an unbearable stench. They had no lights and they were sealed in

their cells without any air circulation. Inmates on the ground floor felt they were going to drown. On upper floors, they jumped from windows. One inmate told a Human Rights Watch interviewer, "they left us to die there."

27. By the numbers, Hurricane Katrina ranked as the fourth most intense Atlantic hurricane ever recorded up to the time of the storm and it was the strongest hurricane ever recorded in the Gulf of Mexico. Neither ranking would last for long.

28. Within a month, Hurricane Rita eclipsed Hurricane Katrina in both respects. Hurricane Rita became the fourth most intense hurricane ever recorded in the Atlantic Ocean, the strongest in the Gulf of Mexico, and its winds reached 180 miles an hour, exceeding Katrina's 175 miles per hour.

**Nature of Hardships Embedded in a Hurricane (Category 3 or Higher)**

29. A storm becomes a hurricane when winds are 74 miles an hour. If the wind is 111 to 130 miles an hour, it becomes a category 3 hurricane. Category 3 or higher hurricanes typically justify mandatory evacuations. These categories are defined by *sustained winds*, not instantaneous winds. Sustained winds are the average speed over a period of time at 30 feet above ground. The actual wind will be both faster and slower. Toward the center, the wind is faster. In the spiral bands, these winds are slower.

30. Hurricane Rita hit landfall at 115 miles per hour of *sustained winds*, qualifying as a Category 3. Winds toward the center exceeded this 115 miles per hour. The center of Hurricane Rita traveled directly over Beaumont, which means that the winds hitting this prison were stronger than 115 miles an hour, reaching levels closer to 125 to 130 miles an hour. [2]

31. The amount of damage caused by a hurricane does not increase linearly [3] but exponentially. A 25 mile per hour wind places 1.6 pounds of pressure upon each square inch. In a 75 mile per hour wind, that force becomes 450 pounds of pressure upon each square inch (i.e. rising from 1.6 to 450 pounds); and for 125 mile per hour winds – which is the speed hitting this prison – *it becomes 1,250 pounds per square inch* or roughly the weight of 32 concrete building blocks slamming against *each square inch* of wall and glass window encountered.

32. Defying a hurricane requires more than just the physical ability to absorb 1,250 pounds of pressure per square inch. Winds of this nature can lift and propel steel and wood debris, turning these items into missiles. When you add the weight of flying objects to the velocity of these winds, the sum can exceed its parts and the impact can destroy buildings which, on

---

[2] *See* Exhibit B, Tracking Maps of Hurricane Rita issued by the National Oceanic and Atmospheric Administration, showing how eye traveled directly over Beaumont.
[3] If the damage caused by winds increased linearly, a 74 mile per hour hurricane would cause half of the damage of a 148 (category 4) miles per hour hurricane.

paper, appear capable of withstanding this wind. If the walls of this prison are not equal to this test, the result will be a wholesale loss of human lives.[4]

33. Standard electrical fixtures are not built to withstand this force and their destruction is a foregone conclusion. Hurricane Rita knocked out 264 high-voltage power transmission lines, 259 power substations in Texas, plus another 153 high voltage power transmission lines and 120 substations in Louisiana. 766,000 Entergy Texas customers were without power.

34. Hurricanes are low-pressure systems, so they always bring a storm surge. Hurricane Rita carried a 20 foot water surge. Like moving wind, moving water carries substantial destructive force and sweeps up a mix of raw sewage, bacteria, toxic chemicals and debris. Once movement stops, massive amounts of inland trapped water become ponds and breeding grounds in Beaumont's hot and humid climate for disease bearing insects.

35. With every hurricane, there is a drop in barometric pressure. A drop in barometric pressure means that the oxygen content of the air is below normal.[5] Hurricane Rita was especially intense, and this intensity is reflected in the third lowest barometric pressure for a hurricane up to that time. When the oxygen content of air drops, everyone caught in a hurricane's path struggles to breath.

---

[4] 300,000 people were killed on November 12, 1970 in Bangladesh by a comparable storm.
[5] Normal barometric pressure is 29.92 inches. For Hurricane Rita, this fell to 27.64 inches.

36. Every hurricane is accompanied by 100% humidity, which makes the air feel very heavy. A drop in barometric pressure coupled with the high humidity further exacerbates breathing during a storm.

37. From September 23rd to September 29th, 2005, Beaumont experienced a heat wave, with termperature highs hovering just below or just above 100 degrees. At the same time, hurricanes knock out electricity and with it, all forms of air conditioning and refrigeration. Food spoils easily under this kind of heat and becomes toxic, even poisonous.

38. Finally, there is intense rainfall which hinders cleanup and repair operations, particularly work on outdoor, high power electrical lines. In the case of Beaumont, electricity to the city was still not restored on September 28th , 2005, four days after hitting landfall.

39. All of these factors, lethal wind damage, flying missiles of wood and steel, a water surge, a fall in barometric pressure, 100% humidity followed by intense rainfall are all embedded in a Category 3 hurricane. Hurricane Rita arrived during a heat wave, which added still another highly uncomfortable condition which is not necessarily embedded in a hurricane. This was the danger that was courted by people choosing not to evacuate.

## September 20th, 21st, 22nd, and 23rd, 2005

40. When Hurricane Rita formed and appeared headed for the Texas and Louisiana coast, it was moving at the turtle place of 13 miles per hour, providing a four day window of time to prepare for its landfall. Even more ominous, the devastation brought by Hurricane Katrina was still in the grips of chaos. This is to say, its memory was not just fresh, but still unfolding.

41. On our about September 20th, 2005, Claimant Kelvin Spotts as well as other claimants approached Warden Tim Outlaw to discuss being moved due to reports of an approaching hurricane. This request was ignored.

42. On September 21st and 22nd, 2005, additional verbal requests were made to be relocated. These requests were ignored. By September 23rd, 2005, when the hurricane reached Category 5, claimants begged the Warden to be evacuated. All of these pleas landed upon deaf ears.

43. While Hurricane Rita's fury did not impress Warden Tim Outlaw, it did impress President Bush. To be sure the mistakes of Hurricane Katrina were not repeated, President Bush flew to NorthCom Headquarters (i.e. U.S. Northern Command in Colorado Springs) where the military operates a crisis command center for monitoring any kind of emergency taking place on the Northern Continent, including a natural disaster.

44. Prior to going to NorthCom Headquarters, President Bush, in conjunction with Secretary of Defense Rumsfeld and Homeland Security Secretary Michael Chertoff, ordered a major deployment of military personnel and hardware to the eastern coastline of Texas in anticipation of Hurricane Rita. The news media reported that amphibious vessels carrying 1000 marines on immediate alert along with more than 5,000 Texas National Guardsmen were deployed.

45. The Bloomberg News Service reported on September 24th, 2005, that the entire emergency relief effort was placed under the control of the military. For a moment, President Bush considered declaring martial law, but instead decided to let Homeland Security Secretary Michael Chertoff classify Hurricane Rita as an "incident of national significance," which justifies the activation of a "National Response Plan." In practical terms, *National Response Plan* meant that the entire assets of the military would be made available to civilian authorities for rescue and evacuation operations.

46. In addition to qualifying as an "incident of national significance" – only one step down from martial law – by the U.S. armed forces, mandatory evacuation orders were issued for the Beaumont area by the Federal Emergency Management Agency, the Governor of Texas and by Judge Carl Griffith for the city of Beaumont.

47. In the final hours before landfall, Hurricane Rita shifted to the east away from Houston and toward Beaumont, Texas. Just after Hurricane Rita struck, the Governor of Texas declared Beaumont part of a nine county disaster area, which qualified this area for further emergency relief, beyond the assistance already available in preparation for the storm.

48. None of this impressed Federal Bureau of Prisons Director Harley Lappin, Assisant Director Bruce Sasser, Assistant Director Joyce Conley (responsible for emergency preparedness), South Central Regional Director Gerardo Maldonado and Warden Tim Outlaw. These officials jointly decided – and so informed callers – that the Penitentiary would not evacuate for Hurricane Rita but would instead, *ride it out*. The very idea of applying a rodeo cowboy analogy to a Category 3 hurricane is nothing short of obscene.

**Hurricane Rita – Preparations Made by T.D.C.J. for Texas Inmates**

49. The city of Beaumont rivals Leavenworth, Kansas as a city dotted with a large number of prisons. In addition to the extensive Beaumont Prison Complex operated by the Federal Bureau of Prisons, the Texas Department of Criminal Justice operates four prisons in the city.

50. Prior to Hurricane Rita hitting landfall, the Texas Department of Criminal Justice moved over 9,400 inmates to safety. Over a two day period, these offenders were all moved to safer ground from ten Texas prisons.

51. There are three State prisons and a half way house surrounding Beaumont; the Gist State Jail, the LeBlanc Unit, the Stiles Unit and the Beaumont Transitional Treatment Center. All four prisons were completely evacuated. Inmates at Stiles were moved to the Polunsky Unit. Inmates at Gist State Jail and LeBlanc Unit were first moved to neighboring Stiles. Next, 1,300 inmates from the LeBlanc Unit and another 170 parolees from the Beaumont half way house were airlifted to Corpus Christi aboard three aircraft provided by the U.S. Marshal's Service, than bussed to prisons in Beeville. After the storm passed, 2,100 offenders from Gist State Jail were bussed to the Michael, Coffield and Beto units in Tennessee Colony.

52. These relocated inmates were placed in makeshift quarters such as the dayroom, the multipurpose room, the chapel and gymnasium. Portable toilets were made available for their use until water and sewer services could be restored. Once prisons hit by the storm were restored to being functional, the inmates were bussed back and took on the task of finishing the clean up.

53. The Federal Bureau of Prisons operates six prisons within a one day's drive of Beaumont. [6] It could have followed the example set by Texas.

---

[6] These prisons are: (1) FCC Oakdale (low and minimum security) 125.9 miles / 2 hrs. 16 minutes driving time; (2) U.S.P. Pollack (high security) 175.3 miles / 3 hrs. 9 minutes driving time; (3) FCI Bastrop (low and minimum security) 225 miles / 3 hrs. 27 minutes driving time; (4) FCI Seagoville (low and minimum security) 291.7 miles / 4 hrs. 41 minutes driving time; (5) FCI Three Rivers (medium and minimum) 309.4 miles / 4 hrs.

54. Federal Bureau of Prisons Director Harley Lappin, Assisant Director Bruce Sasser, Assistant Director Joyce Conley and Regional Director Gerardo Maldonado and Warden Tim Outlaw [hereafter *Defendants' agents*] decided against evacuating the Beaumont Penitentiary.

55. In so d/oing, these federal officials made a decision to disobey two orders setting forth the ascertainable standard of conduct for hurricane Rita; (1) a mandatory evacuation order issued by Jefferson County Judge Carl Griffith on September 21, 2005, the Emergency Disaster Proclamation by Texas Governor Rick Perry on September 20, 2005 and an evacuation order for Beaumont by the Federal Emergency Management Agency; and (2) complying with the hurricane checklist widely disseminated by F.E.M.A. on the internet and via the media for people choosing not to evacuate.

56. These federal officials further ignored saturation coverage of hurrican Katrina and the widely disseminated story of Sheriff Guzman.

57. Defendants's Agents disobeyed orders with full knowledge of the consequences that would follow, given the televised scense of chaos beamed nightly to livingrooms on all major networks from New Ordeans. These Defendants's Agents cannot deny and can be charged with full knowledge of the risks posed by a Category 3 hurricane followed by a Category 5 storm

47 minutes driving time; and (6) FCI Yazoo City, (low and minimum security) 409.1 miles / 6 hrs. 21 minutes driving time.

surge. By placing their faith in a building, these federal officials were taking the chance that if the walls and windows proved inadequate, a number of people, inmates and guards, would pay for the error with their lives.

58. In paragraphs which follow, the time frame of September 25th to October 25th of 2005 is documented for plaintiffs at Beaumont Penitentiary. While reading these descriptions, it is important to keep this point in mind. Plaintiffs were in a lockdown 24 hours a day, 7 days a week, with no ability to move or minimize their ordeal throughout this time period.

59. Leading up to this time and throughout this period (i.e. September 25th to October 25th, 2005), there was no prison disturbance, no challenge to authority and no potential for violent confrontation of any kind.

60. When hardships exceeding the level of discomfort anticipated in prison are imposed without provocation, a less demanding standard for physical injury applies. Proof of medical attention at a hospital and permanent marks are not necessary because contemporary standards of decency do not condone the arbitrary and unnecessary infliction of pain and suffering. When an entire prison is punished unnecessarily, harm can be based upon common sense reasoning based upon observable facts.[7]

---

[7] *See* Hudson v. McMillian, 503 U.S. 1, 9 (1992). *See also* Ruiz v. Estelle, 503 F. Supp. 1265, 1287 (D.C. Tex. 1980)

**Preparations for Hurricane Rita at Beaumont Penitentiary**

61. Pursuant to 18 U.S.C. § 4042 (a)(2), titled *Duties of Bureau of Prisons*, Defendant has a duty to provide *suitable quarters* and provide for *the safekeeping, care and subsistence* of all persons held in the custody of the Federal Bureau of Prisons. This statute sets out a duty of care owed to Plaintiffs "independent of an inconsistent state rule." [8] [Emphasis added.]

62. On the eve of Hurricane Rita's arrival, Defendants' agents defined their duty to provide for the safekeeping, care and subsistence of persons entrusted to their care by taking the following overt actions. (1) Plaintiffs were given a plastic trash bag and told to fill it with water. (2) Plaintiffs were told they would be locked in their cells until the hurricane was over.

63. The plastic bag for holding water had little holes punched in it. Holes are punched in plastic bags to deter using them for brewing alcohol beverages. These punctured bags were issued instead of new plastic bags, even though they were clearly unsuitable for the purpose to be performed.

64. No emergency training was provided to staff prior to the hurricane's arrival. They performed their duties after the hurricane struck just as they had performed their duties normally.

---

[8] U.S. v. Mintz, 374 U.S. 150, 164-65 (1963).

65. The storm surge from Rita was expected to reach 15 to 20 feet. The Federal Penitentiary has two bottom floors, with one slightly lower than the other. The FA Unit has two tiers. There were fears that the storm surge could cause inmates housed in the lower tier of FA Unit to drown. As a result, there were cells on the lower tier of FA Unit which were left empty.

66. The two cell occupants in this ground floor cell on FA Unit were moved to the higher tier, leaving four people in quarters built for two men. Inmates on the lower floor were allowed to bring their plastic bag of water punctured with holes with them when they were transferred.

67. The overt act of giving everyone a plastic bag and a plan to move people on the ground floor to the cell directly overhead was the full extent of preparations made for Hurricane Rita by Defendants' agents.

68. In defining their duty to provide for the safekeeping, care and subsistence of persons entrusted to their care, it was a material omission to: (1) fail to stock sufficient supplies of sanitary water, (2) failing to stock sufficient food, (3) failing to stock supplies of medicines, (4) failing to stock extra supplies of toilet paper, soap and related items to maintain rudimentary hygiene; (5) failing to bring in portable toilets, (6) failing to provide a back-up system for circulating fresh air; (7) failing to make arrangements for quarantined inmates so that infectious and contagious diseases would not be

spread; (8) failing to stock clean clothes and making arrangements off premises to clean filthy clothes and bedding; and (9) failing to have sufficient generators to replace electricity required internally for operating emergency buttons and maintaining evening lighting.

**Deception to Media and Family Members**

69. Concerned family members were given mixed signals as to whether or not the Penitentiary would be evacuated. If you called the Regional Office in Fort Worth – Dallas, you were told that they would *ride it out.* Other callers were told that they would be evacuated.

70. One nationally disseminated prison publication called Prison Legal News reported that all Beaumont Penitentiary inmates had been moved to the Federal Correctional Complex in Yazoo City, Mississippi.

71. In truth, there was never any plan to evacuate the Penitentiary and statements to the contrary were false and calculated to deceive the public.

**Guilty Knowledge**

72. Defendants' agents knew that holding cells are airtight and windows could not be opened. Defendants further knew that fresh air could only enter and foul air could only exit one way, and this was through the air conditioning system. After watching scenes of devastation brought by Hurricane Katrina, Defendants' agents can be charged with knowledge that

loss of power is unavoidable in a major hurricane. Given this knowledge, it was *deliberate indifference*[9] to decide against evacuation, knowing persons entrusted to their care would be trapped in an airtight cell with no fresh air to breath and with no means for expelling foul air for an indefinite period of time, and they had no back-up plan to fix this problem.

73. Defendants' agents knew that their back-up generators could not replace loss of electricity inside cells. Given this knowledge, it was deliberate indifference to decide against evacuation knowing that persons entrusted to their care would experience pitch black darkness from sundown to sunrise as well as no relief from sweltering heat for an indefinite period of time, and they had no back-up plan for alleviating this dire situation.

74. Providing every Plaintiff with a plastic bag and an instruction to fill it with water evidences advance knowledge that the water supply would be cut off and drinkable water would not be available for an indefinite time. Given this guilty knowledge, Defendants' agents reflected a reckless disregard for the welfare of persons entrusted to their care when they refused to stock supplies of sanitary water and chose instead, to issue punctured

---

[9] *See* Farmer v. Brennan, 511 U.S. 825, 826 (1994) Deliberate indifference is more than negligence but less than intentional and occurs if an act or omission takes place for the purpose of causing harm or with full knowledge that harm will inevitably be the result.

plastic bags for holding water coming from a faucet, and they did not have any plan for providing drinkable water when this water was gone.

## Hurricane Rita Arrives on September 24th, 2005

75. On the eve of the hurricane, Plaintiffs watched television coverage of Hurricane Rita and fully appreciated the force of a Category 5 hurricane coming their way and the storm surge it could generate.

76. Ground floor units AA/BA, CA/DA and EA/FA were particularly vulnerable to the storm surge, which was expected to exceed 20 feet. The city of Beaumont is roughly ten feet above sea level. Claimants in lower cells worried about drowning. Some decided to use their plastic bag to trap air, thinking it might keep them alive until a diver arrived.

77. On the eve of September 23rd, 2005, every prisoner at the Beaumont Penitentiary was locked down and each housing unit was secured. All prisoners were orderly and compliant as they went to their cells.

78. As each inmate was being locked in their cell, they were acutely conscious of their state of helplessness in the face of imminent life threatening danger. Nobody seriously expected a guard to risk their own life to save their life. They truly believed the decision not to evacuate was driven by a plan to overcome crowding. Their deaths could be blamed on the storm. These were their thoughts and conversations on the eve of Rita's arrival.

79. Claimants in upper level cells watched in disbelief as the approaching hurricane uprooted and knocked over trees with the same ease and forward motion of a bowling ball knocking over bowling alley pins. Trees acted as if they were not even rooted in the ground.

80. The hurricane first hit the Medium prison, and they could see sections of roof getting blown away by the storm.[10] Once separated, these pieces of roofing became transformed into heavy flying missiles.

81. Next, the Penitentiary was hit. The rain came in horizontal and flew with such force, claimants were surprised that the windows were not getting broken. Some water did enter through calking surrounding windows, sufficient to leave a wet floor. At the same time, they could hear the sound of metal slamming against stone, the result of debris lifted by wind. Every time metal slammed against the stone wall, the whole building would shake.

82. The storm had an eerie, queer, rumbling sound, faintly reminiscent of a train but with a deeply foreboding sound of doom. An equally ominous hush prevailed inside the prison, with everyone deeply engaged in prayer.

83. The time required for the eye of this hurricane to pass over the Penitentiary was approximately 30 minutes. During this time, a drop in the barometric pressure made them struggle to breath, because the intake of air

---

[10] Federal Bureau of Prisons Contract No. DJB50211005 for $5,180,233 went to the D.K. Haney Construction Co. on October 11, 2005, to repair roofing lost at all Beaumont prisons..

lacked its normal oxygen content. Air is the most basic of life's necessities. Lack of oxygen by itself would be a huge source of anxiety.

84. The combination of what they could see, hear and feel from forces slamming against their building and colliding with windows was equally traumatizing and served as a second independent source of anxiety.

85. While Claimants struggled to breath, they had to watch nature transformed into a huge destruction machine. Experiencing both sources of anxiety at once effectively strained a body's coping mechanism beyond its limit, culminating in a deeply scarring experience and a long term source of nighmares. The ordeal exceeded anything that anyone had ever experienced or even imagined. The fact that they were powerless to do anything to help themselves further elevated their level of stress.

86. Prison staff were ordered to stay through the night and for some time afterward. The prison's management did not bother to stock food for guards, despite knowing that 450 guards would be compelled to stay there.[11]

87. The thirty minutes of time required for the eye of the storm to pass overhead seemed like an eternity. Each claimant knew that if the window and wall separating them from this storm failed, their life was instantly over.

---

[11]    The Guards labor union, AFSCME came to their rescue by bringing a truck with burgers and drinks. Of course, nothing was passed along to Plaintiffs.

88. When the eye of the storm passed, their fears shifted to the coming storm surge and, for claimants on the lowest level, the prospect of drowning. Fortunately, no water entered the prison. But groundfloor cells that were left vacant because of the storm surge remained vacant, even after the storm surge passed. These cells would continue to remain vacant for three weeks.

89. Although the storm surge did not enter the prison building, there were trapped pools of inland water filled with sewage and debris picked up by the storm. Intense heat eventually evaporated this water, lifting it into the air and adding to an already high humidity, making the area miserable.

**Beaumont's Chronic Care Unit**

90. Beaumont's Penitentiary has a chronic care facility set up to accommodate illnesses that cannot be stabilized and require frequent observation and monitoring by a medical professional, typically a nurse. Examples of chronic care conditions include high blood pressure, diabetes, cardiac conditions and inmates with CD4+ cell counts of 200 or less. [12] There are a couple of hundred inmates in this chronic care unit.

91. The failure to evacuate an inmate in the chronic care, particularly an inmate with AIDS and its very low immune system, qualifies as an act

---

[12] A CD4+ count is a blood test to determine how well the immune system is working. Normal is 600 to 1,200 cells per microliter (μL). A CD4+ cell count of fewer than 200 cells/μL indicates a low immune system and a high risk for contacting AIDS, a long-term chronic disease that cannot be cured.

repugnant to the conscience. In practical terms, the odds of living and dying were stacked in favor of the latter for many of these Plaintiffs.

**September 25th, 26th and 27th, 2005**

92. The news media reported on September 28th, 2005, the entire city of Beaumont was still left without electricity, without water and without gasoline. People interviewed complained that they were living like cavemen.

93. The maximum temperature in Beaumont on September 25th, 26th and 27th was in the high 90's and may have reached 100 degrees on September 26th and 27th. This temperature is recorded by the weather bureau.

94. A second mandatory evacuation was ordered immediately after the storm. This time, the answer *no* was not acceptable. People that had chosen not to evacuate were ordered to leave and if they did not have any place to go, F.E.M.A. had set up temporary shelters for them.

**Deprivations of Minimal Civilized Measure of Life's Necessities**

95. Pursuant to 18 U.S.C. § 4042 (a)(2), the Federal Bureau of Prisons must provide reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities (i.e. hot and cold water, light, heat, plumbing).[13]

---

[13] *See* Ramos v. Lamm, 639 F. 2nd 559, 568 (10th Cir. 1980). *See also* Del Raine v. Williford, 926 F. 2nd 1057, 1064 (11th Cir. 1991)

96. Some conditions in combination can have a mutually enforcing effect. For example, a cell temperature of 60 degrees and no blanket would deny an identifiable human need (i.e. warmth and probably sleep deprivation). But in isolation, each of these factors (i.e. 60 degrees or lack of a blanket) would not deny an identifiable human need.

97. Plaintiffs submit that each and every one of the below listed deprivations of identifiable human needs suffered by Claimants were severe enough in isolation to press the outer boundaries of what a human being can tolerate. Each of these deprivations of identifiable human needs had a mutually enforcing effect upon one another. When you add the mutually enforcing increment of discomfort to the pain and suffering caused by each single deprivation, the hardship inflicted defies description and requires a term employed for conduct which exceeds our ability to describe – torture.

**First Deprivation – Extreme Heat / Maintaining 98.6 Body Temperature**

98. Prisons are urban areas composed of brick and mortar buildings, concrete and asphalt streets and typically little or no grass. These urban materials absorb heat during the day and release it in the evening, causing the raw temperature to hover by several degrees higher than over nature during both the day and night. In prison compounds, the true temperatures experienced on these days easily reached 100 degrees for someone outside.

99. Prison cell walls in the penitentiary are made of cement and brick. These materials act as a crude oven, further raising the internal temperature. Being in a small, cramped space with no air movement can raise temperatures still higher. With no electricity, fans cannot work. Claimants were subjected to confinement with no air circulation or ventilation throughout this period of time. The heat *and* humidity was so intense, floor wax melted and the internal facing of the supporting bricks were sweating.

100. During these three days, Plaintiffs had to endure temperatures well in excess of 100 degrees. Exposure of a person to a temperature of this magnitude places them in danger of heat exhaustion as well as muscle cramps and, if the temperatures climbed to 110 degrees or higher, to a heat stroke which can prove fatal even if the exposure is only for a few hours. When heat reaches this level, you experience extreme fatigue and faintness. And claimants did in fact experience extreme fatigue and faintness.

101. While claimants suffered unbearable heat, the presence of staff inside housing units varied from scarce to nonexistent. Pushing an emergency button was an act of futility. No sound was emitted and even if a sound were emitted, there was no one to come to the rescue. This lack of staff triggers fears of abandonment and hormones linked to self preservation.

102. For claimants with cells facing the sun, temperatures climbed above 110 degrees to as high as 115 degrees. No relief of any kind, not even a wet towel, was offered to claimants in these or any of the other cells.

**Second Deprivation - Forcing Claimants to Drink Non-Potable Water**

103. When subjected to this kind of heat, the body desperately needs water to cool off. Plaintiffs were not given any sanitary water at all for the first three days. Given the heat inside these cells and the manner in which their bodies were perspiring, they were experiencing rapid dehydration.

104. On September 24th, 2005, claimants were initially told by Warden Tim Outlaw that the water was fit for human consumption. In fact, water flowing into the Penitentiary was contaminated by a back flow of raw sewage. The water offered to claimants was colored brown with some type of matter flowing in it. Because claimants were experiencing dehydration and had no other choice, this water was drunk simply to stay alive.

105. On September 26, 2005, Warden Outlaw issued a memo saying that the water was non-potable (i.e. not suitable for drinking) and should not be "ingested" (i.e. drunk) under any circumstances.[14] Notwithstanding this memo and in complete contradiction to its terms, guards would open the food tray and offer plastic bags of water stating "you can take it or you do

---

[14]  See Memo from Warden Outlaw dated September 26, 2005 attached as Exhibit C.

not have to take it." Given this *Hobson's Choice* – which is to say there is outwardly an option but in reality no choice at all – profusely sweating Plaintiffs facing a choice of drinking this water or perishing, took the water.

106. The water coming through the food tray had a gray color and a spoiled, fishy smell. It smelled so foul, Plaintiffs had to hold their nose to drink it. Rapid dehydration is a powerful motivating force. As desperation grew, they did drink it and staff knew that they would necessarily drink it.

107. The overpowering odor emitted by this water betrays the presence of contaminated matter. Claimants anticipate discovering human waste at least partially responsible for this odor. By holding their noses, they disabled their sense of smell and the body's protective mechanism. In this manner, claimants were involuntarily forced to ingest human waste.

108. The unsanitary water caused claimants skin to break out in bumps.

109. For an elderly person, extreme heat poses a unique danger. The function of perspiration is to provide evaporation, which in turn provides cooling. Elderly people have a reduced capacity to perspire and release their body heat and thereby maintain the body temperature of 98.6 degrees.

110. For everyone else, sweat dripped off their bodies even though they were still. They could feel their body temperature rising. Many

experienced an irregular heart beat. All Plaintiffs feared the prospect of a heat stroke.

**Third Deprivation – Lack of Oxygen**

111. Cells for two men average seven by twelve feet. Lack of circulating air in a cell this size means that claimants were continuously breathing and re-breathing the same air. This condition was experienced by all claimants. In the Special Housing Unit, where three or more people occupied a seven foot by twelve foot cell designed for two people, this breathing and re-breathing of air was significantly more pronounced.

112. Fresh air is approximately 21% oxygen. With each inhale, our body metabolizes part of this oxygen. If inhaled air is 21% oxygen, exhaled air is around 16% oxygen and 5% carbon dioxide. When air for breathing falls below 10% oxygen, we begin to feel as if there is a lack of air.

113. Absence of oxygen and a surplus of carbon dioxide activates chemorecptors,[15] sending nervous impulses to external intercostal muscles and the diaphragm via the phrenic nerve to increase breathing rate and the volume of lungs during inhalation. If the balance between oxygen and carbon dioxide is not restored through faster breathing, the body will go weak and eventually become unconscious.

---

[15] Chemoreceptors (also termed a chemosensor) converts a chemical signal into an action potential. These chemorecptors react to the high concentration of carbon dioxide.

114. The surplus of carbondioxide caused claimants to suffer headaches.

115. Claimants experienced difficulty breathing due to the low oxygen content of air. They were commonly experiencing extreme fatigue and faintness which progressed until it in fact did result in unconsciousness.

**Fourth Deprivation - Denial of Food**

116. For the first three days, September 25th, 26th and the 27th, Plaintiffs received no food at all from guards. Lack of food for this duration of time will cause hunger, accompanied by acute hunger pains. Every claimant suffered acute physical pains due to a deprivation of food. In addition to feeling physical pains, there is a mental anxiety. Food is an indispensable necessity for maintaining life. As each day passed, they had to fear starvation caused by the staff's lack of preparedness.

117. The body must have certain nutrients and vitamins everyday. When the body cannot get these essential foods, it will convert stored fat into the nutrients and vitamins required. All Plaintiffs experienced this phenomenon.

**Fifth Deprivation - No Flushing Toilet and Functional Plumbing**

118. Toilets could not be flushed throughout this time. Naturally, they became filled to overflowing with feces and urine of each cells' two

occupants. In some cases, there were three and four occupants in a cell designed for two. The odor emitted from this toilet became embedded in the bedding, in sheets, in clothes and throughout the air to the point that the stench was ubiquitous (i.e. present in all places at the same time).

119. After a bowel movement, there was no ability to wash one's hands. There was also a lack of toilet paper. Plaintiffs were left with no means for cleaning either their rectum or hands. The bacteria commonly known as E. Coli [16] can be found in human feces as well as in contaminated water.  E. Coli bacteria causes diarrhea. This disease was rampant among Plaintiffs at this time. With diarrhea, there is a great deal more liquid leaving the body than normal. Loss of fluid through diarrhea, coupled with profuse sweating, accelerates dehydration and can ultimately lead to cardiac arrest.

120. Overflowing toilets affected Plaintiffs in different ways. Some forced themselves to hold their bowel movements for as long as three days until they could no longer do so. Resisting a bowel movement will cause significant discomfort. Others became violently, causing them to vomit, and the vomit went on top of feces, making the whole spectacle even worse.

121. When toilets became filled to overflowing, guards began to pass out plastic bags, one for urine and another for feces. At irregular intervals,

---

[16] The scientific name for E. Coli is Escherichia coli.

guards would come around to collect these plastic bags. In some cases, they removed them from the area. In other cases, they left them in the corridor just outside the door. The contents of these bags and the toilet made already fetid air still more rancid with the unmistakable odor of urine and feces, which at times became so thick that just breathing could make one nauseous.

**Sixth Deprivation – Lack of Sleep**

123. It was nearly impossible to sleep due to the penetrating stench of feces, the lack of air circulation, the heat, hunger pains and a headache from excess carbon dioxide. Filth overflowed into their bedding and could now be smelled on their pillow and sheets. Lack of sleep can result in blurred vision and irritability. Blurred vision and irritability were also rampant.

**Seventh Deprivation – Denial of Sanitation, Clean Clothes, No Hygiene**

124. Throughout this period, claimants were not allowed to shower, they were forced to sleep in filthy dirty sheets and they were forced to wear filthy dirty clothes that stank from the smell of sweat and human feces.

125. Claimants were forced to share cells with inmates infected with MRSA staph, [17] and previously under quarantine. Due to the close quarters and unsanitary environment, this infection spread to others in the vicinity.

---

[17] MRSA staph refers to methicillin-resistant Staphylococcus, a drug resistant staph infection that can lead to a brain tumor and an excruciating death. Claimants in close proximity to such inmates were in fact infected with MRSA staph during this period of time.

126. Claimants could not wash because there was no running water. Every time a claimant touched their mouth, nose or ears, they ran the risk of transferring filth from their hands to internal areas of the body.

127. When claimants were allowed to take showers, water coming through the showerhead was contaminated with sewage. After taking a shower in sewage contaminated water, they had to put on the same filthy clothes that they had been wearing before taking this shower. This continued for the whole month. They never received a clean change of clothes.

128. Claimants were never given a change of sheets or a change of pillow cases. Every evening, they slept in the same smelly, filthy bedding.

130. Plaintiffs were subjected to high concentrations of harmful bacteria in unsanitary water, airborne ammonia from feces and urine, contaminants released from other inmate's lungs due to breathing and re-breathing the same air, and to a lack of protection from inmates with contagious diseases.

**Eighth Deprivation for Chronic Care Unit - Denial of Medicine**

131. Chronic care Plaintiffs were all denied medical care. Plaintiffs with asthma could not get their inhaler refilled. Inmates with diabetes could not get their insulin. Chronic care claimants had to get along without

medication while temperatures and stagnant air strained their already compromised immune system and severely tested their will to survive.

**Ninth Deprivation – Feeling Protected, Out of Danger**

132. When the sun went down, Plaintiffs were plunged into pitch black darkness until sunrise. At the same time, their emergency buttons would not work and they could not summon a guard.

133. It is a basic identifiable human need to feel protected and out of harm's way. Pitch black darkness in a prison and the inability to summon a guard are mutually enforcing. Considered alone, neither item would deny a basic human need. In combination, they will deny the need to feel protected.

134. When stress is linked to survival, the body releases a hormone called Cortisol, which elevates the blood pressure and places stress upon the cardio vascular system. The combination of pitch black darkness and the inability to summon a guard for help triggered this survival reaction.

135. The deprivation of this identifiable human need would also become mutually enforcing and contribute to sleep deprivation.

**Cumulative Impact of Nine Fundamental Deprvations of Human Needs**

136.. When a person is denied or given minimal amounts of basic life necessities such as oxygen, water, food, basic hygiene, fresh air, sanitary clothing and feeling protected, the level of suffering exceeds the discomfort

inherent in detention and causes intense distress and hardship, sufficient to arouse in a person a feeling of being debased and humiliated. In the process, the physiological equilibrium of the human body is altered.

137. To get what the body lacks, it will feed off of itself more and more to survive. As the body feeds off of itself, it gets weaker. As we shall see, all of these basic necessities of life were denied for a full month. When this duration of time is allowed to pass, the body becomes both biologically and psychologically affected.

138. The deprivation of identifiable human needs discussed above has weakened the biological and psychological make-up of claimants and it has left them permanently damaged physically and deeply scarred mentally.

**Long Term Health Hazard - Fungus Known as Microtoxins**

139. On the third day, Hurricane Rita managed to do what correctional officers thought impossible. It entered the cells. Moisture slamming against the outer walls on the day of the hurricane's arrival painstakingly made its way through miniscule openings and cracks in the porous bricks and mortar until it emerged on the interior side. Along with this moisture, Hurricane Rita brought an ever present passenger – a fungus

known as *microtoxins*.[18] Inmates had never seen the interior walls of this fortress like prison sweat with moisture before or since. In the corners and on the floor, where this moisture would collect, they soon found as well this slimy black mold.

140. Microtoxins were prominently discussed during coverage of Hurricane Katrina. This mold is a well documented health hazard. It sends its spores airborne to settle *and stay* in a person's lungs. Once it gets settled, be it on a floor or in a lung, it is almost impossible to dislodge.

141. In an extremely hot and stagnant area, this mold thrives. It immediately releases its harmful spores into the atmosphere. With casual contact, this mold can cause burning and watery eyes and a dry hacking cough. With prolonged exposure, the Center for Disease Control has advised that these molds can cause unique and rare heath conditions such as pulmonary hemorrhage or memory loss.

142. The only permanent way to get rid of this mold is to call in professionals with proper sanitary attire and throw out the concrete infested with this mold. Even bleach will not kill this mold.

---

[18] This term has been spelled *myrcrotoxins* and as *mycotoxins*. Regardless of its spelling, we are referring to a slimy black mold widely transported by Hurricanes Katrina and Rita.

143. Claimants had to learn – and did learn – to live with this black mold. Every claimant has long term exposure to the spores of this black mold, compromising their lungs and their respiratory health.

## Lockdown Continues despite Storm's Passage

144. When Plaintiffs were locked in their cells on September 24th, they expected it to be for the duration of the hurricane. By September 25th, the hurricane had passed, but they remained locked in their airtight cells.

145. Just being in a lockdown, without any of the other deprivations mentioned, constitutes a punishment. They are denied the ability to exercise. Without exercise, muscle atrophy sets in. This confinement would continue through these three days and for many more to follow. This mental and physical anguish had to be endured one day at a time with no idea when it would end. Just not knowing *when it would end* was a large source of stress.

## Revisiting Wisdom of Refusing to Evacuate

146. Pursuant to 18 U.S.C. § 4042 (a)(2), Defendant has a duty to provide *suitable quarters* for Plaintiffs. Under no stretch of any imagination can the quarters maintained for the last three days be termed *suitable*.

147. By September 25th and 26th, it was abundantly obvious that the Beaumont Penitentiary was in a free fall heading for a total meltdown. The weather forecast for the next two days was a continuation of the last three

days, calling for temperatures near or over 100 degrees. Upon discovering the reality and futility of riding out a hurricane in personal and humiliating terms, and given the catastrophic state of affairs inside these prisons walls, Defendants' agents could have revisited the wisdom of their decision not to evacuate and called for help. Instead, they chose to follow their rodeo cowboy analogy and continued to *ride it out*.

148. The city of Beaumont was declared a disaster area and it was being totally evacuated. Services from area businesses were not available.

149. In refusing to reconsider their decision to evacuate this prison, Defendants' agents demonstrated obduracy (i.e. doggedness) and wantonness (i.e. callousness) which together, equaled to a reckless disregard for right and wrong and for the consequences flowing from their decision.[19]

### September 28th, 29th and 30th , 2005

150. The heat wave continued through September 28th and 29th, than broke on the 30th with temperatures falling to the 80's. Prolonged exposure to intense heat significantly raises the risk of a heat stroke, which can be fatal. Under any yardstick employed, five days of above 100 degree temperatures inside oven-like cells qualifies as prolonged heat exposure.

---

[19] *See* Whitley v. Albers, 475 U.S. 312, 319 (1986).

151. For these three days, there was no electricity, no air conditioning, no circulation of air, no means for pulling in fresh air and expelling stale air. For three more days, they had to breathe air already significantly depleted of oxygen while their bodies reacted to higher than normal levels of carbon dioxide and its accompanying headache.

152. For September 28th and 29th, claimants were subjected to prolonged exposure to extreme heat and the clear and present danger of a heat stroke. If a particular inmate's tolerance for heat was not equal to the demands of the moment, their chances of being rescued were nil.

153. For three more days, Plaintiffs remained confined in their cells 24 hours a day, forbidden to take showers, unable to change from their filthy clothes, deprived of clean bedding, deprived of basic hygiene items such as toilet paper, and living without any flushing toilet or any running water.

154. For three more days, there was just pitch black darkness once the sun went down, and it stayed pitch black until the sun rose. The emergency button also remained out of order for this entire time.

155. On the fifth day, Plaintiffs received a small plastic bottle of sanitary water. Given the perspiration that they were losing in this 100 degree and higher heat, this water replaced only the perspiration lost over several hours. For the remaining twenty plus hours of each day, they had to

hold their noses and continue to drink enough of contaminated water as necessary to avoid going into a cardiac arrest brought on by dehydration.

155.  So desperate were Plaintiffs for some kind of circulation by this point, they begged guards inside the penitentiary to open their tray slot where meals are normally handed to them. Even the little bit of air that could enter through this tray slot would have made a difference. The guards mostly refused all such requests. The reason given – it stank inside their cells.

156. So desperate were some Plaintiffs to escape the unbearable heat that at times and not by choice but through sheer desperation, they would lay on the filthy cell floor just to be in contact with its relative coolness.

157.  Plaintiffs continued to receive plastic bags for relieving themselves, one for feces and the other for urine. The suffocating odor of feces grew, permeating their air, clothes, bed sheets and afflicted them with a deeply embedded feeling of filth which seemingly reached the very pores of their body. Feces and urine were the only smells that they knew.

158.. Providing each inmate with two bags for human waste was analogous to creating five toilets inside this small space instead of one. Instead of odor rising from one source, it began rising from five sources.

159. Exposing human waste (feces and urine) to high temperatures will cause ammonia gas to be released into the air. Once airborne, this

ammonia gas enters through the respiratory tract (i.e. breathing). Taking in ammonia will cause irritation of the throat and mouth. Complaints about throat and mouth irritation were widespread throughout the inmate population.

160. Long term exposure to ammonia gas can lead to severe respiratory tract irritants and pulmonary edema, a potentially fatal accumulation of fluid in the lungs. The symptoms of pulmonary edema are tightness in the chest and difficulty in breathing. These difficulties were widely experienced. Due to this prolonged exposure to ammonia – which would continue for a month before it ended – every Plaintiff has a long term risk of contracting respiratory and lung disorders.

161. On the fourth day, claimants received their first food. This consisted of out-dated or spoiled items such as fungus filled cold cuts, moldy bread and cheese riddled with mold taken from nonfunctioning refrigerators. This was followed by military meals and peanut butter sandwiches, the latter provided by F.E.M.A. [Federal Emergency Management Agency].

162. Once supplies arrived from F.E.M.A., Plaintiffs were forced to eat peanut butter sandwiches and military meals, parts of which – such as the moldy bread – were already contaminated and not fit to be eaten. As a result,

Plaintiffs had to subsist upon a diet made up primarily of peanut butter. In the morning, at noon and at night, they were only given peanut butter.

163. Eating peanut butter brought constipation, which is a very painful condition but typically not hazardous to one's health. However, the pain from constipation coupled with an irregular heartbeat brought on by the high heat, blurred vision due to a lack of sleep, fatigue and faintness due to a lack of oxygen, headaches due to surplus carbon dioxide, difficulty in breathing, and the suffocating smell of human waste, all of which had to be endured at the same time, added unnecessarily to an already high level of discomfort.

## Oct. 1st to 7th, 2005

164. Termperatures on October 1st resembled September 30th. On October 2nd, 3rd, 4th, 5th and 6th, the unrelenting heat of the prior week returned. On all five days, the temperature inside each cell went over 100 degrees and hovered between 100 and 110 degrees. On October 7th, 2005, the heat spell broke and fell back to the 80's.

165. Claimants remained confined to cells 24 hours a day, 7 days a week for a second week in a row. There was no relief from oxygen depleted stale air, the overpowering stench from human waste, the airborne spores from the toxic fungus emitted by black mold, and from harmful airborne bacteria covering everything around them.

166. For a second consecutive week, there was no opportunity to get any exercise. There was no escape from this unrelenting filth.

167. On October 1st, claimant received a liter of sanitary water each day. Due to the unrelenting heat outside and the enhancement of hot air inside the cement and brick walls of the cell, this liter of water was inadequate to replenish sweat dripping off them continuously. Against every instinct and only to avoid perishing, they had to continue to hold their noses and drink the contaminated water brought to them.

168. With five toilets giving off ammonia gas, this toxic substance increased accordingly, and they could not get away from it.

169. Claimants were given no opportunity to shower, and they had to live without rudimentary hygiene, such as toilet paper and soap. Throughout this time, they continued to be deprived of medicines.

170. Throughout this period, they received only peanut butter sandwiches. Prison staff would open the sandwiches, scrape off the jelly and serve them just peanut butter. Claimants have no idea why this was done. Three times a day, this was all they received for food.

### Oct. 8th to Oct. 25th, 2005

171. On or about October 8th, 2005, they permitted claimant to come out of their cell to shower for very short periods of time. When

they turned on the showers, the water coming out had a brownish color and an offensive smell. This was the same water that had back-flushed into the main water pipeline from the sewer, and this raw sewage was now coming out of the shower head and getting dispersed upon claimants. Instantly, claimants moved away from these shower heads, feeling that instead of getting cleaner, they were getting dirtier.

172. After taking showers, claimants had to get back into the same filthy clothes worn the previous two weeks. No clean clothes were made available. This continued for another two weeks. After standing under a shower releasing water with contaminated sewage, they had to get back into the same filthy clothes worn since the Hurricane struck.

173. Immediately after taking showers in this dirty water, claimants began to get open wound sores, peeling skin with puss coming out and skin rashes, which itched and burned. Recurring boil infections the size of golf balls and eggs became common. Infections transmitted by the dirty water were coming out of the shower head, and these infections were entering the blood stream, where they could destroy or impair the blood's chemistry and alter biological functions of the body. Claimants asked staff for medication to fight these

infections. Guards would make a note of their cell, but they did not return with medicine. There was no medication to dispense.

174. These skin rashes began as soon as they could shower, and can be traced to contaminants coming out of showerheads. Ammonia in water acted as an acid, burning the skin. Once skin is injured by the acid reaction of ammonia present in urine, the exposed tissue is susceptible to the bacterial contact of feces and urine. These skin rashes were a product of: (1) a superficial burn caused by ammonia, (2) followed by an opening for bacteria to penetrate the body's immune system and begin an infection. Once infection enters the blood system, any number of illnesses can follow.

175. There was literally an epidemic of skin rashes, open sores and bleeding from cuts. This contaminated water carrying sewage continued to come out of the showerhead throughout this period of time. October 25th marks the date when electricity was restored. Plumbing became operational shortly after electricity was restored.

176. During this period of time, the prison installed a huge fan in every housing unit. This huge fan merely moved around the stale air. It did nothing to cure the real problem involving a lack of oxygen. It was still not possible to take in fresh air and push stale air out.

177. Also during this period of time, they relieved stress in some cells with three or more people by finally filling up the vacant cells.

178. In addition to constipation from eating peanut butter, difficult breathing, stale air, headaches, extreme stench from human waste, blurred vision from an inability to sleep and an irregular heart beat brought on by dehydration, they had one more matter to endure, the itching, burning and upsetting appearance of a skin rash and the fear as to whether or not this will be a permanent scarring of tissue.

179. It is a testament to the low immunity level of claimants and the toxicity of this water, that it caused open sores and a skin rash on mere contact.

180. For the entire duration of time from October 8th up to October 25th, there continued to be no air conditioning, no electricity, and no circulating air. Aside from 20 or so minutes that they were allowed to take showers, claimants remained locked in their cells.

181. For October 8th, 9th, 10th, and 11th, the weather dropped into the 70's, which means the heat inside these cells was probably in the 80's. The temperature rose into the 80's and stayed there for October 12th, 13th, 14th, 15th, 16th, 17th, 18th, 19th, 20th, 21st and 22nd. Throughout this period, the temperature in these cells was in the 90's, which is also

uncomfortable. For October 23rd, 24th and 25th, the temperature dropped back to the 70's and even into the 60's on October 25th.

182. So ill prepared was the prison staff for the loss of electricity, they could not return the power to the complex until the third attempt. These false starts attest to the fact that the staff never truly appraised the full depth of the problem posed by a loss of electricity and they never did any emergency roll playing or conducted any computer simulations to discover the difficulties that would be encountered.

183. For an entire month, claimants had to go without electricity, without air conditioning, without circulating air, without flushing toilets and without sufficient sanitary drinking water for replenishing the water leaving their bodies in the form of sweat. There were no meals, only peanut butter sandwiches. There was no ability to clean their clothes, clean their sheets or remove themselves from an overpowering stench caused by human waste.

### Post – October 25th, 2005 to Present

184. When claimants were at last allowed to call and write to their families, they were told that no one was worried about them because the day after the hurricane passed, a voice mail message assured them that occupants in the Penitentiary had been transferred to a safe facility. In addition to being

untrue, this served a deeper and more sinister purpose. Calming the only people that cared also enabled them to continue their course undetected.

185. The mental strain caused by this ordeal left indelible scars upon claimants that are instantly triggered by the smallest reminders. On a recent lockdown, guards circulated meals in a brown paper bag which included a squeeze-um tube of peanut butter issued during this time. The sight of this peanut butter caused them to break out in a sweat and in some cases, to actually breakdown and cry. If lights at night go out for a few seconds, there is instant panic and screaming, reacting to pitch black darkness.

186. The whole hurricane season is a time of stress. Hurricane tracking charts are taped to lockers. Many claimants wake up with nightmares about not being able to get water, and about drowning in handcuffs.

**Failure to Provide Appropriate Follow-Up Medical Care**

187. There are 24 chairs in the medical care unit located on this prison to accommodate about 1,800 prisoners that were subjected to this treatment. When inmates were finally allowed out of their cells, they were all seeking medical assistance and the limited on site facility was overwhelmed.

188. Instead of appreciating the ordeal that they had survived and calling in outside resources, the prison's management went the opposite

way. Up to this time, there was free medical care. The Warden imposed pay medical care, which meant that every inmate had to pay $3.00 before they could see a nurse. The given reason was to discourage frivolous medical visits. The switch from free medical to pay medical care at this critical time constitutes deliberate indifference. It is also obscene to color the needs of claimants as frivolous given their treatment and the ordeal they survived.

189. Upon information and belief, the true reason for instituting pay medical care was to conceal the physical damage inflicted by imposing a burden upon access to medical care that prison management knew, would cause some claimants to forego medical attention.

190. For inmates that did go to the medical care unit, the staff refused to take blood samples and perform a true diagnosis. Instead, they offered only over the counter and already available medicines to treat symptoms, and ignored the underlying causes.

191. Claimants complained of excruciating pain and swelling to the face. These symptoms were dismissed as spider bites and treated first with Tylenol, and then with an antibiotic. No diagnosis was made before prescribing an antibiotic. No doctor was called and no blood work was conducted. When blood work was finally done, the source of swelling in some cases was traced to the MRSA staph infection.

192. Claimants experienced swelling of the tongue, swelling of lips and of the eye socket. Any swelling of the head should receive immediate attention due to its close proximity to the brain. These infections could have been caused by non-potable water, or by touching their faces. Due to the shortage of medical personnel, many claimants were not treated and suffered excruciating pain until they finally called so much attention to themselves that guards demanded the attention of a nurse on their behalf.

193. Upon information and belief, there are numerous additional cases of MRSA staph infections which are a direct result of close proximity for a sustained period of time to inmates previously infected with this infection, as well as other infections existing at the time among quarantined inmates.

194. Nothing was done to remove the deadly fungus known as *microtoxins* from interior cells. Inmates used household cleaners such as Comet to remove the mold themselves without any safety apparel. This served one purpose, placing them in close and harmful contact.

**Obstructing Access to Courts**

195. One definition for malice consists of reckless disregard of the law or of a person's legal rights. [20]  Claimants are incarcerated and their world is defined by acts and just as tangibly, by omissions of prison staff.

---

[20] *See* Black's Law Dictionary, 8th Edition, online version, under "malice."

196. Probably 70% of the Penitentiary population lacks the education to find and pursue an administrative remedy following these events. But that still leaves 30% or about 550 inmates which can read and recognize that their legal rights have been violated.

197. The Form 95 for filing an administrative tort claim could only be found in one place, and that was the law library. Before an inmate could get to the law library, they needed permission. This was the first hurdle placed in their road. Burdens were imposed upon them for access to the law library.

198. One inside the law library, staff offered no help whatsoever in locating this form 95. Claimants had to be lucky enough to be there when another inmate with knowledge of this form could direct them to it.

199. When inmates somehow overcame these obstacles and obtained the form, prison staff held the form and refused to send it out.

200. While the library staff held the form, other forms of coercion were taken inside living quarters, calculated to get them to retrieve this tort form and decide against filing it. These tactics ranged from being taken off a good prison job and given an obnoxious job. Prison staff could also take them from a cell with people that could get along, and move them to a cell and a cell mate with an anger management problem. Prison staff also

engaged in shake-downs, where they invaded cells and left with legal papers as well as lockdowns, during which time they could not mail a letter.

201. As late as August of 2007, with only a month left before the two year statute of limitation would toll, less than one hundred inmates had successfully managed to gain access to the courts. The large number of claimants entering this lawsuit was only made possible once counsel was able to become involved and do these Form 95's for them.

202. The policy of discouraging inmates from pursuing legal claims has been continued by Justice Department attorneys. These attorneys are to perform a neutral and objective review to determine whether these claims have merit and, if they do have merit, to attempt a settlement. No such review has been conducted. Denial letters have all found these claims to be frivolous. Furthermore, these denial letters go further. They have been written in a clearly biased manner calculated to discourage claimants and cause them to drop their tort actions.

203. Once denial letters were issued and began circulating through the prison, the sacrifices made to pursue these claims no longer seemed worthwhile, given the attitude reflected in these denial decisions.

204. Counsel for claimant can also attest that the task of arranging an attorney client interview with an inmate was nearly impossible. Of

68

course, counsel's telephone carries the caller identifier of a law firm. Prison staff simply refused to answer the phone. Only persistence and dropping the caller-id enabled us to get an attorney-client visit.

**Physical Injuries Suffered**

205. *High Stress* - a portion of our brain called the hippocampus is responsible for memory. When this portion of the brain is subjected to large amounts of stress, a hormone called glucocorticiods acts almost as if a dam has burst and floods the bloodstream, impacting upon every cell in the body. Most importantly, the glucocorticiods hormone damages and impairs the memory storing function performed by the hippocampus portion of the brain.[21] Another stress hormone, norepinephrine (i.e. the so-called *fright*, *flight* or *fight* hormone) made by the adrenal cortex (i.e. another part of the brain distinct from the hippocampus) retains and frequently retrieves traumatic episodes. In this manner, the daily loading of enormous stress for a prolonged and uninterrupted period of time triggers these hormones, and there is direct physiological causation linking one hormone to memory loss, and the other hormone to nightmares and night-terrors (i.e. waking in the night seized with fear and trauma relating to a past event.) [22]

---

[21] This same damage to the hippocampus part of the brain is responsible for such neurological diseases as Alzheimer's and dementia.

[22] This is the same phenomenon encountered by soldiers after surviving battles.

206. *High Blood Pressure & Heart Damage* - not only did claimants experience stress, but it was an extreme form of stress linked to survival. This ordeal consisted of a lack of control over what was happening *and*, a fear of dying before this subsided. They could not influence the nature or extent of their ordeal and they were helpless to bring it to an end. This *kind* of stress would prompt the body to produce a large amount of Cortisol, the hormone that the body produces to cope with high stress linked to survival. A high level of Cortisol will elevate blood pressure and place stress upon the cardio vascular system (i.e. the heart). Sustained high levels of Cortisol can lead to cardiac arrest and death. All claimants were exposed to this special form of stress for a prolonged period time and, if cardiac arrest did not occur, damage to the heart definitely took place.

207. *Respiratory and Lung Disorders* - Claimants endured prolonged exposure to ammonia gas given off by urine and feces. Long term exposure to ammonia gas can lead to severe respiratory tract irritants and pulmonary edema, a potentially fatal accumulation of fluid in the lungs. The symptoms of pulmonary edema are tightness in the chest and difficulty in breathing. These difficulties were widely experienced. Due to this prolonged exposure to ammonia – which would continue for a month before it ended – every claimant has a long term risk of contracting respiratory and lung disorders.

208. *Heat Exhaustion and Heat Stroke* - For a five day period running from September 25th, 26th, 27th, 28th and 29th, and for a second five day period running from October 2nd, 3rd, 4th, 5th and 6th, the temperatures hovered in these cells between 100 and 110 degrees. This was continuous, non-stop unrelenting heat, unrelieved by any air circulation, no electricity and no air conditioning. It was trapped heat, which was continuously getting reheated by surrounding cement and brick walls. Throughout this period, claimants suffered from heat exhaustion and they were further exposed to an unacceptably high risk of heat stroke. If a heat stroke occurs, help must come immediately or they will die. Claimants had no way of summoning help. This is physically and mentally stressful. If claimant's tolerance for heat was not equal to the demands of the moment, his chances for survival were nil. Ten days feels like ten weeks when you endure this heat, further tormented by the thought that you have no control over this, and you are totally at the mercy of others as to when it will be over.

209. *Dehydration & Malnutrition* - In addition to heat stroke and high stress, dehydration was experienced. If you are dehydrated and you do not replenish the water that is lost, your body goes out of balance nutritionally. Lack of water will disturb the chemical composition of the body's electrolytes. The term *electrolyte* refers to a material that dissolves in

water to give a solution that conducts an electric current. All higher life forms require a subtle and complex electrolyte balance. The primary ions of electrolytes are sodium, potassium, calcium, magnesium, chloride, phosphate and hydrogen-carbonate. Muscle tissue and neurons are considered electric tissues of the body. Muscles and neurons are activated by electrolyte activity. In this manner, electrolytes are critical for nerve and muscle function. Lack of water due to dehydration will translate into too little potassium within the electrolyte. Serious electrolyte disturbances caused by dehydration for an extended period of time will lead to irregular heart activity and, from there, to neurological complications. If this is not promptly corrected with liquids, cardiac arrest and death will follow.

210. *Dehydration & Diarrhea* – Diarrhea will cause an even further disturbance among the electrolyte imbalance. Once again, diarrhea is causing excessive body fluids to be expelled. The combination of diarrhea coupled with excessive sweating for a prolonged period of time will accelerate dehydration and expedite death through cardiac arrest. Claimants were exposed to this risk and it is a miracle they did not have cardiac arrest.

211. *Harmful Airborne Fungi* - Respiratory problems can result from breathing and re-breathing the same air, even if it is clean, and this is particularly dangerous when there are high concentrations of harmful fungus

and bacteria in the air. Microtoxins, in the form of slimy black mold, give off spores and are a well documented hurricane health hazard. It sends its spores airborne to settle *and stay* in a person's lungs. Once it gets settled, be it on a cell floor or in a lung, it is very difficult to dislodge. Claimants were never given suitable supplies to combat this mold. In an extremely hot and stagnant area, this mold thrives. With prolonged exposure, the Center for Disease Control has advised that these molds can cause unique and rare heath conditions such as pulmonary hemorrhage or memory loss. Claimants are exposed to this well documented health hazard with long lasting effects.

212. *Blood Stream Infections* - Skin rashes are visible manifestations of an internal infection. Once infection penetrates the skin and enters the blood stream, prompt medical attention is necessary to neutralize this infection. From October 8th to October 25th, 2005, the supply of medicine was not just inadequate, it was non-existent to address the widespread outbreak of rashes. To this day, claimants that are still afflicted with a rash, which is now well advanced and spreading over a large part of their body.

213. *Sleep Deprivation* will severely impair the human body's ability to metabolize glucose, which can lead to early-stage Diabetes Type 2. Lack of sleep will also cause blurred vision, impaired motor skills and irritability. All of these physical and behavior impairments were widely experienced.

214. *E Coli and Salmonella Poisoning* – In unsanitary water, there was exposure to E. Coli, which can cause diarrhea. Salmonella poisoning can also cause diarrhea, along with nausea, vomiting and chills accompanied by fever. When discovery commences, and we are able to analyze exactly what was in water which claimants had to drink, we believe additional health hazards will become known and those additional health hazards are hereby incorporated as if they were written and inserted here.

215. *Muscle Atrophy* - when a muscle is not used, the process of atrophy – the wasting away of a body part – begins to occur, resulting in a loss of muscle mass and strength. While this process can be reversed, recovery is never more than 85% of original mass and strength. If a person is not prone to vigorously restoring lost muscle, the recovery is lower. This occurred due to the long time in lockdown with no opportunity to exercise.

216. *Pre-existing Chronic Conditions* - There was no medicine for people with pre-existing chronic conditions such as asthma, diabetes and AIDS. If a diabetic cannot get insulin, sugar goes out of control and damage is inflicted on the kidney and liver. In this manner, lack of medicine for any chronic illness will take a toll on internal organs affected.

217. *Constipation* was encountered due to a diet that consisted only of peanut butter. Constipation is very painful.

218. *Hunger Pains* - Going 3 days without food causes hunger pains and raises anxiety about not being fed. Hunger pains are very painful.

219. *Experiencing Physical Impairments Simultaneously* – These conditions occurred simultaneously. The same time claimant was experiencing oppressive heat, they experienced hunger pains, dehydration, difficulty in breathing, headaches due to excess carbon dioxide, blurred vision, nausea and vomiting due to harmful bacteria in the water and air.

**Mental Damages**

220. *Post Traumatic Stress Disorder* occurs when a person is exposed to severe and extensive stress and traumatic incidents. Given the length of this ordeal, the damage done by two hormones in the brain (i.e. the glucocorticiods hormone and norepinephrine hormone), claimants were exposed to conditions where the post traumatic stress disorder is not just possible but probable. The heat, stench and darkness coupled with the certain knowledge that if they need help, no help would be forthcoming, is enough to take all but the hardiest over the edge and make them mentally scarred for life. This illness is very difficult to conquer and requires both psychiatric care and prescription drugs for the rest of their life.

221. *Suicidal Tendencies* - It is now well documented, in studies triggered by Hurricane Katrina, that suicidal thoughts and suicide deaths rise

dramatically among people that have been subjected to a hurricane. Suicidal thoughts are just the natural outgrowth of a post traumatic stress disorder.

222. *Abandonment - Depression* issues are a logical occurrence due to this kind of ordeal. Just as in Pavlovian conditioning (i.e. holding a desired food in front of a dog will *always* make them salivate), the fear of being abandoned will always trigger a low self esteem and unworthiness to be loved. Once this injury is inflicted, a heavy burden is imposed upon care givers to combat these forces and typically leads to depression.

223. *Insomnia* – claimants do not want to go to sleep because they are afraid that they will not wake up.

224. *Dehydration causing Delusions.* Lack of water can cause a person to become delusional. From this stage, they go into a coma. From a coma, they die unless they are rescued. Prolonged dehydration is severe for a healthy person and life threatening to anyone that is not in excellent physical condition. Claimants were all exposed to the risk of a coma.

## Claim 1 – Negligence

225. The elements of negligence include: (1) Plaintiff must show that Defendant owed them a duty of care; (2) the Defendant breached that duty of care; (3) Plaintiffs suffered damages and (4) Defendants' breach was the proximate cause of Plaintiffs' damages.

226. The existence of a duty is question of law to be decided from facts surrounding the occurrence. Pursuant to 18 U.S.C. § 4042 (a)(2), titled *Duties of Bureau of Prisons*, Defendant has a duty to provide *suitable quarters*, and provide for *the safekeeping, care and subsistence* of all persons held in custody by the Federal Bureau of Prisons. The resolution of this issue (i.e. the existence of a duty) is resolved in Plaintiff's favor. This is a case where a duty has been established by operation of law. Furthermore, this duty overrules any lesser duty imposed by state or local laws.

227. Confronted with an Act of God, Defendant was presented with a fixed and readily ascertainable standard of conduct defined by Jefferson County Judge Carl Griffith, the Texas Governor and the Federal Emergency Management Agency, ordering a *mandatory* evacuation. It is a testament to the legitimacy of this ascertainable standard of conduct – and its application to Defendant's Agents – that the State of Texas evacuated ten prisons, including four prisons in Beaumont, and three of the four federal prisons were evacuated either before the storm arrived or during the week following the storm. If a prison was not evacuated, an equally fixed and readily ascertainable standard of conduct existed in the list of essential supplies to be stocked for surviving a hurricane's destruction.

228. The common law recognizes a duty to take affirmative action to control or avoid increasing danger to others in harm's way when the actor has created, in part or in whole, this danger.[23] Defendant was under a duty to evacuate the Beaumont Penitentiary. When Defendant opted against evacuation, every claimant was placed in harm's way solely because of this decision. Deciding against evacuation placed Defendant under an affirmative duty to stock sufficient supplies for handling the aftermath of a hurricane.

229. Upon opting against evacuation with full knowledge that sufficient supplies for surviving a hurricane were not stocked, this fixed and readily ascertainable standard of conduct was breached and the likelihood of danger increased. In the process, Defendant's duty of care was breached.

230. If actions of one actor create a life-threatening risk to another, the duty to take reasonable steps to alleviate risk is enhanced, particularly when the consequences of inaction are well known. Under facts unique to this case, saturation media coverage of Hurricane Katrina made everyone – and we emphasize *everyone* – aware of consequences flowing from inaction. The damages inflicted were both foreseeable and avoidable.

---

[23] *See* Pinkerton's v. Manriquez, 964 S.W. 2d 39, 50 (Tex. App.  1997) "If circumstances are such that a person of ordinary common sense would recognize that if he did not exercise reasonable care in his conduct with regard to those circumstances, his acts would place another person in danger, the duty to use ordinary care to avoid such danger arises."

231. Claimants experienced and suffered life threatening harm and life threatening hardships. All claimants were subjected to the life threatening risk posed by a Category 3 hurricane. Plaintiffs were exposed to the danger that a piece of torn roof from the Medium prison or any other similarly hard metal debris could become a missile capable of piercing a Penitentiary window and killing all occupants in the area. Claimants were exposed to the traumatizing spectacle of the full destructive fury of a Category 3 hurricane while struggling to breathe in an oxygen depleted environment. These life threatening damages and hardships were both foreseeable and avoidable.

232. Decision making causation runs directly from claimant hardships to Defendant's failure to follow a fixed and readily ascertainable standard of conduct established and followed by *all* similarly situated parties. These life threatening harms can be laid upon one doorstep, and that doorstep belongs to Defendant, which must take responsibility for its own misconduct.

233. Defendant's breach is the *exclusive* cause as well as the proximate cause for life threatening harms visited upon claimants. Plaintiffs were locked in cells with no latitude to diminish their exposure to harm.

234. As a result, Defendant was negligent. Defendant breached the duty of care which it owed to Claimants as a matter of law. The harm

inflicted upon claimants was foreseeable and avoidable. Claimants suffered injuries. Defendants' breach is the proximate cause of these injuries.

## Claim 2 – Reckless Disregard for Welfare / Deliberate Indifference

235. The torts *reckless disregard for the welfare of another* and *deliberate indifference* overlap one another. Because of this commonality, both types of torts are considered together as one claim.

236. The definition of *reckless disregard for the welfare of another* in Texas exceeds negligence and requires such want of care as to equate to gross negligence. In proving this claim, there is no requirement to prove any mental state of the person whose acts or omissions are subject to the claim. Reckless disregard for one's welfare can be proven externally by acts and omissions and the readily foreseeable consequences flowing from those acts and omissions, leading up to and occurring at the time of the incident.[24]

237. *Deliberate indifference* is invoked to describe systemic deficiencies and can also be proven through external evidence either through an established pattern or by systemic deficiencies which make widespread

---

[24] *See* Rice v. Schiller, 241 S.W. 2nd 330, 338 (Tex. App. 1951) "reckless disregard of the rights of others does not depend upon the actual mental state of the person whose acts or omissions are complained of, but is determined externally by his acts and conduct and the facts and circumstances in evidence before you leading up to and at the time of the accident in question." This authority has been overruled on another, unrelated matter. The point of law referenced herein has been cited and reaffirmed on several occasions.

suffering inevitable.[25] Like reckless disregard for another's welfare, deliberate indifference requires conduct more blameworthy than negligence.

238. Three days after Hurricane Rita's arrival and fully appreciating its desperate state of affairs, Defendant could have reconsidered the wisdom of its decision not to evacuate and, just as another warden did for occupants of the Medium prison, reverse its course and evacuate the Penitentiary.

239. Reckless disregard for another's welfare can be inferred by these external factors;

> (1) the act of holding claimants in an unventilated and non-airconditioned cell notwithstanding an unrelenting heat wave showing no sign of ending with the forecast for the fourth and fifth day promising more of the 100 degree heat experienced in the first three days;

> (2) the overt acts of telling inmates the water was not drinkable but passing it around anyway, knowing full well that it would be drunk due to the rapid dehydrating occurring, while efforts to secure sanitary water were unsuccessful;

> (3) their inability to restore essential basic services such as electricity and plumbing with full knowledge that running a prison without electricity and plumbing is unthinkable;

> (4) the act of permitting claimants to take showers after raw sewage back-flowed into the main water line, causing sewage contaminated water to come out of showerheads;

> (5) the act of switching from free medical care to pay medical care just as the need for medical care was overwhelming.

---

[25] *See* Ruiz v. Estelle, 503 F. Supp. 1265, 1329 (D.C. Tex. 1980)

240. The adverse consequences flowing from a decision not to evacuate were foreseeable prior to and at the time this decision was made.

241. Deliberate indifference arises from these systemic deficiencies;

(1) the deficiency of using plastic bags to hold drinkable water that is punctured with holes instead of plastic bags suitable for holding water through an emergency;

(2) the act of compelling chronic care inmates and, in particular, inmates with severely weakened immune systems due to the AIDS disease to endure conditions that would challenge and overcome even the healthiest of immune systems; and

(3) the act of placing quarantined inmates with contagious and MRSA staph infections in close proximity and for an extended period of time with unaffected inmates;

(4) the deficiency of making claimants put back on the same filthy clothes worn before taking a shower; and

(5) the deficiency of failing to get bedding washed off premises, thereby making them get into a dirty bed with no respite from the overwhelming and the oppressive presence of filth.

242. These acts and deficiencies affirm a culture of neglect. It was inevitable that these acts and omissions would lead to widespread suffering.

243. Adverse consequences flowing from these widespread systemic deficiencies are severe enough to be characterized as deliberate indifference.

244. By choosing to stay its course, despite chaos and suffering inside the prison and an equally chaotic situation afflicting the entire Beaumont community, Defendant's decision-making demonstrated the glaring, flagrant

want of care indicative of gross negligence and qualifies as both a reckless disregard for claimants' welfare as well as widespread systemic deficiencies severe enough to be characterized as deliberate indifference.

### Claim 3 – Intentional Infliction of Emotional Distress

245. To make out a claim of Intentional Infliction of Emotional Distress under Texas law,  plaintiffs must show (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. [26]

246. *Extreme and outrageous conduct* is defined by Texas caselaw as "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." [27] In Texas, this tort exists for the limited purpose of allowing recovery in rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress.

247. Giving out plastic bags for feces and urine, making claimants use plastic bags as substitutes for a toilet, compelling them to live in a 12 by 7 foot cell with at least one other person and in some cases more than two

---

[26] *See* Hoffman – La Roche, Inc. v. Zeltwanger, 144 S.W. 3rd 438, 445 (Tex. 2004)
[27] *See* Hoffman – La Roche, Inc. v. Zeltwanger, 144 S.W. 3rd 438, 445 - 446 (Tex. 2004)

people, forcing them to breathe non-stop the noxious fumes of human waste 24 hours a day, 7 days a week for a month, smelling these noxious odors on their clothes, in their bedding, on their pillow and giving them no opportunity to escape this putrid, nauseating air qualifies as outrageous and extreme to such a degree as to be intolerable to a civilized society.

248. The condition created by bags of human waste was so repugnant, guards were reluctant to enter housing units. Once exposed to this stench, guards could only endure it for limited amounts of time. As a result, bags of human waste remained inside cells for protracted periods of time and, when taken away, in some cases, guards left these bags in the hall outside the cell.

249. Defendant did nothing to mitigate this foul and demoralizing odor in cells. Claimants were never given clean clothes or clean bedding. They were left to wear the same odor infested clothes and sleep upon the same odor infested bedding without any relief from this nauseating odor.

250. To smell vapors of human waste all day and all night is to ingest it orally by taking it into one's lungs through breathing and by tasting it through the mouth. The very idea of ingesting human waste is inhumane.

251. Common sense and everyday experience informs us that this conduct is outrageous, atrocious and far exceeds all possible bounds of decency. The distress suffered is both unusual in character and extreme in

degree. It is unusual in character to be inundated with the presence of human waste and to be forced to breathe and inhale it, and to involuntarily ingest it. It is extreme in degree to allow this condition to persist for a month.

252. Every minute of every day and night was occupied with thoughts of urine and feces. In practical terms, each claimant dwelled in a toilet and they were helpless to get out *for a month*. Claimants endured severe humiliation of the kind that would acutely eviscerate feelings of self worth. Their senses were continually assaulted by the most disgusting kind of filth.

253. All elements for Intentional Infliction of Severe Emotional Distress can be proven by Claimants. It is undeniable that Defendants acted intentionally and recklessly. Defendants' conduct was extreme and outrageous. Defendants' actions caused claimants to suffer emotional distress and this distress was severe. Although not an element to this tort, it is further true that claimants had no opportunity to mitigate their discomfort.

**Claim 4 – Cruel and Unusual Punishment (as a Constitutional Tort)**

254. Routine discomfort is part of the penalty that criminal offenders pay for committing crimes. Only those deprivations denying "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation." It is *obduracy and wantonness,*

*not inadvertence or error in good faith* that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause …" [28]

255. From day three (i.e. September 27th) and forward, Defendants' decision to remain in Beaumont notwithstanding its non-functional state, reflected obduracy and wantonness, not inadvertence or error in good faith.

256. From September 27 to October 25, 2005, claimants were either impaired or denied eight identifiable necessities of life: (1) extreme heat coupled with inadequate water for replacing sweat challenging the body's ability to maintain a temperature of 98.6 degrees; (2) denial of sanitary and drinkable water; (3) denial of oxygen coupled with excess carbon-dioxide; (4) denial of proper nutrition due to eating only one food, peanut butter; (5) denial of functional plumbing for washing hands and disposing of human waste; (6) denial and impairment of sleep; (7) denial of sanitation, clean clothes, laundered bedding and lack of basic hygiene items such as toilet paper; and (8) denial of security and feeling protected from sundown to sunrise. Chronic care claimants were denied a ninth necessity, essential medicines for keeping chronic illnesses in check.

257. Each deprivation or impairment constitutes a violation of the 8th Amendment's prohibition against cruel and unusual punishments. Each

---

[28] Wilson v. Seiter, 501 U.S. 294, 298 – 299 (1991) [Emphasis in original text.]

deprivation and impairment was mutually reinforcing, adding increments of physical pain, suffering and mental anguish to one another, collectively imposing an elevated level of pain, suffering and mental anguish which exceeded any of its constituent parts.

258. The sum total of all of these deprivations and impairments amounted to nothing less than torture, and this torture was visited upon inmates which were compliant and orderly at all times referenced herein.

259. None of these deprivations and impairments furthered any legitimate penological objective or purpose.

260. All of this pain, suffering and mental anguish was unnecessary. A similar fate was avoided for thousands of nearby state and federal inmates.

261. Defendant violated the 8th Amendment's prohibition against cruel and unusual punishments by imposing hardships going to the brink and beyond what a person can endure, with no good cause for doing so. Furthermore, these hardships were arbitrarily imposed, because there was no violence, no challenge to authority, no provocation of any kind. Imposing hardships upon compliant inmates constitutes an arbitrary use of authority.

### Claim 5 – Malfeasance, Misfeasance and Nonfeasance

262. Malfeasance, misfeasance and nonfeasance – also referred to as *wanton misconduct* – has roots in ancient common law and addresses acts

and non-acts by public officials. Today, these offenses are a species of tort,
[29] and lie for the breach of duties imposed as a matter of public policy.

263. *Malfeasance* occurs when a public official violates the public trust by exercising authority in a wrongful manner. *Misfeasance* occurs when a lawful act is done in an unlawful matter. *Nonfeasance* occurs if an act they are obligated to do is not done.

**Failure to Render and Diagnose Medical Care**

264.  "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being.... The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs- *e.g.,* food, clothing, shelter, medical care, and reasonable safety-it transgresses the substantive limits on state action set by the Eighth Amendment...." [30]

265. When electricity was finally restored and the lockdown was lifted, claimants were all badly in need of medical attention. Swollen tongues, skin

---

[29] Continental Casualty v. County of Chester, 244 F. Supp. 2d 403, 410 (E.D. Pa. 2003).
[30] Helling v. McKinney, 509 U.S. 25, 32 (1993) *quoting with approval* DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189 , 199-200 (1989).

rashes, puffed lips, swelling around the eye socket and on the side of the face were common sights. Defendant well knew what claimants had endured. This knowledge created a duty to render medical care to claimants.

266. Instead of rendering medical care, Defendant schemed and conspired to suppress and to place impediments in the way of providing medical care. These devices and conspiratorial strategies took several forms.

> (1) Previously, there were 24 chairs for 24 patients in the medical care unit. These chairs should have been increased due to an overwhelming need for medical care after Rita. Instead, the number of chairs and medical personnel stayed the same.

> (2) Previously, there was free medical care. At this critical time, Defendant ended free medical care and instituted pay medical care, requiring $3.00 before they could see a nurse. This fee was sure to inhibit some claimants from seeking medical care.

> (3) Many needy claimants were refused medical attention until their suffering became so egregious (i.e. outstanding for undesirable qualities), guards forced a nurse on duty to respond.

> (4) When treatment was given, it was without a diagnosis and consisted of Tylenol or a medicine that just happened to be on the shelf. As a result, there was no record of new medications ordered to address anything out of the ordinary.

267. On account of these practices, claimants were denied needed medical care while Defendant schemed and conspired to maintain the appearance of business as usual.

268. Depriving claimants of medical care served the purpose of masking and rendering invisible the physical scars from hardships which claimants suffered, and substituted in its place a false picture of normalcy.

269. The timing of the decision to begin pay medical care just when the inmates were most needy constitutes malfeasance. Making a transition from free to pay medical care for suppressing and masking physical maladies constitutes an improper exercise of authority, due to a fabricated absence of medical care, conjuring up a counterfeit picture of business as usual.

270. When damages occur because of a Defendant's decision-making, there is a further duty to mitigate those damages. By terminating free medical care and imposing the fee of $3, this overt act betrays a state of mind calculated to do damage control instead of addressing damages caused by their wrongdoing. This damage control consisted of the following:

(1) it turns away a certain segment of needy claimants;

(2) because this segment is not seeking out medical care, a false picture is created that medical care was not necessary; and

(3) from the factual premise that medical care was not requested, the inference appears to be proper that no harm occurred.

271. Through subtle and stealthy means, Defendant is downplaying the physical injuries caused by their decision-making and substituting in its place, a false picture of no harm and well-being. In this manner, authority

has been exercised to create false appearances instead mitigating damages caused by their acts. These overt acts and omissions, when viewed from this vantage point, constitute an outright admission of wrongdoing. If it were truly business as usual, there would be no reason to depart from free care.

272. When an inmate has a badly swollen tongue, enlarged lips or swelling around the eye socket, a medical visit is obviously not frivolous. Notwithstanding the apparent need for treatment, pleas for medical attention went unanswered. Defendant was obligated to provide medical care and by refusing to do so, this exercise of authority constitutes Nonfeasance.

273. When medical care is given, it should follow the medical protocol dictated by the training and ethics of the medical profession. By refusing to do a diagnosis and allowing months to pass before cases of MRSA staph infection become diagnosed, plus other contagious diseases to be uncovered in the course of discovery, Defendant was endangering lives of every inmate in close proximity to an infected person, as well as inmates in close proximity to those that are just exposed. The refusal to diagnose cases and to detect horrifying diseases constitutes Misfeasance. Medical care has been rendered in an improper way and in a potentially life threatening manner.

274. In letters issued by the Department of Justice, Bureau of Prisons legal staff, there is a standard boilerplate sentence which reads: "you have

failed to demonstrate that you suffered any physical injury in connection with your alleged emotional injury, a requirement under 28 U.S.C. § 1346 (b)(2). Based on the above findings, your claim is denied in its entirety."

275. Given this sweeping and conclusory finding, the engine driving the practice of masking and rendering physical injuries invisible, and which set in motion the schemes and conspiratorial strategies which in due course led to switching from free to pay medical care, to ignoring medical care, and to rendering medical care without a diagnosis, was to maintain deniability so that government attorneys could make this statement in a tort claim denial.

### Claim 6 – Malice through Denial of Access to Courts

276. Pursuant to 28 U.S.C. § 2401(b), any tort claim against the United States must first be presented in writing to the agency at fault within two years of the claim's accrual. The legal department of the agency is to render a neutral and objective review of the claim, concluding with an offer to settle or a denial. A claimant has six months to go to court if their claim is denied.

277. A U.S. District Court is denied jurisdiction over a claim unless and until the administrative agency has first been given a right to review and try to settle this claim. The U.S. District Court only acquires jurisdiction after a claim has been denied. Accordingly, access to courts for a federal tort claim requires submission of a letter or a Standard Form 95 to the agency first.

278. One definition for malice consists of the reckless disregard of the law or of a person's legal rights. [31]

279. Since 1977, the Supreme Court has recognized an inmate's right to have access to courts and the obligation of prison staff to provide tools for challenging their sentences and conditions of confinement. Prison officials are not required to file any such claims, but simply to make it possible for the inmate to pursue such a claim. [32]

280. At minimum, Defendant was required to have an attendant at the Law Library in the Penitentiary whose job description included distribution of the Form 95 for initiating a tort claim.

281. The Penitentiary's law librarian refused to offer any assistance in locating the Standard Form 95. By failing to provide the tools for initiating a claim, this omission to offer assistance violated claimants' access to courts.

282. In housing units, staff with authority over cellmate assignments became aware of the tort claim and, in some cases, claimants were asked to abandon their claim in exchange for keeping a compatible cell mate. In this manner and through other devices which could be carried out under the radar screen as housekeeping changes, claimants were encouraged to abandon claims. These threats posed an unnecessary impediment to access to court.

---

[31] *See* Black's Law Dictionary, 8th Edition, online version, under "malice."
[32] *See* Bounds v. Smith, 430 U.S. 817 (1977). *See also* Lewis v. Casey, 518 U.S. 343 (1996).

283. Denial letters have not been neutral and objective. Instead, the tone and clear purpose for writing each denial letter is to belittle this claim and urge them to abandon further litigation. Once a denial letter was issued, it would be shown around and discourage others from even trying.

284. All of these unnecessary and deliberate impediments reflect a disregard for claimants' legal rights and constitute the tort of malice.

285. As a result of these practices, hundreds of eligible claimants have been blocked from pursuing a remedy under the Federal Tort Claim Act.

### Claim 7 – Wrongful Death

286. The tort for wrongful death is similar in kind and in its elements to negligence, reckless disregard for another's welfare, intentional infliction of extreme emotional distress, cruel and unusual punishment and wanton misconduct. The only difference is the measure of damages. When tortious conduct has resulted in a death, the measure of damages is greater. Accordingly, paragraphs setting forth the factual allegations for these torts are hereby incorporated by reference as if fully printed here.

287. We are aware of two claimants that have died as a result of the wrongful conduct occurring at the Beaumont Prison. For these cases, the tort for wrongful death applies and the damages sought are significantly greater.

288. Plaintiffs request a trial before a Judge.

WHEREFORE, Plaintiffs request the following relief.

1. Issue an order adjudging and declaring the pre-requisites of the Federal Tort Claim Act and, in particular, that the requirement imposed by 28 U.S.C. § 1346 (b)(2) [i.e. the physiological basis for a mental disorder]  have been satisfied and further finding that Defendant is liable to claimants for damages.

2. Declare that Plaintiff has proven all of the elements for negligence and that Defendant has in fact been negligent toward claimants.

3. Declare that Plaintiff has proven all elements for reckless disregard for the welfare of another and / or deliberate indifference, and that Defendant has in fact been reckless and deliberately indifferent toward claimants.

4.  Declare that Plaintiff has proven all elements for intentional infliction of emotional distress and that Defendant has in fact intentionally inflicted emotional distress upon claimants.

5.  Declare that Plaintiff has proven all elements for proving the constitutional tort of cruel and unusual punishments and that Defendant has in fact arbitrarily and without good cause imposed cruel and unusual punishments upon claimants.

6.  Declare that Plaintiff has proven all elements for Malfeasance, Misfeasance  and Nonfeasance and that Defendant has in fact committed acts

and omissions which amount to Malfeasance, Misfeasance and Nonfeasance toward claimants.

7. Declare that Plaintiff has proven all elements for malice and that Defendant has in fact acted with malice toward claimants.

8. Declare that for all but two claimants, the measure of damages is $250,000 per claimant. Declare that for wrongful deaths, the measure of damages is $2,000,000 per claimant.

9. Find that counsel has taken this case on a contingency fee basis and is entitled to attorney fees as set forth in the Federal Tort Claim Act, up to but not exceeding 25% of the award granted to claimants.

10. A Trustee should be appointed to issue awards granted to claimants.

11. Claimants seek any other relief developed by the evidence and consistent with allegations pled herein, which is necessary, expedient or consequential to the relief herein requested.

Respectfully submitted;

/s/ Norman L. Sirak

_____

Norman L. Sirak
Ohio Reg.  OH0038058
D.C.  Bar  # 162669
4974 Higbee Ave.  – Suite 203
Canton, Ohio 44718
Phone (330) 493 – 7462
Fax (330) 493 – 7851
Email nsirak@parolereform.com

## Certificate of Service

Plaintiffs hereby affirm that a copy of this Amended Complaint has been mailed to the Attorney General at 950 Pennsylvania Ave. N.W., Washington, D.C. 20530 via certified mail [Receipt No. 7007 2680 0003 0006 5095, the United States Attorney through the Civil Process Clerk at 555 4th Street N.W., Washington, D.C. 70530 [Receipt No. 7007 2680 0003 0006 5101] and to the Federal Government Defendant, Federal Bureau of Prisons, 320 First Street N.W., Room 977 HOLC, Washington, D.C., 20534 Attn. Joyce Zoldak, Associate General Counsel [Receipt No. 7007 2680 0003 0006 5118], the 5th day of March, 2008.

/s/ Norman L. Sirak

_____

Norman L. Sirak

# EXHIBIT A

# 438 Clients

| | | | |
|---|---|---|---|
| William | Abbott | 10442-002 | Beaumont USP |
| Clifton | Adianshingh | 06314-088 | Allenwood |
| Billy | Aguero | 08466-059 | Beaumont |
| Ricardo | Aguilar-Mexicai | 09189-085 | Released |
| Donnie | Alexander | 59920-079 | Beaumont |
| Joe L. | Alvarado | 11079-081 | Beaumont USP |
| Daniel | Anderson | 11633-052 | Released |
| DeShawn | Andrews | 44998-079 | Beaumont USP |
| Andres | Aquiar | 37249-053 | Brooklyn MDC |
| Lionel W. | Armstrong | 37023-053 | Beaumont USP |
| William E. | Armstrong | 76018-011 | Beaumont USP |
| Marcus | Arnold | 11704-078 | Beaumont |
| Frederick | Asberry | 29141-077 | Beaumont USP |
| Omar | Avila | 21140-424 | Pollock USP |
| Jose Mendosa | Baena | 77382-079 | Beaumont USP |
| Mario R. | Baker | 03618-061 | Beaumont USP |
| Craig | Baldwin | 27003-034 | Beaumont USP |
| Arthur | Banks | 29253-034 | Beaumont USP |
| Willie Jermaine | Barnes | 07706-003 | Beaumont USP |
| Ricky | Battle | 33139-007 | Ottisville FCI |
| Lloyd | Battles | 15809-179 | Beaumont |
| Jose | Baza | 80363-011 | Beaumont |
| Lukel Anthony | Beckford | 26117-037 | Beaumont USP |
| Jason | Bell | 21876-057 | Beaumont Medium |
| Ron | Bembrey | 31292-177 | Beaumont USP |
| Gregory | Berry | 20993-039 | Released |
| Akim Jamal | Betsey | 12094-052 | Beaumont USP |
| Frankie Dean | Billings | 06145-078 | Beaumont USP |
| Danny | Bishop | 35696-180 | Beaumont USP |
| Christopher | Black | 95001-071 | Pollock USP |
| Grayling | Bolston | 55704-019 | USP Coleman |
| Antonio | Bouce | 11055-171 | Beaumont USP |
| Eladio L. | Bouza | 29645-198 | Beaumont USP |
| Reginald | Boxley | 71875-004 | USP Coleman |
| William Marcell | Boyce | 03336-088 | Beaumont USP |
| Phillip Michael | Brady | 14929-037 | Beaumont USP |
| Johnny | Brazile | 08439-062 | Beaumont USP |
| John Patrick | Brennick | 21203-038 | Beaumont USP |
| Paul | Brewer | 10227-078 | Beaumont FCI |
| Robert W. | Brewer | 79900-012 | Beaumont USP |
| Marion | Bridges | 40798-133 | Beaumont USP |
| Jeffrey | Briscoe | 11736-078 | Terre-Haute USP |
| L.C. | Brooks | 03553-095 | Pollock USP |
| Christopher M. | Brown | 10980-035 | Beaumont USP |

| | | | |
|---|---|---|---|
| Louis S. | Brown | 06478-043 | Beaumont USP |
| Richard D. | Brown | 11923-040 | Beaumont USP |
| Sean Deqince | Brown | 62260-079 | Beaumont USP |
| Omar Andre | Bulah | 85299-020 | Beaumont USP |
| John | Burton | 15696-058 | Beaumont FCI |
| Solomon T. | Burton | 04118-063 | Beaumont |
| Jessie L. | Cage | 22766-034 | Beaumont USP |
| Victor Hugo | Calderon-Miran | 11404-180 | Beaumont FCI |
| Anastacio | Cantu | 19200-179 | Beaumont |
| Richard | Caparella | 52564-004 | Beaumont USP |
| Matsuda N. | Carter | 13155-007 | Beaumont USP |
| Purvis Ray | Cartwright | 59478-079 | Cartwright USP |
| Genaro-Parez | Castillo | 58293-080 | Beaumont USP |
| Gregorio V. | Castro | 11261-179 | Beaumont Med FCI |
| Damon Anthony | Causey | 24328-034 | Beaumont USP |
| Fred Nimoy | Ceasar | 25408-179 | Beaumont USP |
| Ezequiel G. | Cervantes | 09671-079 | Beaumont USP |
| Ruben | Chapa-Ibarra S | 64530-080 | Beaumont USP |
| Jamison Shawn | Charles | 05020-078 | Beaumont USP |
| Donald | Chew | 13080-007 | Beaumont USP |
| Byron Shane | Chubbuck | 07909-051 | Beaumont USP |
| Donald | Churchill | 27879-177 | Beaumont |
| Thomas | Ciprano | 23148-034 | Beaumont USP |
| Mark A. | Clark | 26409-077 | Beaumont USP |
| Joseph | Colone | 09915-078 | Beaumont FCI |
| Walter | Compton | 73124-012 | Beaumont USP |
| Fredrick | Cooper | 20968-009 | Beaumont USP |
| Wendell Alboyd | Cornett | 04675-081 | Beaumont USP |
| Glen H. | Cotton | 29234-077 | Beaumont USP |
| Michael | Couran | 42666-018 | Coleman FCC |
| Darrell | Cribbenden | 98731-079 | Beaumont FCI |
| Robert | Crisostomo | 28997-180 | Beaumont USP |
| Richard | Cruz | 60692-079 | Beaumont |
| Rodolfo | Cuellar | 25755-077 | Beaumont USP |
| William | Daniels | 14748-056 | Beaumont USP |
| Thomas Shannon | Darr | 18389-077 | Beaumont FCI |
| Michael De Angelc | David | 24604-077 | Beaumont USP |
| Daniel | Davis | 14306-179 | Beaumont FCI |
| Robert T. | Day | 30797-177 | Beaumont USP |
| William | Dean | 56046-180 | Beaumont FCI |
| Garrett | Deetz | 43611-008 | Beaumont |
| Bernadino | Delgado | 28273-177 | Beaumont USP |
| Joseph | Deveau | 02996-049 | Beaumont USP |
| Russell V. | Dinovo | 19736-038 | Beaumont USP |

| | | | |
|---|---|---|---|
| Emile | Dixon | 06411-041 | Beaumont USP |
| Richard T. | Dorman | 13386-057 | Beaumont USP |
| Robert | Dorsey | 47454-066 | Pollack USP |
| Chris | Drew | 04511-112 | Beaumont |
| Calvin | Dyess | 03713-088 | Pollack USP |
| Darren | Edeker | 06015-017 | Beaumont USP |
| Samuel P. | Edmondson | 05102-010 | Beaumont USP |
| Brian | Edwards | 69122-079 | Beaumont USP |
| John E. | Edwards | 45100-079 | Beaumont USP |
| Mark | Edwards | 24328-077 | Beaumont LOW FCI |
| Sharkey | Elam | 99695-024 | Beaumont FCI |
| Michael | Ellison | 15256-180 | Three Rivers SCI |
| George | Escamilla | 54920-146 | Beaumont FCI |
| Juan P. | Esquivel | 33321-077 | Beaumont USP |
| Ricky | Estrada | 56534-180 | Beaumont FCI |
| Juan | Estrada Jr | 43539-080 | Beaumont USP |
| Darrell | Evans | 21232-039 | Big Sandy USP |
| Bilal | Farahkhan | 72541-079 | Beaumont FCI |
| Michael Dean | Faver | 04920-081 | Beaumont USP |
| Darron | Fields | 24511-077 | Beaumont USP |
| Maurice M. | Fife | 32191-007 | Fife Raleigh CCM |
| David Lee | Fisher | 55967-066 | Beaumont USP |
| Ronald | Fleming | 14586-076 | Beaumont USP |
| Bennie | Floyd | 11978-007 | Mccreary USP |
| Donnell Bartholo | Ford | 09934-424 | Beaumont USP |
| Charles Edwin | Fortes | 10190-158 | Beaumont USP |
| Steve | Foster | 90808-011 | Beaumont USP |
| Kenneth C. | Fragoso | 265-20079 | Beaumont USP |
| Orenthel J. | Francois | 10462-078 | Beaumont USP |
| Richard | Galicia | 07709-097 | Beaumont USP |
| Everildo | Garcia | 40677-018 | Beaumont USP |
| Gabrial | Garcia | 15130-180 | Beaumont |
| Rico Wayne | Garcia | 99521-011 | Beaumont Usp |
| Sammy | Garcia | 49058-180 | Beaumont Usp |
| John B. | Gary | 96921-071 | Lee USP |
| Asencion | Garza | 56840-079 | Beaumont USP |
| Charles E. | Gibson | 26166-016 | Released |
| David A. | Gish | 44530-179 | Beaumont USp |
| Darrell | Gittenden | 98731-079 | Beaumont FCI |
| Jaime N. | Gomez | 48323-054 | Beaumont USP |
| Luis | Gonzalez | 04434-078 | Beaumont USP |
| Nelson | Gonzalez | 03792-131 | Beaumont USP |
| Arandal | Goodley | 76598-080 | Beaumont USP |
| James Earl | Goolsby | 21248-009 | Beaumont USP |

| | | | |
|---|---|---|---|
| Donnell | Graves | 79208-079 | Beaumont FCI |
| Henry L. | Green | 09949-035 | Beaumont USP |
| Johnny | Green | 79344-079 | Beaumont USP |
| Curtis | Greer | 20313-179 | Beaumont |
| Nakai | Gregory | 48686-008 | Beaumont USP |
| Richard | Griego | 08906-081 | Beaumont USP |
| Michael | Grigg | 05832-085 | Sheridan FCI |
| Jaime | Guerrero | 79072-079 | Beaumont |
| Brian | Hardwick | 03330-089 | Beaumont USP |
| Curtis | Hardy | 01102-043 | Memphis FCI |
| Ronnie | Harris | 66413-079 | Beaumont FCI |
| George | Harrison | 20467-016 | Pollack USP |
| Willie Henry | Harrison | 79293-079 | Beaumont USP |
| Malcolm | Hartzog | 02391-043 | Beaumont USP |
| Earl Ellis | Hawkins | 25412-077 | Beaumont |
| Enrico D. | Hawkins | 50530-019 | Pollack USP |
| Edgar Lee | Hayes | 34618-118 | Beaumont USP |
| Brandon | Henderson | 3254078 | Beaumont FCI |
| Cedric | Henderson | 56390-080 | Beaumont |
| Marvin | Hendricks Jr | 04886-196 | Phoenix CCM |
| Johnny D. | Hensley | 87864-012 | Beaumont USP |
| James | Herbert | 04134-078 | Beaumont USP |
| Jason | Hernandez | 07031-078 | Beaumont USP |
| Julio Cesar | Hernandez-Pin | 82937-079 | Beaumont FCI |
| Juan | Herrera | 95092-080 | Beaumont USP |
| Larry E. | Herrera | 99686-111 | Beaumont USP |
| Rafael A. | Herrera | 21027-077 | Beaumont |
| Donovan | Hickman | 05891-043 | FCC Forest City |
| Curley B. | Hicks | 97752-079 | Beaumont USP |
| Jerry Joesph | Higdon | 11167-002 | Beaumont USP |
| Michael L. | Hill | 27023-177 | Beaumont USP |
| Robert | Hill | 04084-180 | San Antonio CCM |
| Lonnie | Hines | 42618-080 | 3214 Shawn Marie San Antonio |
| Richard | Hodges | 29736-177 | Beaumont USP |
| Kipley J. | Holbrook | 17714-047 | Pekin FCI |
| Willie | Holloway | 03667-180 | Beaumont FCI |
| Michael | Holmes | 07030-078 | Beaumont USP |
| Leon | Holt | 11022-007 | Beaumont USP |
| Raynard H. | Hopkins | 14079-064 | Beaumont USP |
| Christopher | Hopson | 21763-051 | Beaumont USP |
| Harold | Howard | 13349-007 | Beaumont USP |
| Inocencio | Huerta | 44518-079 | Houston CCM |
| Vincent | Humphrey | 06307-097 | Victorville USP |
| Ernest G. | Humphries | 21395-057 | Williamsburg FCI |

| | | | |
|---|---|---|---|
| Clarence | Hunter | 04094-180 | Beaumont USP |
| Charles H. | Jackson | 01125-112 | Pollack USP |
| David Lee | Jackson | 13567-039 | Terre-Haute USP |
| Donald | Jackson | 25664-077 | Beaumont USP |
| Harold | Jackson | 06811-424 | Lewisburg USP |
| Joseph | Jackson | 33186-007 | Beaumont USP |
| Michael | Jackson | 15083-064 | Springfield USMCFP |
| Odis | Jackson | 15806-179 | Beaumont |
| Steven | Jackson | 06274-156 | Beaumont USP |
| Tyronne | Jackson | 10332-078 | Beaumont |
| Travis | Jacobs | 15648-064 | |
| Anthony | James | 56700-097 | Beaumont USP |
| Cleveland A. | James | 49320-004 | Beaumont USP |
| Herbert | James | 04134-078 | Beaumont USP |
| Allen | Jett | 32325-037 | Beaumont USP |
| Burton Little | John | 15696-058 | Beaumont FCI |
| Bernard | Johnson | 22000-016 | Beaumont USP |
| Perry | Johnson | 33609-018 | Beaumont USP |
| Shaheem | Johnson | 19138-057 | Beaumont USP |
| Stanley J. | Johnson | 98687-131 | Beaumont USP |
| Samual L. | johnson | 10097-180 | Beaumont USP |
| Benjamin | Jones | 52366-066 | Beaumont USP |
| Charles Gregory | Jones | 19935-039 | Beaumont USP |
| Leonard T. | Jones | 09022-014 | Beaumont USP |
| Odell | Jones Jr. | 95923-071 | Beaumont |
| Donnell | Joseph | 01534-112 | Canaan USP |
| Anthony G. | Joyner | 18548-050 | Beaumont USP |
| Matsukata | Keeling | 27964-034 | Beaumont |
| Joe L. | Kelly | 21350-009 | Beaumont USP |
| Henry G | Laffoon | 32074-177 | Beaumont USP |
| Kerry D. | Laury | 24149-077 | Beaumont |
| Curtis J. | LaVallie | 08424-059 | Minneapolis CCM |
| Greg C. | Laxey | 09953-078 | Beaumont |
| Rogge | Leslie | 13915-004 | Beaumont FCI |
| Jorge | Levario | 03942-051 | Beaumont FCI |
| Marcus J | Lewis | 54567-083 | Otisville FCI |
| Steven Curtis | Lewis | 03801-078 | Beaumont FCI |
| Curtis | Lindsey | 72793-079 | Beaumont |
| John | Lockett | 75159-079 | Beaumont |
| Oscar | Longoria | 14563-424 | Beaumont |
| Gary | Lott | 14256-064 | Beaumont USP |
| Wallace | Love | 13239-026 | Atwater USP |
| Anthony J. | Lucas | 30893-013 | Released |
| Dolandon V. | Mack | 23050-009 | Beaumont USP |

| | | | |
|---|---|---|---|
| Nadir M. | Mahdi | 56528-066 | Pollack USP |
| Michael A. | Mahone | 04430-036 | Beaumont USP |
| David | Marquez | 10895-097 | Beaumont USP |
| Ameein R. | Martin | 70881-004 | Beaumont USP |
| Noel R. | Martin | 39461-180 | Released |
| Adam E. | Martin | 39706-180 | Beaumont USP |
| David | Martinez | 45066-079 | Beaumont FCI |
| James D. | Martinez | 30493-037 | Beaumont USP |
| Oscar | Martinez | 26438-179 | Beaumont |
| Robert B | Martinez | 27063-051 | Beaumont USP |
| Steven | Martinez | 45757-019 | Hazelton USP |
| Michael Dean | Mason | 02027-078 | Beaumont USP |
| Bryan | Maxwell | 50539-079 | Big Sandy USP |
| Ray | McAllister | 28856-180 | Beaumont |
| Steven | Mcclarty | 81028-008 | Beaumont USP |
| David | McClurre | 24642-079 | Beaumont USP |
| William | McCoy | 08220-056 | Beaumont |
| Sirus | MCDaniel | | Released |
| David C. | McDonald | 04950-033 | Released |
| Kevin | McDonald | 96795-011 | Beaumont USP |
| Donte T. | McFarland | 18900-112 | Pollack USP |
| Terryonto | McGrier | 02469-087 | Atwater USP |
| Calvin | McIntosh | 26855-177 | Beaumont USP |
| Baena Jose | Mendoza | 77382-079 | Beaumont |
| Willliam | Mercer | 15996-016 | Pollack USP |
| Jon Wesley | Merritt | 05800-017 | Beaumont USP |
| Randall | Midkiff | 23193-016 | Manchester FCI |
| Gregory L. | Miles | 22717-077 | Beaumont USP |
| Anthony | Miller | 33648-048 | Beaumont Med FCI |
| Bernard | Montgomery | 53653-146 | Beaumont USP |
| Charles | Montgomery | 25433-018 | Beaumont |
| Edward | Moore | 19707-056 | Beaumont USP |
| Jimmy T | Moore | 11761-042 | Deceased |
| Vega Aljandro | Morales | 14368-179 | Beaumont FCI |
| Luis | Moreno | 71492-079 | Beaumont USP |
| Omar | Moreno | 69786-080 | Pollock USP |
| Brian J. | Moroney | 23901-038 | Beaumont |
| Anthony W. | Morris | 03060-031 | Beaumont USP |
| Carl | Morrisset | 05945-003 | Beaumont USP |
| Darren | Mozingo | 26032.177 | Coleman -2 USP |
| Gregory | Nakai | 48686-008 | Beaumont USP |
| Benjamin | Navejar | 43691-080 | Beaumont FCI |
| Harry R. | Nelson | 01142-000 | Beaumont USP |
| Gregory | Nesbit | 68746-004 | Beaumont |

| | | | |
|---|---|---|---|
| Michael | Neugebauer | 16761-045 | Beaumont |
| Ha T | Nguyen | 28151-034 | USP McCreary |
| Corey | Nixon | 26981-177 | Beaumont FCI |
| Gregory F. | Nixon | 09899-078 | Beaumont USP |
| Michael J | Noil | 25331-034 | Beaumont USP |
| Cruz | Nunez | 32314-013 | Beaumont USP |
| James | Olinde | 26824-034 | Beaumont Med FCI |
| QueGeraldo | Ortiz | 23696-180 | Beaumont Med FCI |
| Nicholas | Pablo | 08658-085 | Beaumont USP |
| Everett Earl | Parker | 01574-095 | Beaumont USP |
| Cory Lee | Parton | 12281-052 | Beaumont USP |
| Steven | Patrick | 81028-008 | Beaumont USP |
| Eugene P. | Patterson | 36755-118 | Beaumont USP |
| Marcus Don | Paul | 14913-047 | Released |
| Najac | Paul | 04970-088 | Released |
| William | Peay | 03533-007 | Terre-Haute USP |
| Roy | Pedroza | 11207-179 | Beaumont USP |
| Michael | Perez | 91508-080 | Beaumont USP |
| Charles Anthony | Perry | 14375-064 | Beaumont USP |
| Douglas L. | Perry | 05841-043 | Beaumont |
| Jaime | Phillips | 12804-179 | Beaumont Med FCI |
| James | Pickett | 32698-077 | Beaumont USP |
| Julio | Pineda | 82937-079 | Beaumont Med FCI |
| Andre J. | Pinkston | 12783-026 | Beaumont USP |
| John M. | Pope | 43067-180 | Beaumont |
| Raphael F. | Porche | 02860-095 | Beaumont USP |
| Terrance | Powell | 27259-180 | Beaumont Med FCI |
| Trint Lamar | Powell | 15936-058 | Beaumont USP |
| Kirk | Pryor | 16835-058 | Beaumont USP |
| Jackie Lee | Pullum | 60433-080 | Beaumont USP |
| Jose-Cruz | Quinlan | 09256-069 | Beaumont USP |
| Keith | Quinn | 86558-011 | Beaumont Med FCI |
| Ras | Rahim | 54889-019 | Beaumont |
| Angel A. | Ramirez | 34148-179 | Released |
| Eurique | Ramirez | 53450-146 | Beaumont USp |
| Raul | Ramirez | 44222-079 | Beaumont USP |
| Jimmy | Ramos | 58020-080 | Beaumont USP |
| Orlando | Randall | 10670-078 | Beaumont USP |
| Joseph | Randall Jr. | 22594-009 | Beaumont |
| David | Rangel | 83638-079 | Beaumont USP |
| Raul | Rangel | 39518-180 | Beaumont USP |
| Arthur Charles | Reader | 06769-078 | Beaumont USP |
| Warnell | Reams | 33164-007 | Beaumont USP |
| Leslie | Redmond | 31204-177 | Beaumont FCI |

| | | | |
|---|---|---|---|
| Nathaniel | Reed | 02844-095 | Beaumont USP |
| Sylvester | Reid | 50013-004 | Beaumont USP |
| Juan | Reyes | 07371-040 | Beaumont USP |
| Luis | Reyes | 50411-066 | Beaumont USP |
| Donald | Richardson | 01523-164 | Beaumont USP |
| Terrell Christopher | Richardson | 11412-035 | Lee USP |
| Charles Pernell | Riddick | 48826-066 | Beaumont USP |
| Harry L | Riddick | 48116-066 | Beaumont USP |
| Duran | Riley | 20305-179 | Three Rivers SCI |
| Roberto | Riojas | 71509-079 | Beaumont USP |
| Clifton | Rivers | 36491-180 | Beaumont FCI |
| Michael H. | Roberson | 60656-080 | Beaumont USP |
| Crisostomo | Robert | 28997-180 | Beaumont USP |
| Lopez | Roberto | 12999-180 | Beaumont USP |
| Marcus | Roberts | 70033-079 | Beaumont USP |
| Ernest Edward | Robertson | 02659-095 | Beaumont USP |
| Roy E. | Robertson | 14226-031 | Released |
| Miguel | Rocha | 83176-079 | Beaumont USP |
| Anthony Christoph | Rodgers | 42910-060 | Beaumont USP |
| Rene | Rodriguez | 11185-040 | Beaumont FCI |
| Jose | Rodriguez-Garc | 13430-198 | Beaumont USP |
| Jose Abel | Rodriquez | 18162-180 | Beaumont USP |
| Shawn | Rogers | 03723-007 | Beaumont USP |
| William | Rogers | 33495-018 | coleman usp |
| Les | Rogge | 13915-004 | Beaumont FCI |
| George A. | Rohlsen | 01308-094 | Jesup FCI |
| James | Roland | 32698-077 | Beaumont USP |
| Andra | Routt | 60985-079 | Pollack USP |
| Herbert | Rozier | 55725-004 | Beaumont USP |
| Timnah K. | Rudisill | 16854-058 | Hazelton USP |
| Francisco | Saldana | 49160-004 | Beaumont |
| Garrie | Samuels | 27012-077 | Beaumont |
| Samual | Sanchez | 04949-070 | Beaumont USP |
| Willie May | Sanders | 28763-177 | Beaumont |
| Paul | Santivanez | 91551-080 | Beaumont |
| Jeff A. | Saunders | 36208-004 | Beaumont USP |
| Earl McRae | Scales | 14406-057 | Beaumont USP |
| Richard A. | Schaffer | 18373-047 | Beaumont USP |
| Tremayne | Scoggins | 22554-009 | Beaumont FCI |
| Welton | Scott | 11400-083 | Beaumont FCI |
| Reginald | Sharp | 13515-179 | Beaumont USP |
| Keith | Sheel | 07224-043 | Beaumont SCI |
| Monty M. | Shelton | 10426-078 | Beaumont FCI |
| Keith Lamar | Shepard | 13275-051 | Beaumont USP |

| | | | |
|---|---|---|---|
| Jamie C. | Sherrod | 19305-076 | Beaumont USP |
| Ramon Laroi | Shorter | 97558-079 | Beaumont USP |
| Peter | Simpson | 50611-053 | Beaumont USP |
| Jermaine Jerrell | Sims | 34263-083 | Beaumont USP |
| Robert J | Smallwood | 42708-080 | Beaumont USP |
| Cedric | Smith | 07790-035 | Beaumont USP |
| Joshua | Smith | 21727-057 | Beaumont USP |
| Kelvin D. | Smith | 01420-000 | Beaumont USP |
| Richard Allen | Smith | 03666-087 | Beaumont |
| Derrick Lamont | Smoote | 04873-028 | Beaumont USP |
| Patrick | Sneed | 27674-177 | Beaumont FCI |
| Gilbert S. | Soza | 57503-180 | Beaumont USP |
| Daniel | Spence | 32723-037 | Beaumont USP |
| Willie Joe | Spence | 11230-007 | Beaumont USP |
| Kelvin Andre | Spotts | 05613-088 | Beaumont |
| Tairone Traniel | Stanford | 07316-078 | Beaumont USP |
| Michael | Starnes | 11642-042 | Beaumont |
| Keith | Steel | 0722-4043 | Beaumont FCI |
| Robert | Steen | 12695-180 | Beaumont |
| Patrick | Stewart | 15744-064 | Pollock USP |
| Terry Earl | Stewart | 46272-080 | Beaumont USP |
| Shawn L. | Stone | 44824-008 | Beaumont USP |
| Brenson | Stovall | 34009-077 | Beaumont |
| Robert Kyle | Sturdy | 18616-077 | Beaumont USP |
| Anthony L. | Stutson | 18418-001 | Beaumont |
| Michael Hugh | Surrell | 29493-177 | Beaumont |
| Taylor | Taurus | 56195-004 | Beaumont USP |
| Anthony S. | Taylor | 12191-035 | New Orleans CCm |
| Bruce A. | Taylor | 09794-078 | Beaumont USP |
| Theodore T. | Taylor | 04625-003 | Beaumont USP |
| Plutarco | Tello | 11583-045 | Beaumont USP |
| Howard | Terrence | 28602-034 | |
| Darrell | Theodore | 28382-034 | Beaumont USP |
| Eric D. | Thomas | 70222-079 | Beaumont USP |
| Jerry Wayne | Thomas | 33934-086 | Beaumont USP |
| Keith | Thomas | 22987-009 | Beaumont USP |
| Rodney Lee | Thompson | 29247-179 | Beaumont |
| Ronald | Tillman | 85375-071 | Beaumont FCI |
| Gregory S. | Tolley | 04181-046 | Released |
| Leonard T. | Tom | 817755-008 | Beaumont |
| Ossie | Trader | 32019-066 | Atlanta USP |
| Lan Ngoc | Tran | 38262-053 | Beaumont USP |
| Joe L. | Traylor | 03532-079 | Beaumont USP |
| William Ivon | Turner | 88328-024 | Beaumont USP |

| | | | |
|---|---|---|---|
| Mario | Ugalde | 39890-180 | Beaumont USP |
| Warren Lee | Underwood | 57245-097 | Beaumont USP |
| Roberto | Urbina | 39608-180 | Beaumont USP |
| Gilardo | Valarde | 10887-039 | Beaumont FCI |
| Jesus | Vargas | 14039-026 | FCC Forrest City |
| Adrian | Vasquez | 31895-180 | Beaumont USP |
| Rafael M. | Vasquez | 85731-080 | Beaumont FCI |
| John Lasoya | Vela | 27131-180 | EL Paso CCM |
| Jose B. | Velasquez | 21400-051 | Deceased |
| Arturo | Villarreal | 40823-115 | Beaumont USP |
| Baldemar Sambrai | Villarreal | 03367-078 | Beaumont USP |
| Gary T. | Wade | 19578-038 | Beaumont USP |
| Michael R. | Waggoner | 44210-008 | Beaumont USP |
| Henry L. | Wallace | 31038-007 | Beaumont USP |
| Larry | Ward | 26037-044 | Beaumont USP |
| Marnail | Washington | 11175-002 | Beaumont USP |
| Terrance | Washington | 03038-095 | Beaumont FCI |
| William | Washington | 65149-061 | Beaumont USP |
| David | Webb | 21291-009 | Beaumont USP |
| Samuel L. | Webb | 12352-014 | Philadelphia CCM |
| Kieron | Webber | 57489-053 | Houston FDC |
| THomas | Wesson | 02870-424 | Beaumont USP |
| Kenneth | Wheeler | | Released |
| Antone | White | 16047-016 | Atwater USP |
| Danny | White | 05267-078 | Beaumont FCI |
| James R. | White | 87785-079 | Beaumont USP |
| Freddie J. | Whitmore | 27118-048 | Beaumont USP |
| Joe L. | Wigfall | 30499-177 | Beaumont FCI |
| Darryl | Wilkes | 355522-083 | Beaumont |
| Adam T. | Williams | 06718-027 | Beaumont |
| Chacy S. | Williams | 65479-061 | Beaumont |
| Jules L. | Williams | 34444-037 | Pollack USP |
| Nobel John | Williams | 24113-180 | Pollack USP |
| Rayah Markieth | Williams | 32487-177 | Beaumont USP |
| Bryan L | Wilson | 55118-079 | Beaumont USP |
| William | Wise | 11356-007 | Beaumont USP |
| Jimmy D. | Womack | 56187-080 | Beaumont USP |
| Alex | Wong | 37985-053 | Coleman I USP |
| Anthony | Woodland | 07927-043 | Beaumont |
| Marco A. | Woodson | 06166-007 | Beaumont USP |
| Steven | Wooldridge | 05381-010 | Beaumont |
| Delmar Anton | Zeigler | 13897-064 | Beaumont Low FCI |

# Exhibit B

Hurricane Rita's Eye Passing over Beaumont



### Hurricane Rita & Texas Petrochemical Resources
Last Updated: 09.24.05 @ 13:30 CT

**Legend**

⬤ Oil Refineries, Capacity in BCD (Barrels per Calendar Day)

▲ Strategic Petroleum Reserves

▲ Other Petroleum Resources of Interest

Actual Path of Eye

Actual Path of Hurricane Force Winds

Hurricane path data from NOAA; Last updated 09.24.05 @ 13:30 CT

Valero Energy Corp. 168,327 BCD
ConocoPhillips 146,000 BCD
Alon USA LP 61,000 BCD
Western Refining Co. 107,000 BCD
La Gloria Oil & Gas Co. 55,000 BCD
ExxonMobil Refining 348,500 BCD
South Hampton Ref. - Asphalt Plant
Total Petrochemicals 233,500 BCD
Big Hill SPR 160,000,000 bbl
Motiva Enterprises 285,000 BCD
Dow Haltermann Prod. - Idle
Premcor Refining Grp. 255,000 BCD
Lyondell Citgo Ref. 270,200 BCD
Age Refining, Inc 10,308 BCD
Valero Refining Co. 83,000 BCD
Crown Central Petro. 100,000 BCD
ExxonMobil Refining 567,000 BCD
ConocoPhillips 229,000 BCD
Deer Park Refining LTD 333,700 BCD
Valero Energy Corp. 90,000 BCD
Bryan Mound SPR 226,000,000 bbl
Valero Refining Co. 142,000 BCD
Valero Refining Co. 209,950 BCD
Flint Hills Resources 288,126 BCD
Marathon Ashland 72,000 BCD
Citgo Refining & Chem. 156,000 BCD
Trigeant LTD - Downstream only
BP Products NA, Inc. 437,000 BCD

Additional information/sources at: http://www.pannexresearch.com/rita/tx-oil.php
Please email 'contact@pannexusa.com' with status updates and/or corrections.
Copyright 2006 Pannex Corporation. All rights reserved.

# Exhibit C

Warden's Letter Stating Water Non-Potable



# U.S. Department of Justice

*Federal Bureau of Prisons*

---

*Central Administration Building*               *Beaumont, Texas  77720*

September 26, 2005

MEMORANDUM FOR INMATE POPULATION

FROM:             //signed//
                  T. C. Outlaw, USP/CAB Warden
                  //signed//
                  Steve Morris, MED Warden
                  //signed//
                  R. Childress, LOW/CAMP Warden

SUBJECT:          Health Warning/Aviso Sobre Cuidados de Salud

Due to the recent Hurricane event on September 24, 2005, drinking water for the Beaumont/Port Arthur area has been deemed non-potable (non-drinkable).  " Non-potable water" can be utilized for routine daily usage, but should not be ingested under any circumstance.

- Do not drink the water from any fixture through out the complex.

- You may utilize the water to bath and wash clothing or drain washbasins of bodily waste.

Effective 7:00 p.m. today you will have non-portable water available to you.


*Debido al evento Huracanal de Septiembre 24, 2005, el agua de Beaumont y Puerto Arturo an sido identificatda como no potable. "Agua no potable" puede ser utilizada para eventos rutinarios, pero no debe ser ingerido bajo ninguna situacion.*

- *No beba el agua de las llaves en ningunas de las instituciones del complejo.*

- *Si puede, utilizar la agua para aceo diario, el lavado de ropa y dernaje de los inodoros.*

*A las 7:00 p.m. del este todos tendran agua no potable.*

9/2 9/05