# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Kelvin Andre Spotts, et al.

      Plaintiffs

    v.

United States of America

      Defendant

Case No. 1:08-cv-00044

Judge Kollar-Kotelly,
Colleen

**Memorandum in Opposition to
Change of Venue Motion**

## Summary of Memo in Opposition

Plaintiff has the burden of proof on whether the District of Columbia is the proper venue. Defendant has the burden of proof to change this venue. The pivotal issue is where the tortious conduct took place. The Supreme Court has ruled that the place where the conduct took place must prevail over the place where the negligent conduct had its operative effect. Plaintiffs have published statements from correctional officers, stating that orders not to evacuate for Hurricane Rita came from the Central Office in Washington, D.C. This evidence places the tortious conduct here, making this venue proper. Regarding convenience of parties and witnesses, Washington, D.C. is closer and less costly to Plaintiffs. Defendant does not argue that this District is inconvenient. A change of venue has not been justified.

# Table of Contents

|  | Page |
|---|---|
| Standard of Review | 2 |
| Part I – Propriety of Venue | 3 |
| Pertinent Facts | 4 |
| Applicable Law | 8 |
| Discussion | 9 |
| Conclusion for Part I | 10 |
| Part II – Change of Venue | 10 |
| Plaintiff's Choice of Forum | 11 |
| Convenience of the Parties | 14 |
| Convenience of the Witnesses | 15 |
| Interests of Justice | 16 |
| Conclusion for Part II | 18 |

**Exhibits**

A – Mandatory Evacuation Order for Beaumont, Texas

B – January – February issue of *The Government Standard*

C – Houston Press, *A prison cover-up during Hurricane Rita*

D – Memo to Penitentiary Inmates, Feb. 22, 2008

E – List of Plaintiff Residences as of April 28, 2008

## Table of Authorities

| **Federal Decisions** | **Page** |
|---|---|
| Argueta v. Banco Mexicano, S.A.,<br>87 F. 3rd 320 (9th Cir. 1996) | 2 |
| Murphy v. Schneider National, Inc.<br>362 F. 3rd 1133 (9th Cir. 2004). | 2 |
| Richards v. Lloyd of London,<br>135 F. 3rd 1289 (9th Cir. 1998) | 2 |
| Whitley v. Albers<br>475 U.S. 312 (1986). | 5 |
| Richards v. U.S.,<br>369 U.S. 1 (1962). | 8, 9 |
| DeFazio v. Hollister Employee Share Ownership Trust,<br>406 F.Supp.2d 1085 (E.D. Cal. 2005) | 11 |
| Texas Gulf Sulphur Co. v. Ritter,<br>371 F. 2nd 145 (C.A. Utah, 1967) | 11 |
| U.S. v. Cinemark U.S.A., Inc.,<br>66 F. Supp. 2nd 881 (N.D. Ohio, 1999) | 11 |

**Federal Statutes**

| | |
|---|---|
| 28 U.S.C. § 1402 (b) | 1, 3 |
| 28 U.S.C. § 1404 (a) | 1, 11 |

**Federal Rules**

| | |
|---|---|
| Fed.R.Civ.P. 12(b)(3) | 1, 2 |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Kelvin Andre Spotts, et al.

      Plaintiffs

     v.

United States of America

      Defendant

Case No. 1:08-cv-00044

Judge Kollar-Kotelly, Colleen

**Memorandum in Opposition to Change of Venue Motion**

Defendant [hereafter *Defendant* or *Bureau of Prisons*] filed a Motion for Change of Venue pursuant to Fed.R.Civ.P. 12(b)(3) [hereafter *Rule 12(b)(3)*] and 28 U.S.C. § 1404 (a). Plaintiffs strongly oppose this motion.

Defendant's Motion engages two statutes. Each statute raises different issues and places different burdens upon the parties. The first statute, titled *United States as Defendant* (i.e. 28 U.S.C. § 1402 (b)), challenges the propriety of venue in the District of Columbia. The substantive law under this statute imposes a burden upon Plaintiff to prove that venue with this Court is appropriate. The second statute, titled *Change of Venue* (i.e. 28 U.S.C. § 1404 (a)), allows this Court to transfer venue, but the burden rests upon the Defendant to show that another Court would be more convenient.

For clarity purposes, Plaintiffs will rebut the Defendant's motion in two steps, labeled *Part I Propriety of Venue* and *Part II Change of Venue*.

## Standard of Review

Under Rule 12(b)(3), a district court is permitted to consider facts outside the pleadings.[1] Allegations in pleadings need not be accepted as true under Rule 12(b)(3). [2] If facts are disputed, the rule is different. Disputed facts are resolved in favor of the non-movant. As one court explained:

> "the trial court must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party, … This conclusion is in accord with virtually unanimous authority of the few courts that have faced this issue and with a leading federal procedural treatise that has addressed the issue." [3]

Disputed facts are present under the statute titled *United States as Defendant*, concerning the phrase *in the place where the act or omission … occurred.* Defendant places this act or omission in Beaumont, Texas.[4] Plaintiffs maintain that the *act or omission* took place in the District of Columbia. Where facts such as these are in dispute, the standard of review under Rule 12(b)(3) declares that Plaintiffs' factual statements are to prevail.

---

[1] Argueta v. Banco Mexicano, S.A., 87 F. 3rd 320, 324 (9th Cir. 1996) *See also* Murphy v. Schneider National, Inc. 362 F. 3rd 1133, 1137 (9th Cir. 2004).
[2] Richards v. Lloyd of London, 135 F. 3rd 1289, 1292 (9th Cir. 1998).
[3] Murphy v. Schneider National, Inc. 362 F.3rd 1133, 1138 (9th Cir. 2004).
[4] Defendant's Motion to Transfer, at p. 2

## Part I Propriety of Venue

The first statute, titled *United States as Defendant*, reads as follows:

"Any civil action on a tort claim against the United States …
may be prosecuted *only* in the judicial district *where the
plaintiff resides or wherein the act or omission complained of
occurred*." [Emphasis added.]

Plaintiff bears the burden of proving that venue in this District is

proper. It is self evident that there are no Plaintiffs residing in the District of

Columbia. Plaintiffs maintain that the second prong, *wherein the act or

omission … occurred*, took place at the Central Office in Washington, D.C.

Terms such as *act or omission complained of* only become meaningful

when viewed in the context of Plaintiffs' Complaint. The quintessence of

Plaintiffs' Complaint is described in the following three paragraphs.

¶54. Federal Bureau of Prisons Director Harley Lappin,
Assisant Director Bruce Sasser, Assistant Director Joyce
Conley and Regional Director Gerardo Maldonado and Warden
Tim Outlaw [hereafter *Defendants' agents*] *decided against*
evacuating the Beaumont Penitentiary. [Emphasis added.]

¶147 By September 25th and 26th, it was abundantly
obvious that the Beaumont Penitentiary was in a free fall
heading for a total meltdown. The weather forecast for the next
two days was a continuation of the last three days, calling for
temperatures near or over 100 degrees. Upon discovering the
reality and futility of riding out a hurricane in personal and
humiliating terms, and given the catastrophic state of affairs
inside these prisons walls, Defendants' agents [i.e. Washington
Central Office Director Lappin, Washington Central Office
Assistant Director Sasser, Washington Central Office Assistant
Director Conley, Fort   Worth – Dallas Regional Director

Maldonado and Beaumont Penitentiary Warden Outlaw] could have revisited the wisdom of their decision not to evacuate and called for help. Instead, they chose to follow their rodeo cowboy analogy and continued to *ride it out*.

¶149. In refusing to reconsider their decision to evacuate this prison, Defendants' agents [i.e. Washington Central Office Director Lappin, Washington Central Office Assistant Director Sasser, Washington Central Office Assistant Director Conley, Fort Worth – Dallas Regional Director Maldonado and Beaumont Penitentiary Warden Outlaw]demonstrated obduracy (i.e. doggedness) and wantonness (i.e. callousness) which together, equaled a reckless disregard for right and wrong and for the consequences flowing from their decision.[5]

The substance of Plaintiff's Complaint is driven by decisions not to evacuate at two points in time; (1) before the hurricane arrived and, (2) after its destructive force reduced this prison to chaos. These decisions are pivotal acts setting forces into motion that are common denominators for all claims.

**Pertinent Facts**

On September 21, 2005, a Wednesday, County Judge Carl Griffith issued a Mandatory Evacuation Order for Jefferson County, which includes the U.S. Penitentiary.[6] The next day, September 22nd, Hurricane Rita became a Category 5 storm, more powerful than Hurricane Katrina. On September 23, 2005, a Friday, NASA's Goddard Space Flight Center reported that Hurricane Rita was a category 4 storm with sustained winds of 120 knots

---

[5] *See* Whitley v. Albers, 475 U.S. 312, 319 (1986).
[6] *See* Exhibit A, Mandatory Evacuation Order of Judge Griffin, dated September 21, 2005, effective at 6 a.m. on September 22, 2005.

(i.e. 138 miles per hour). It was pulling an equally massive storm surge that was expected to reach 20 feet in height. To place this in some perspective, winds moving at 125 miles an hour are equal to *1,250 pounds of pressure per square inch* or roughly the weight of 32 concrete building blocks slamming against *every inch* of wall, window or tree in its path.[7]

Also on Friday, September 23, 2005, an article in *The Government Standard*, a publication issued by the American Federation of Government Employees, describes decision-making just before Hurricane Rita's arrival.

> "On Friday, September 23, 2005, word came down from *BoP [Bureau of Prisons] headquarters* that non-essential personnel would be permitted to evacuate, as would one parent in a family where both parents worked at the facility. Staff forced to stay brought food, water, blankets, boats and jet skis to the facility in preparation for the storm's landfall." [Emphasis added.] [8]

At the pin point center of Plaintiffs' Complaint is the charge that upper echelon Bureau of Prison officials made the decision not to evacuate the U.S. Penitentiary at Beaumont with Hurricane Rita coming its way. The quote appearing in *The Government Standard*, a publication for correctional officers stationed at the Beaumont Prison Complex, reveals that the Bureau of Prisons Central Office was much more deeply engaged than our

---

[7] *See* Plaintiffs' Complaint at ¶ ¶ 31 and 32.
[8] *See* Exhibit B, January – February 2006 Issue of *The Government Standard*. Article on Hurricane Rita is located on page 7, and quoted comment is in the first column.

Complaint even alleges. Headquarters was not limiting its role to the big picture, deciding whether or not to evacuate. On the contrary, the Central Office in Washington D.C. was deeply involved with the details, down to deciding who could be safe and who must stand in harm's way.

The author of this article is writing in the moment with untrammeled candor. This issue of *The Government Standard* was published shortly after these events unfolded, when the ordeal was still fresh in every participants mind. This article describes *operative events* occurring in BoP headquarters.

There is further corroboration for the Central Office's involvement in the decision not to evacuate for Hurricane Rita. Houston Press investigative reporter Chris Vogel recently interviewed Isaac Ortez, president of the local correction officers union. Mr. Ortez was forced to stay in the prison when Rita arrived,[9] and had this comment to make about experiencing a hurricane.

> "We thought were going to die. It was very traumatic for all the staff and the inmates. It was insane."[10]

Mr. Ortez also confirmed the Central Office's pivotal role, stating that the decision not to evacuate came from management at the South Central Regional Office in Dallas and the Central Office in Washington, D.C. [11]

---

[9] *See* Exhibit C, Houston Press, *A prison cover-up during Hurricane Rita*, online version dated March 6, 2008, at p. 6. [hereafter *Exhibit C, Hurricane Rita cover-up*].

[10] Exhibit C, Hurricane Rita cover-up at p. 8

[11] Exhibit C, Hurricane Rita cover-up at p. 7

"It's in their policy that when an emergency like this comes, they're supposed to evacuate. They have the evacuation plans in their own contingency plan, and they violated that. *You have to hold the entire Bureau of Prisons accountable.* They had the means and they had the budget for emergencies ... (but) they made the decision and they put us in harm's way when they didn't have to." [12] [Emphasis added.]

Investigative reporter Chris Vogel also interviewed Jeffrey Schwartz, director of a nonprofit training and prison research consulting group. Mr. Schwartz's firm was hired to write the after-action incident report on Hurricane Katrina for the Louisiana Department of Corrections and the National Institute of Corrections. Mr. Schwartz confirmed the statement made by union leader Isaac Ortez concerning evacuation plans.

"Every major prison has evacuation plans. No one is perfectly prepared for everything, but while you can't judge just on the outcome, the real question is, Did you reasonably well prepare for predictable emergencies? If the answer is no, well, there just isn't any good excuse." [13]

With Hurricane Katrina striking this vicinity only three weeks earlier, this emergency was definitely predictable. Asked to comment upon the credibility of statements made by union leader Ortez, Mr. Schwartz volunteered the observation that inmates are sometimes prone to exaggerate the truth, but union leaders are as solid as they come. [14]

---

[12] Exhibit C, Hurricane Rita cover-up at p. 7
[13] Exhibit C, Hurricane Rita cover-up at p. 7
[14] Exhibit C, Hurricane Rita cover-up at p. 8

"What the union is unlikely to do is invent facts that most of their own staff know are not true because their own membership would be very put off."[15]

Only the Central Office would have authority to disobey evacuation policies, refuse to follow a mandatory evacuation order and last but not least, compel its staff and its wards to face the perils of a Category 4 Hurricane.

**Applicable Law**

The tort claim contemplated by Congress upon passing the Federal Tort Claim Act involved a case where the negligence and injury occur simultaneously, such as hitting a person with a government owned vehicle.[16] Congress never considered whether the words *the law of the place where an act or omission occurred* related to: (1) the place where the negligence took place, or (2) to the place where the negligence had its operative effect. The exact meaning of these words was finally settled in 1962, when this question was considered and decided by the U.S. Supreme Court.

> "The legislative materials cited to us by American [Airlines] not only lack probative force in a judicial sense, but they are completely unpersuasive to support the argument that Congress intended the words 'act or omission' to refer to the place where the negligence had its operative effect. The ease of application inherent in the rule urged by American lends a certain attractiveness, but we are bound to operate within the framework of the words chosen by Congress and not to question the wisdom of the latter in the process of construction.

---

[15] Exhibit C, Hurricane Rita cover-up at p. 8
[16] *See* Richards v. U.S., 369 U.S. 1, 9 (1962).

We conclude that Congress has, in the Tort Claims Act, enacted
a rule which requires federal courts, in multistate tort actions, to
look in the first instance to the law of the place where the acts
of negligence took place."[17]

In this case, it is an obvious truth that the District of Columbia is the

place where the negligent and wrongful conduct took place, and Beaumont,

Texas is where this wrongful conduct had its operative effect.

## Discussion

The Bureau of Prisons defends its choice of the Eastern District of

Texas by stating:

'... the actions alleged in Plaintiffs' Second Amended
Complaint occurred solely and exclusively within the Eastern
District of Texas."[18]

"All of the actions complained of occurred in Beaumont, Texas."[19]

"Plaintiffs further allege events that occurred solely at USP
Beaumont, located in the Eastern District of Texas." [20]

These statements are legal conclusions posing as factual allegations.

The hidden legal conclusion declares that Beaumont is where this tortious

conduct occurred. A legal conclusion does not further the process of

establishing the truth on any factual matter and, for this reason, it is not

---

[17] *See* Richards v. U.S., 369 U.S. 1, 9-10 (1962).
[18] Defendant's Motion to Transfer, at p. 1.
[19] Defendant's Motion to Transfer, at p. 2.
[20] Defendant's Motion to Transfer, at p. 4.

evidence. Accordingly, Plaintiffs' evidence demonstrating that this tortious conduct took place in Washington, D.C. continues to stand uncontested.

Secondly, these are unsubstantiated and unsupported statements. No affidavits or documents are attached. At most, these statements reflect counsel's beliefs, and beliefs cannot serve as a substitute for probative facts.

Finally, the Supreme Court has definitively ruled that the words *the law of the place where an act or omission occurred* refers to the place where the conduct took place, and *not* where this conduct had its operative effect. It is undeniable that Hurricane Rita traveled over Beaumont's Penitentiary. The Eastern District of Texas is where wrongful conduct had its operative effect. But the District of Columbia is where the tortious conduct took place.

**Conclusion for Part I**

Plaintiffs have proven that the Washington Central Office made the fateful decision not to evacuate the Penitentiary in Beaumont and participated in operative events taking place as a result of this decision. In so doing, this conduct vests the District of Columbia with the second prong of 28 U.S.C. § 1402 (b), namely *the place where an act or omission occurred.*

**Part II – Change of Venue**

The second statute, titled *Change of Venue,* reads as follows.

10

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

Now the burden of proof shifts to the moving party, Defendant, to show that transfer of venue is appropriate.[21] We begin with the general rule, which states that a court should give plaintiff's choice of forum great weight.

"Unless the evidence and the circumstances of the case are strongly in favor of the transfer, the Plaintiff's choice of forum should not be disturbed." [22]

Furthermore, to prevail, a movant must show that the balance for *all relevant factors* must weigh *strongly in favor of transfer*.[23]

Under the change of venue statute, 28 U.S.C. § 1404(a), four factors are weighed: (1) the plaintiff's choice of forum; (2) the convenience of the parties; (3) the convenience of the witnesses; and (4) the interests of justice.

## Plaintiffs' Choice of Forum

Defendant's brief states that Plaintiffs' choice of forum deserves little deference and, for good cause, states as follows.

"Plaintiffs' choice of forum deserves little deference because they do not reside in this District, and because this District lacks meaningful ties to the controversy. Federal officials in the Eastern District of Texas ran the facility at

---

[21] DeFazio v. Hollister Employee Share Ownership Trust, 406 F.Supp.2d 1085, 1088 (E.D. Cal. 2005).
[22] Texas Gulf Sulphur Co. v. Ritter, 371 F. 2nd 145, 147 (C.A. Utah, 1967) See also U.S. v. Cinemark U.S.A., Inc., 66 F. Supp. 2nd 881, 887 (N.D. Ohio, 1999) [with extensive discussion of this point of law].
[23] U.S. v. Cinemark USA, Inc., 66 F.Supp.2d 881, 890 (N.D. Ohio. 1999).

which Plaintiffs' alleged injuries occurred. Accordingly, this case is similar to other cases in which courts have found that the interests favor transfer because the 'primary issue in the case' concerns a decision made by an agency's local outpost as opposed to its headquarters." [24]

The thrust of this argument is that the decision not to evacuate was made by the local outpost because local officials *ran the facility at which Plaintiffs' injuries occurred.* If true, we must also believe that local officials decided to abandon their evacuation plan, disobey the mandatory evacuation order and subject their staff and wards to the fury of a Category 4 hurricane without any clearance from higher authority. Common sense and everyday experience informs us that hierarchal government agencies do not operate in this manner. These statements are all self serving observations made by Defendant's counsel. Self serving statements by counsel are not probative, they are not evidence and they are not entitled to any weight. Defendant's argument for attaching little deference to Plaintiffs' choice of venue is a great non- sequitur, a conclusion that does not follow from its premise.

Defendant's brief continues.

"It is true that some Bureau of Prisons officials *work* in offices in the District of Columbia. That, however, does not make this Court the appropriate forum. Moreover, the fact that those officials "*reside*" in the District of Columbia does not control the venue analysis. [authority deleted] Instead, the relevant factor is that the officials were directly involved in the

---

[24] Defendant's Motion to Transfer, at p. 6.

events that are alleged to have caused Plaintiffs' injuries are in the Eastern District of Texas."[25] [Emphasis added.]

Coloring Plaintiffs' grounds for venue upon the premise that certain officials *work* and *reside* in the District of Columbia is a mischaracterization of Plaintiffs' claims as well as a myopic view of the complained of events. Plaintiffs' Complaint states that these Central Office officials *decided against* evacuating the Beaumont Penitentiary. This is *decision-making*, not working or residing. Published statements from prison staff forced to endure Hurricane Rita's arrival and destruction confirm this decision-making. These participants also blame the Central Office in Washington, D.C. for putting so many lives in harm's way. This is *high stakes risk taking*, not working or residing. The observation that only local officials can be directly involved in events leading to Plaintiffs' injuries is another self serving and unsupported statement by counsel and as such, it is entitled to no evidentiary value.

And once again, we have a legal conclusion posing as a factual allegation. The unstated legal conclusion is that Plaintiffs' injuries could only be caused by the local officials in the Eastern District of Columbia. This statement builds upon the premise that the tortious act or omission took place in Beaumont – a legal conclusion lacking any evidentiary support.

---

[25] Defendant's Motion to Transfer, at pp.'s 6 – 7.

Defendant's burden has not been carried. Plaintiffs' choice of forum continues to deserve great weight.

## Convenience of the Parties

The reasons given by Defendant for seeking transfer are as follows.

"The prison is there, most of the Plaintiffs are there, all of the relevant witnesses are there and sources of proof are there." [26]

Consistent with preceding portions of the Defendant's brief, relevant witnesses are not listed, sources of proof are not identified and there is no documentary or affidavit support for this statement. It is another self serving and unsupported statement of counsel, deserving of no evidentiary credit.

More fundamentally, Defendant is wrong. The Beaumont Penitentiary in Texas is *not there*. On February 21, 2008, the Federal Bureau of Prisons announced that USP Beaumont would undergo a program change and:

> "In the near future, the Designation and Sentence Computation Center will begin the process of designating our current high security level inmates to other high security level institutions." [27]

At last count, 229 [out of 438] Plaintiffs still reside in Beaumont.[28] This amounts to 52.2% of the Plaintiffs. And this figure will continue to fall.

---

[26] Defendant's Motion to Transfer, at p. 7.
[27] *See* Exhibit D, Memo to Inmates dated February 22, 2008.  The Penitentiary is becoming a Medium Security prison and Plaintiffs are moving to other Penitentiaries.
[28] *See* Exhibit E, List of Plaintiffs by location effective April 29, 2008.

14

For Plaintiff's counsel, the driving distance from his home city of Canton, Ohio to the District of Columbia is 373 miles and requires 6 hours and 22 minutes by car. The distance to Beaumont from Plaintiff's counsel's home is 1,287 miles and requires 19 hours and 45 minutes by car. More realistically, it is a two day trip each way by airplane and rental car.

Defendant does not allege that this District is an inconvenient forum. The burden of proof imposed upon movant to show that the District of Columbia is an inconvenient forum for either party has not been satisfied.

**Conveniences of the Witnesses**

Plaintiffs have three expert physician witnesses. Two doctors are in Cleveland, Ohio. The distance by car to Washington is the same driving time for Plaintiffs' counsel. [29] Plaintiffs' third doctor is in Marietta, Georgia, which is also further from Beaumont, Texas than from Washington, D.C. [30] Beaumont is substantially less convenient in two of these three cases.

Plaintiffs plan to pursue electronic discovery very aggressively. The location of data bases may be anywhere. And while it is undeniable that Hurricane Rita ravaged the U.S. Penitentiary in Beaumont, nothing in the

---

[29] Psychiatrist Dr. Mark Woyshville is 6 hours 13 minutes distant from Washington, D.C. and 19 hours, 32 minutes away from Beaumont, Texas. Dr. Elizabeth Mease is 6 hours and 16 minutes from Washington, D.C. and 19 hours, 58 minutes away from Beaumont.
[30] Dr. Joseph Paris is 10 hours and 22 minutes from Washington, D.C. and 11 hours and 24 minutes from Beaumont, Texas.

way of an accident scene has been preserved. Hence, there is no evidentiary value still attaching to the place.

Defendant has not demonstrated how Beaumont, Texas will be more convenient for its witnesses. Warden Tim Outlaw is no longer in Beaumont. Plaintiffs' witnesses will be severely inconvenienced by this transfer. As for inmate witnesses, Plaintiffs plan to do video tape recordings of depositions. The cost of transporting a penitentiary inmate is prohibitively expensive.

**Interests of Justice**

Defendant maintains that the public interest would be served by moving this litigation to Beaumont, and states:

> "The relevant considerations include: the transferee's familiarity with governing laws, relative congestion of the calendars of the potential and transferee and transferor courts, and local interests in deciding local controversies at home." [31]

The governing law for this case will be the District of Columbia's jurisprudence, because this is where the tortious conduct took place. Interpreting District of Columbia law in the Eastern District of Texas will be less convenient than here. The caseload differential between the two Districts is inconsequential and continually subject to change. As for deciding local controversies at home, none of these Plaintiffs would regard Beaumont as *home*.

---

[31] Defendant's Motion to Transfer, at p. 8.

More fundamentally, Beaumont, Texas is a very inhospitable place for inmates. The City of Beaumont has 113,866 residents and it is home to 9 prisons [32] holding 11,585 prisoners. These prisons provide jobs for over 3,000 local residents.[33] If the business of housing inmates were consolidated instead of being splintered among private, State and Federal governments, operating prisons would be the City of Beaumont's number one employer. [34]

In Beaumont, inmates are regarded as a less than human commodity tolerated because they provide jobs and support for the local economy. This attitude surfaced inadvertently when union leader Isaac Ortez commented to reporter Chris Vogel, on the subject of future major hurricanes:

> "We had another hurricane that came by this year, and they dropped the ball on that one. They didn't do any emergency procedures. They're no better prepared today.

---

[32] The Federal Bureau of Prisons has a Federal Correctional Institute (hereafter *F.C.I*) Beaumont Low prison holding 1,831 inmates, F.C.I. Beaumont Medium prison holding 1,700 inmates, a U.S.P. Beaumont holding 972 inmates and a Beaumont U.S.P. Camp holding 443 inmates. Beaumont is also the cite for three Texas state prisons; (1) Gist State Jail holding 2,086 inmates, (2) LeBlanc Unit holding 1,019 inmates and (3) Stiles Unit holding 2,854 inmates. It is also the site of the Beaumont Transitional Treatment Center, which is called a halfway house but in practice, operates as a prison and holds 180 parolees, Jefferson County Prison – a private prison operated by the GEO Group and holding 500 inmates. Inmate numbers were found on April 21, 2008.

[33] Texas has listed its employees. Jefferson County has 101 employees, Stiles Unit 746 employees, LeBlanc 262 employees and Gist Prison 392 employees, for a total 1,501 jobs. The Federal Bureau of Prison does not disclose its number of employees per prison on the internet, but from other sources, we know that the compliment of people varies from 400 to 500 depending upon the security classification of the prison, with low security prisons employing closer to 400 and a Penitentiary closer to 500 people. The lower figure of 400 will take the number of employees over 3,000. The number of people employed at the privately owned transitional prison is unknown.

[34] The highest employer is the Beaumont Independent School District, with 2,840 people.

*They've already said that if another hurricane comes, they will not evacuate.*" [Emphasis added.]

Defendant is well aware of this calloused attitude toward prisoners in Beaumont. In fact, this is the real and unstated reason for seeking a transfer.

## Conclusion for Part II

Moving venue to Texas would make everything significantly more difficult and costly for Plaintiffs. For the above reasons, Defendant has not carried its burden of proof and venue for this lawsuit should not be moved.

Respectfully submitted;

/s/ Norman L. Sirak

_____

Norman L. Sirak
Ohio Reg. OH0038058
D.C. Bar # 162669
4974 Higbee Ave. – Suite 203
Canton, Ohio 44718
Phone (330) 493 – 7462
Fax (330) 493 – 7851
Email nsirak@parolereform.com

## Certificate of Service

A copy of the foregoing will be sent via the Court's electronic filing system to Christian A. Natiello, Assistant U.S. Attorney, as well as to any other parties entered on the Court's filing system for this case.

/s/ Norman L. Sirak

_____

Norman L. Sirak

# **EXHIBIT A**

Mandatory Evacuation Order for Beaumont Texas

Carl R. Griffith, Jr.
County Judge

Jefferson County Courthouse
P. O. Box 4025
Beaumont, Texas 77704

Beaumont 409-835-4665
Pt. Arthur 409-727-2191, ext. 8465
Crosbville 409-839-2311

MANDATORY EVACUATION ORDER

I, Carl R. Griffith, Jr., duly elected Judge of Jefferson County, pursuant to the Disaster Declaration of September 21, 2005, do hereby order a mandatory evacuation, effective 6:00am. September 22, 2005, for Jefferson County, under the authority granted me by Section 418.108 (f) of the Government Code. This mandatory evacuation will be in effect until it is deemed safe for the citizens to return.

_____          _____
Date                                Carl R. Griffith, Jr.
                                    County Judge

# **EXHIBIT B**

January – February issue of
***The Government Standard***
A publication of the American Federation of
Government Employees AFL-CIO

[See Page 7, Column 1 for article]



# THE GOVERNMENT STANDARD

Vol. LXXIII, No. 1

January/February 2006

**for current and retired government workers and their families since 1933**
American Federation of Government Employees, AFL-CIO

# AFGE—THE *Homeland Security Union*

A FGE recently was certified as the sole union representing almost 5,000 Immigration and Customs Enforcement (ICE) bargaining unit members, part of the union's continuing efforts to secure itself as the only union to speak on behalf of Homeland Security workers across the nation.

The ICE certification covers all eligible employees, including those in Detention and Removal Operations and the Federal Protective Service (FPS). This is the first time that all of FPS, which focuses on the interior security of the nation, will be under one union.

In the fall of 2005, AFGE was awarded successorship of about 11,000 Border Patrol bargaining unit employees, and the certification for more than 7,000 Citizenship and



Immigration Services (CIS) workers is pending. CIS has agreed to the appropriateness of the unit, and no other union is involved.

AFGE's official designation as *the* nation's homeland security union is linked to an upcoming election involving Customs and Border Protection employees. CBP workers previously have been represented by more than one union; however, the Federal Labor Relations Authority last year ordered an election to be held to allow CBP workers to choose which union, if any, will represent them.

"AFGE already represents a majority of Department of Homeland Security workers, and as the CBP employees review their options, I'm sure they will see the wisdom in having one voice represent the agency," AFGE National President **John Gage** said.

*(continued on page 3)*

## Table of Contents

**Page 2**
A Message from National President John Gage

**Page 3**
AFGE Effort to Save Veterans' Health Care Benefits

**Page 4**
TSA Screener Gets Job Back

**Page 5**
AFGE Activism
Education Department

**Page 6**
AFGE Wins Overtime for ICE Employees
Arbitrator Rules on CBP

**Page 7**
Beaumont Facility

**Page 8**
Spotlight: Legislative Department

# AFGE Argues Against DoD Personnel System in Federal Court, Awaits Ruling

## *DoD Agrees to Postpone Implementation of NSPS until March 1*

A FGE presented legal arguments in federal court Jan. 24 against the Department of Defense's (DoD) plan to implement its controversial National Security Personnel System (NSPS), saying the proposal would end nearly a century of civil service protections and decades of transparent, objective public sector personnel policies.

AFGE argued before Judge Emmet G. Sullivan of the U.S. District Court for the District of Columbia. During the hearing, AFGE scored a major victory when DoD representatives agreed to postpone implementation of NSPS until March 1 to give Judge Sullivan time to review arguments and issue a decision.

The postponement marks the second time in as many months that DoD has delayed implementation of NSPS, originally scheduled to go into effect in the spring of 2005.

*(continued on page 3)*

## 2006 AFGE National Convention

**AFGE's 37th National Convention will be held**
**Monday, August 7 through Friday, August 11, 2006, at:**

HYATT REGENCY ATLANTA

265 Peachtree Street, Atlanta, Georgia 30303-1294 · (404) 577-1234

*Important information for the 2006 AFGE National Convention:*
**NO ON-SITE REGISTRATION! ADVANCE REGISTRATION ONLY and must be postmarked by July 8, 2006;**
**All delegates must be elected by July 8, 2006; and those who merely show up will not be seated.**

*Check your mail for complete 2006 Convention details and information.*



## A Message from National President John Gage

# AFGE Gears Up
## *for the* Main Event

*John Gage*

This year is getting off to a great start for AFGE with much promise for regaining the initiative on issues of importance to government employees and the public those employees serve. After several years filled with bad news about privatization, scarce resources and funding for government agencies, and personnel reform efforts that would be detrimental to public services, the tide is turning. AFGE is at the forefront of a campaign to preserve union rights, not just for government employees, but for all Americans.

Union busting has become common practice under the current administration, and federal agencies, which are supposed to serve as model employers for the nation, are setting some bad examples. But AFGE won't let them get away with it. On Jan. 24 AFGE went to federal court to argue against the National Security Personnel System (NSPS) proposed by the Department of Defense, and we won yet another postponement on implementation of this horrendous plan.

AFGE also is fighting cronyism and incompetence among managers and top officials throughout the government. We have strongly opposed personnel changes in the federal sector. We are holding leaders of federal agencies to high standards, like the top officials at the Federal Emergency Management Agency (FEMA) who botched the response to Hurricane Katrina with such tragic consequences. We will continue to act as a guardian of Social Security by supporting agency employees and by working to strengthen the program. We will work with our allies on Capitol Hill and candidates who are friendly toward government workers to ensure that Congress appropriately addresses our concerns. AFGE will fight to continue to represent thousands of Customs and Border Protection (CBP) employees because AFGE overwhelmingly *is the dominant* Homeland Security union.

AFGE has focused enormous energy over the past three years fighting efforts to completely redefine the civil service protections and personnel rules in the federal government because these changes are such a raw deal for government employees and for the public. Proposed personnel changes, like Max$^{HR}$ in the Department of Homeland Security and NSPS, are founded upon the mistaken philosophy that accountability increases as evaluation standards for employees become more subjective and as unilateral power is granted to managers over pay, promotions and the right to continued, gainful employment.

If implemented, Max$^{HR}$ and NSPS would enfeeble labor unions and impose subjective human resources policies not present in America since the high point of the spoils system in the 1800s. The proposed system of collective bargaining binds unions while allowing federal agencies to break labor agreements whenever managers see fit. It is for this reason, among others, that we won a critical legal victory in federal court last year that blocked implementation of the Max$^{HR}$ labor relations scheme. We anticipate a legal win against NSPS very soon that will be just as significant.

Of direct consequence for AFGE members outside DoD and DHS, officials at the Office of Personnel Management are proposing changes along the lines of Max$^{HR}$ and NSPS in all federal agencies. The good news, however, is that the proposed legislation that would permit new personnel rules in all federal agencies, the "Working for America Act," does not yet have a sponsor nor has it been introduced in Congress. AFGE, on your behalf, vigilantly will continue to ensure that the proposed legislation does not gain any momentum on Capitol Hill.

AFGE is fighting for a more effective government in addition to fighting for your workplace rights and the right of taxpayers to have a government workforce that is accountable and held to objective standards.

On behalf of D.C. government workers, AFGE is fighting an anti-union mentality that has emerged in the Water and Sewer Authority (WASA). AFGE members in WASA protect the water supply of our nation's capital and should be viewed as partners by agency managers. Yet they have had contentious contract negotiations forced upon them because agency representatives, backed by private law firms costing D.C. taxpayers hundreds of thousands of dollars, have grown hostile to unions. AFGE will fight to ensure that these employees are treated with the dignity and respect they deserve.

AFGE is coming out swinging for the upcoming midterm elections in 2006. We have sophisticated political mobilization plans and enhanced communications capabilities. We are ready to call upon and inspire our members to join our political efforts. We will advocate, represent, fight and campaign, all on your behalf. From the smallest office to the largest agency, AFGE will be there.

**AFGE—The Government Standard**

Vol. LXXIII, No. 1                    January/February 2006

*AFGE—The Government Standard* (USPS 003-219, ISSN 1041-5335) is published bimonthly and is the official membership publication of the American Federation of Government Employees, AFL-CIO, 80 F Street, NW, Washington, D.C., 20001 Phone: (202) 737-8700, **www.afge.org**. John Gage, **National President**, Jim Davis, **National Secretary-Treasurer**, Andrea E. Brooks, **National Vice President for Women and Fair Practices. National Vice Presidents:** District 2-Derrick F. Thomas, (732) 828-9449; NY, NJ, CT, MA, ME, NH, RI, VT. District 3-Jeffrey R. Williams, (610) 660-0316; DE, PA. District 4-Joseph Flynn, (410) 480-1820; MD, NC, VA, WV. District 5-Charlotte Flowers, (770) 907-2055; AL, FL, GA, SC, TN, Virgin Islands, Puerto Rico. District 6-Arnold Scott, (317) 542-0428; IN, KY, OH. District 7-Dorothy James, (312) 421-6245; IL, MI, WI. District 8-Jane Nygaard, (952) 854-3216; IA, MN, NE, ND, SD. District 9-Michael Kelly, (405) 670-2656; AR, KS, MO, OK. District 10-Roy Flores, (210) 735-8900; LA, MS, TX, NM, Panama. District 11-Gerald D. Swanke, (360) 607-3735; AK, CO, ID, MT, OR, UT, WA, WY, Guam, Okinawa. District 12-Eugene Hudson, Jr., (760) 233-7600; AZ, CA, HI, NV. District 14-Dwight Bowman, (202) 639-6447; District of Columbia, Montgomery and Prince George's Counties in Maryland; Arlington and Fairfax Counties and the City of Alexandria in Virginia.

Produced by the AFGE Communications Dept.: Director, Enid Doggett; Web Site Developer, Rodrigo Maniera; Communications Specialists, Kurt Gallagher, Emily Ryan & Jemarion Jones; Staff Assistant, Kim Kennedy. Union-designed by GO! Creative and union-printed by Mount Vernon Printing Co. Periodicals Postage Paid at Washington, D.C. **Postmaster:** send change of address to AFGE—The Government Standard, ATTN: AFGE Data Processing Dept., 80 F St., NW, Washington, D.C. 20001.

  

# AFGE—THE *Homeland Security Union*

(continued from page 1)

"AFGE is poised for this election and is confident that CBP workers will make the right decision and join their colleagues in the Border Patrol and the other DHS agencies by electing AFGE as their only union."

In addition to Border Patrol, ICE and CIS, AFGE represents DHS employees in the Federal Law Enforcement Training Center, (FLETC), FEMA and Coast Guard. And although TSA screeners remain deprived of collective bargaining rights, AFGE has represented TSA screeners before the Disciplinary Review Board, the Office of Workers' Compensation, the Equal Employment Opportunity Commission, in the courts, before Congress and in the media. In fact, AFGE recently won back the job of TSA Local 1 President Ron Moore after he was wrongfully terminated (story on p. 4).

AFGE also is committed to maintaining a voice in CBP for agricultural specialists and technicians. Accordingly, the National Association of Agriculture Employees has urged its members to support AFGE in the upcoming election.

"The NAAE Executive Committee and its CBP advisory committee unanimously concluded that AFGE affords Legacy Agriculture the best opportunity to stay together, have its voices heard, and to work as a union and with management to accomplish the Agriculture mission," NAAE National President **Michael Randall** wrote in an open letter to his members.

AFGE has actively fought on behalf of DHS workers across the country, most recently winning millions more dollars on behalf of hundreds of current and former employees of DHS (ICE, CBP and CIS) to compensate employees for unpaid overtime.

This decision follows a $20 million initial payment that AFGE secured from the agency last June and covers "suffer or permit" overtime, which is time worked that remains undocumented in agency records. An example would be time spent while traveling to a temporary duty station.

The case initially was filed against the Immigration and Naturalization Service 11 years ago on behalf of thousands of INS employees who were not properly compensated for their overtime. Much of INS

became part of ICE when DHS was created in 2002. After years of delaying tactics—first by INS, then later by DHS—arbitration hearings began in December 2003 and concluded in November 2004. The initial payment of $20 million, covering traditional overtime, was made in June 2005, following several months during which AFGE pressured DHS to honor its obligation to compensate the affected employees.

"This is just another example of AFGE's philosophy of aggressively representing the rank-and-file CBP employee," Gage said. "We may not win every battle, but we can be counted on to fight every round."

## AFGE Awaits Ruling

(continued from page 1)

AFGE, along with several union coalition partners, started its fight to protect the rights and pay of civilian DoD workers by filing a lawsuit in February 2005 challenging the legality of the rules.

AFGE has argued that DoD defied Congress by refusing to engage in any meaningful collaboration with the unions that represent the department's employees, as called for in the legislation that authorized the creation of NSPS. AFGE has consistently stated that NSPS stands to devastate the federal workforce by gutting worker pay, eliminating collective bargaining rights, rendering whistleblower protections moot and wasting millions of taxpayer dollars.

The AFGE-led lawsuit that prompted the Jan. 24 hearing mirrors a lawsuit filed by AFGE and other labor unions against comparable personnel regulations at the Department of Homeland Security (DHS). Twice last year, Federal District Judge Rosemary M. Collyer ruled to block implementation of the DHS proposal because of illegal provisions.

"We are confident that Judge Sullivan will rule against DoD's extreme personnel proposal," said AFGE National President **John Gage.** "AFGE won a similar case against the Department of Homeland Security, and we will win against this misnamed DoD scheme."

If implemented, NSPS would eliminate the decades-old general schedule (also known as GS) pay scale system and other federal workplace rules and affect 750,000 civilian defense workers.

## AFGE to Continue Efforts to Protect Vets From Threats to Health Care Programs

In 2005, AFGE activists worked tirelessly to shed light on the administration's efforts to compromise the care of the nation's veterans by outsourcing the jobs of those that protect their well-being. In 2006, AFGE will continue to pressure the administration and Congress into keeping the promises made to the men and women who proudly served their country. Here are some updates on pending legislation and a look ahead to what veterans and activists can expect in the future from AFGE.

**Contracting Out.** AFGE will be closely monitoring the progress of a contracting out proposal contained in Section 7 of the Veterans Health Care Act of 2005 (S. 1182). As a result of AFGE's diligence, that proposal contains a ban on spending $300 million in veterans' medical dollars for contracting out studies of 36,000 jobs at the Veterans Health Administration (VHA). At the same time, it allows the VA to establish a limited two-

year pilot project for comparing the Office of Management and Budget cost competition process and the VA's own business process reengineering approach to increasing efficiency.

As S. 1182 moves through the House, AFGE will continue to monitor and block any attempts to weaken the spending ban language and will work to ensure that the pilot project is carried out responsibly and the results are reported properly to Congress.

**Budget.** Earlier this year, the VA admitted to a health care funding shortfall of more than $1.2 billion because the VA and the administration inexplicably failed to estimate the number and impact of veterans returning home to the United States from the wars in Iraq and Afghanistan. To plug the budget holes, Congress and the administration approved $1.5 billion in emergency funding for fiscal year 2005.

(continued on page 4)

# AFGE Wins TSA Employee Reinstatement

An employee with the Transportation Security Administration received the perfect holiday gift: his job back.

Thanks to the efforts of AFGE, the employee was restored to his job as a transportation security screener at Baltimore-Washington International Airport.

**Gony Frieder,** assistant general counsel in the AFGE General Counsel's office, described the screener's reinstatement as a "stunning victory" for him and other workers at TSA. On the screener's behalf, AFGE successfully argued that he was given insufficient notice of the alleged offense before his termination.

TSA has a policy that prohibits screeners from having delinquencies of greater than $5,000 unless they show proof that they are adhering to payment plans. Last year, TSA required the screener to prove that he was in compliance with the agency's debt policy due to an alleged debt of $20,812.

The TSA gave the screener only 10 calendar days to supply the evidence. Before the 10 days were up, however, it proposed to terminate the screener for failing to provide an explanation for the alleged indebtedness.

On an appeal to the TSA's Disciplinary Review Board, AFGE argued that the TSA failed to provide meaningful notice to the screener before termination. AFGE said the screener was not given sufficient time to respond and was not progressively disciplined. AFGE said also that because the screener did not actually owe a debt of greater than $5,000 as alleged, he was not on notice that he had to correct any financial wrong. The DRB's decision adopted many of the points made in appeal.

AFGE is the only union that has actively fought on behalf of employment rights for TSA's screeners. Although screeners remain deprived of a collective bargaining agreement, AFGE represents screeners before the Disciplinary Review Board, the Equal Employment Opportunity Commission, courts, in Congress and in the press.

## Holidays Left You Short?

### The Holiday Bonus Bucks Campaign Is Your Answer!

Need help paying those holiday bills? Don't forget the Holiday Bonus Bucks campaign. You have until February 28, 2006, to earn money for every co-worker you get to join AFGE. You can pay off debts, add to your savings or buy yourself that something you've always wanted—all while building AFGE! Everybody wins.

For details, membership applications and complete instructions, visit **www.afge.org** and look for "Holiday Bonus Bucks" or call the Membership and Organization Department at 202-639-6410.

# AFGE to Continue Efforts to Protect Vets From Threats to Health Care Programs

(continued from page 3)

In November 2005, Congress agreed to appropriate $70 billion in VA funding for fiscal year 2006, which includes $22.5 million in health care funds, a more than 8 percent increase over last year. Congress also scrapped heavily criticized plans to apply a 1 percent budget cut to the VA budget. Despite these gains, the VA remains chronically under-funded, and veterans suffer as a result.

In 2006, AFGE will continue to fight for a more assured funding process that brings certainty to program funding. AFGE also will closely monitor the appropriations subcommittees to ensure that no health care funds are set aside for contracting out reviews and that the fiscal 2007 budget meets the needs of the nation's veterans.

**Physicians Pay Bill.** In recent years, AFGE activists and lobbyists worked behind the scenes to ensure the passage of the Physicians Pay Bill. The bill, which sets up new provisions to recruit and properly pay physicians recruited into the federal workforce, finally took effect on Jan. 8, 2006. However,

AFGE remains concerned about the future enforcement of the law because doctors and dentists have largely been excluded from the implementation process during the past year despite written demands from AFGE.

However, after writing members of Congress, VA management has agreed to meet with National VA Council President Alma Lee to hear AFGE concerns about representation on compensation panels, market pay rates, performance pay and the exclusion of union officials from key meetings. In 2006, AFGE will continue to pressure the VA to involve unions in the implementation process and to ensure that federal physician pay ranges reflect the current market.

**IT Centralization.** The VA is a pioneer in electronic medical records usage and a variety of technological innovations. In 2006, AFGE will continue to monitor new legislative IT proposals, especially ones that would aim to centralize IT functions, and inform Congress about changes to the IT system that may adversely affect the ability of physicians, nurses and other health care providers to serve patients.

# iPod Sweepstakes

## There's Still a Chance to Win an iPod Nano!

Due to the holiday crunch, we have extended the deadline to enter the sweepstakes for a chance to win a 2GB iPod nano, courtesy of the Member-Only Benefits program and Apple Computer.

Enter online or by mail by March 15, 2006! Go to the Member Benefits section of the AFGE Web site: www.afge.org, or send your name, address and member number to: AFGE, M&O Department, 80 F Street, NW, Washington, DC 20001.

The Apple Member Purchase Program also offers AFGE members a variety of great deals on popular Apple products—some surely will bring music to your ears. For more information go online to AFGE's website or call 1-800-MY-APPLE (1-800-692-7753).

# *Never Stop Learning*—AFGE Education Department Launches New Web Site—education.afge.org

A FGE members—at the local, district and national levels—do battle every day on behalf of the American people and the government employees who serve them. Our job in AFGE's Department of Education and Leadership Development is to shore up this battle with quality training programs and tools that empower AFGE members to become effective leaders at work, in the union and in the community.



AFGE
**Never Stop Learning!**
training | resources | opportunities

In December 2005, the Education Department launched its latest leadership tool—the AFGE's Education Web Page. Log onto education.afge.org and check out:

- AFGE's 2006 Training Calendar
- Leadership Classes
- AFGE Training Modules and Handouts
- College Scholarships for AFGE Members and their Families
- Volunteer Opportunities

And remember, *"Never Stop Learning."*



## December New Leaders Class Informs and Inspires

Nearly 40 AFGE local leaders participated in the New Leaders Training held this past December at the National Labor College. From Bath, ME, to Sacramento, CA, Officers from 25 different locals honed their skills in representation, organizing, and political action.

*Back row, from left:* Curtis Mitchell, L916; Ken Brucks, L911, Rudolph Porter, L503, Joseph Riley, L2, Victor Gadson, L31, William Allen, L2785, Cecilia Barnes, L4055, Jeff Vanzandt, L916, Gail Brown, L1534, Robert Swanson, L510. *Middle row, from left:* Monroe Johnson, Headquarters Staff, Lawrence Williams, L1534, Ginny duRivage, Education Director, Francisco Smalls, L2263, Russell Varnado, L476, Miriam Rockmore, L1793, Jennifer Salmon, L510, Denis Salmon, L510, Bryce Davis, L1969, Paul Masich, L1698, Glenroy Richards, L2440, Nancy Lopez, L2440, Mohamed Elmesewdy, L51, Terrence Johns, L2341, Toni Douglas, Education Staff. *Front row, from left:* Letisha Nickson, L2718, Randy Maluchnik, L1969, Nancy Jacobs, L2906, Wayne Stubblefield, L1438, John Gross, L2152, Daniel Pursch, L1616, Gerald Caswell, L1840, Ida Gage, L31.

# *Activists*: The Heart of AFGE

U nion activism is critical to the future of the American Federation of Government Employees, according to **Robert Nicklas** of the Legislative & Political Action Department at AFGE headquarters.

"After 30 years in this work there's a sight that still puts a smile on my face: It's AFGE activists standing up for their rights," he said.

"The situation varies from helping to sign up potential members to attending a rally, meeting with their management, or handing out fliers. What matters, and what puts the smile on my face, is that regardless of the action, AFGE members have decided to get involved. That decision is critical to the future of our union."

Nicklas added that the more activists AFGE has, the "more we will grow, and that



improves our ability to win better pay, better benefits and better working conditions for federal employees. Given the challenges we face, we need more activists than ever before."

Activism does not have to be time-consuming, he said. It only takes a few minutes to call, write or e-mail your lawmaker. Members with an hour or two to give could stuff envelopes for a mailing to other AFGE members.

"Or you can walk down the hallway and spend an hour helping to sign up potential members at a lunch and learn or pass out leaflets before or after work," he said. "There's a lot to do, no time to waste and each activity, no matter how small, helps make us a stronger union."

*(continued on page 7)*

# AFGE Wins Overtime Money for ICE Employees
## AFGE Says Decision Cements Its Status as the Homeland Security Union

The American Federation of Government Employees has won additional money on behalf of hundreds of current and former employees of the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE) to compensate employees for unpaid overtime.

This decision follows a $20 million initial payment that AFGE secured from the agency in June 2005.

"Finally, ICE employees will be compensated for overtime worked, that until now was illegally denied by the agency," said **Joe Goldberg**, AFGE assistant general counsel and the attorney who pursued the case.

This decision covers "suffer or permit" overtime, which is time worked that remains undocumented in agency records. Examples of "suffer or permit" overtime would be time spent while traveling to a temporary duty station or time spent when an employee worked through an "off the clock" lunch.

The case initially was filed against the Immigration and Naturalization Service—which became part of ICE when DHS was

> **"AFGE will continue to fight on behalf of government employees, . . . regardless of bullying tactics or attempts to unjustly strip employees of their workplace rights."**
>
> —AFGE National President John Gage

created in 2002—11 years ago on behalf of thousands of INS employees who were not properly compensated for their overtime. After years of delaying tactics by the agency, arbitration hearings began in December 2003 and concluded in November 2004.

The initial payment of $20 million, covering traditional overtime, was made in June 2005 following several months during which AFGE pressured DHS to honor its obligation to compensate the affected employees.

"AFGE is *the* union of the Department of Homeland Security," AFGE National President **John Gage** said. "AFGE will continue to fight on behalf of government employees, including employees of the Department of Homeland Security, regardless of bullying tactics or attempts to unjustly strip employees of their workplace rights."

AFGE is leading a legal fight against DHS over proposed personnel changes (Max[HR]) that the union says would impose subjective rules for pay raises and promotions, strip employees of whistleblower protections and illegally impede unions in the federal workplace. In August 2005, AFGE and four other unions won a decision against DHS that declared several major provisions of Max[HR] to be illegal. In October 2005, the same judge reaffirmed her decision and told DHS that it could not implement any portion of its proposed personnel system until it was made consistent with the law.

---

# AFGE Wins Arbitration for CBP Employee Rights

AFGE recently won a victory in its efforts to protect the rights of Customs and Border Protection officers on shifts and work assignments.

An arbitrator ruled that Customs and Border Protection (CBP), an agency in the U.S. Department of Homeland Security (DHS), must bargain with local unions—not simply with national unions—on issues covered by collective bargaining agreements such as shift hours, overtime, and communications with bargaining unit members on grievances, personnel policies, and other areas (Case No. NY-2005-1596, Arbitrator's Docket No. 05433-B, COSS Grievance).

The arbitrator's decision grew out of a grievance filed Feb. 8, 2005, by AFGE Local 1917 on behalf of federal workers at John F. Kennedy Airport under Articles 9(A) and (9) of an accord, known as Agreement 2000, which covered "legacy" employees from the old Immigration and Naturalization Service. The local union accused CBP of changing long-established practices on shifts and work assignments without nego-

tiating or discussing them with the locals.

The agency argued, however, that Agreement 2000 was superseded by Executive Order 13203, which relieved agency officials from certain collective bargaining obligations but did not prohibit them from such bargaining, and the National Inspectional Assignment Policy (NIAP). The agency claimed the union failed to exercise its right to bargain over the NIAP when that document was issued, but the arbitrator ruled that the union provided sufficient evidence to demonstrate that it did request bargaining, including filing several unfair labor practice charges with the Federal Labor Relations Authority.

When the federal government set up DHS, it said that all collective bargaining obligations that existed in the agencies folded into the department would "carry forward" and remain active.

The grievance charged CBP with changing practices, such as posting temporary and permanent schedules and permitting employees to trade shifts.

---



## New Nurse Steering Committee to be Created

The National Executive Council has approved the creation of a Nurse Steering Committee. National Vice President Jane Nygaard has been designated by President Gage to head the committee.

The Nurse Steering Committee will craft a plan of action to respond to the many challenges of working as a nurse in the federal sector.

If you are interested in becoming a member of the Nurse Steering Committee, please send an e-mail to mcquic@afge.org with the following information: name; job title (RN, LPN, etc.); agency; years of federal service, and a short statement about why you would like to be considered to be a member of the committee.

# Bureau of Prisons Local Still Fighting To Resolve Pay Issues for Officers Who Battled Hurricane

## *Feds Called Unprepared for External Threats to Correctional Units*

Despite higher marks for the federal and state response to Hurricanes Rita and Wilma in comparison to Katrina, the correctional staff at the Beaumont Federal Correctional Complex in Beaumont, Texas, can attest that not every federal agency is prepared to confront emergency situations.

As virtually the entire population along the Gulf of Mexico between Galveston, Texas, and Shreveport, La., was being evacuated, the Beaumont correctional officers (COs) were being abandoned.

Americans expect federal and state agencies to have plans in place for responding to an emergency or disaster. Yet as Hurricane Katrina tragically demonstrated, existing plans may be inadequate and rendered ineffective by incompetence among top managers. The experiences of the Beaumont correctional staff that lived through the landfall and aftermath of Hurricane Rita suggest that the Bureau of Prisons (BoP) is woefully unprepared for external threats to correctional facilities.

The projected path of Hurricane Rita, one of the most powerful hurricanes ever recorded, prompted a massive evacuation along the Gulf of Mexico. The mayor of Port Arthur, a community near Beaumont, ordered a complete evacuation, including first responders and police. Yet BoP made no effort to evacuate Beaumont FCC, nor did the agency send any emergency supplies—such as food, water, generators, medical supplies, tents, or cots—to the facility in advance of the storm.

On Friday, Sept. 23, 2005, word came down from BoP headquarters that non-essential personnel would be permitted to evacuate, as would one parent in a family where both parents worked at the facility. Staff forced to stay brought food, water, blankets, boats and jet skis to the facility in preparation for the storm's landfall. Prisoners held in cells on the ground floor were relocated to the second floor in anticipation of flooding, resulting in four-to-five inmates per cell.

As the power failed on Friday night, Hurricane Rita roared toward land as the most powerful type of hurricane, a Category 5 storm.

"The prison buildings are constructed of steel and cinder blocks, but they didn't feel safe under the onslaught of the storm," said **Isaac Ortiz**, president of Local 1010 at Beaumont, and a correctional officer.

"If Hurricane Rita hadn't weakened, we might not have survived," Ortiz added.

Although Hurricane Rita was downgraded to a Category 3 storm by the time it made landfall, circumstances inside Beaumont had just begun to get ugly.

Without electricity or emergency generators, the clear skies following the storm caused temperatures to rise inside the correctional buildings to dangerous levels. Staff and inmates found it difficult to breathe in the swamp-like atmosphere.

Staff slept wherever they could—on desks, in chairs, or on empty patches of floors. Inmates made due with sandwiches that were prepared before the storm, while staff consumed the food they were able to bring from home.

Water consumption had to be carefully rationed—a dangerous practice in the extreme heat—lest the safe supply in the Beaumont water tower run out. The lack of running water meant that inmates had to use plastic bags for their bodily wastes and correctional officers had to collect the bags.

According to AFGE representatives, miscommunication and miscues marked the agency's response in the days following the storm. BoP officials turned away emergency

generators. Other supplies offered by the National Guard were also turned away initially by management, only to be redirected back to Beaumont. Supplies did not begin to trickle into the facility until Sept. 27.

Relief crews of correctional staff from other facilities in the region were waylaid at a bus terminal near Houston, sleeping on cots, instead of quickly being deployed to Beaumont.

"After several days of keeping the relief crews in limbo, the council had to step in and demand that the Bureau of Prisons either deploy the relief staff, put them up in a hotel or send them home," said **Bryan Lowry**, president of the Council of Prison Locals. "It was the only leverage we had to get some assistance to Beaumont, and it worked."

The relief staff arrived at Beaumont on Sept. 28, five days after the landfall of Rita.

Months later, the council is still struggling to resolve issues on behalf of the Beaumont COs. Lowry explained that the bureau has refused to pay overtime to those who worked through the storm, despite the fact that staff were unable to leave until relief crews arrived.

"We risked our lives, remaining at our posts, yet now the Bureau of Prisons wants to get petty on overtime," said Ortiz. "The COs who lived through this are devastated because of the lack of support from our agency."

# *Activists*: The Heart of AFGE

*(continued from page 5)*

Nicklas offered a few tips for getting involved.

First, he said, members need to get connected. "Go to *www.afge.org* right now and sign up for **AFGE Actions News**," he said. "That's our e-mail alert system that will keep you posted on hot issues and what you can do about them. Point, click and write, call or e-mail your lawmaker in just a few minutes."

Members also need to join the AFGE Volunteer Corp. "AFGE launched the **Volun-

teer Action Corp** in 2004," he said. "You can volunteer for a wide variety of activities from helping out at a lunch and learn to attending a rally or stuffing envelopes." Members can sign up for the Volunteer Action Corp at *http://education.afge.org*.

Most importantly, members need to think positively and long term, he said.

"We can continue to successfully meet the challenges we face by organizing and mobilizing our members in ever greater numbers each year."

HEADQUARTERS SPOTLIGHT

## *At Your Service:*
# Legislative Department

**B**eth Moten, legislative director, says that if she were not a lobbyist at AFGE, she would still be working for another union. "I love standing off the House and Senate floors asking legislators for their votes on AFGE issues."

Beth started her career as a national representative for the National Federation of Federal Employees where she held positions as both a lobbyist and legislative director. She joined AFGE in 1989. Beth received both a bachelor's degree in English and finance from the University of Texas. She is married to another labor lobbyist and has two union-loving children.

**John Threlkeld** is the assistant legislative director and works mostly on contracting out and privatization issues for AFGE. Prior to coming to AFGE, John worked as a legislative aide on Capitol Hill, as well as worked for the Federal Emergency Management Agency. John believes that even though Congress is operating under a hostile administration, AFGE still has had successes on some important issues. "It's very rewarding to know that all the hard work pays off," says John, especially with the Transportation Security Administration and Department of Defense wins. John attended Columbia University and the UCLA School of Law.

**Marilyn Park** began her career at the Social Security Administration and later worked with the Atlanta Legal Aid Society. Marilyn said she loves working with the National Veterans Administration (VA) Council officers and its members. "They make us proud with how well they serve the veterans in the VA system," she said. Marilyn graduated from Barnard College and George Washington University Law

School. "If I weren't working here at AFGE, I would work at Senator [Daniel] Akaka's [D-Hawaii] district office since he is so proveteran, and I could outrigger canoe year round in an idyllic environment," Marilyn said, smiling.

**Alan Kadrofske** began his career at AFGE five years ago. He enjoys analyzing AFGE



*The staff of the Legislative Department includes (front row, left to right) Charity Wilson and Beth Moten. Back row: Linda McCumber, Marilyn Park, Alan Kadrofske, and John Threlkeld.*

issues and making the "case" to members of Congress. Alan says his first "real" job was as a legal assistant at the law firm of McNamee & Associates in Port Huron, Mich., a firm which specialized in worker's compensation and Social Security disability issues. He also worked as a legislative assistant in the offices of U.S. Representatives Peter H, Kostmayer (D-Pa.) and Tom McMillan (D-Md.).

Alan has run three 26.2 mile marathons: the Marine Corps Marathon in Washington, D.C.; the Irish Marathon in Dublin, Ireland; and the New York City Marathon. He is also planning to run the Italian Marathon in Florence, Italy, in December 2006.

**Charity Wilson** recently joined AFGE as a legislative representative in the Legisla-

tive & Political Action Department. Charity will focus on lobbying on behalf of AFGE on Transportation Security Administration issues, in general, with a particular emphasis on the issues of airport screeners. She will also work with District 14 in representing the interests of D.C. workers.

"I am inspired by interaction with local union members, especially in mobilization efforts," says Charity. Prior to her employment with AFGE, Charity worked for the AFL-CIO, first as a legislative representative in the legislation department, then as the lead coordinator for equity issues in the department of public policy.

She handled immigrant and low-wage worker issues and provided policy support for the department of civil rights. Charity graduated from the University of Kentucky and the University of Louisville School of Law.

**Linda McCumber** began working at AFGE in 1977 in the old Pay and Classification department and has been with the legislative department since 2004, after being reassigned from the national president's office. "I enjoy the fact that we are helping to make a difference in people's lives," says Linda. "We have a great group of people working together to make that happen."

As a legislative assistant, Linda contributes in all areas of the legislative department. In addition to her administrative duties, Linda researches the status of bills and pending legislation. For the last several years, she has assisted with hotel logistics and the registration process for the **AFGE Legislative Conference**. The conference will be held this year on March 5- 9 at the Hyatt Regency in Washington, D.C. (www.afge.com).

# EXHIBIT C

Houston Press, *A Prison Cover-up During Hurricane Rita*



**News**

write to the editor | email a friend | print article | Write Your Comment

# A Prison Cover-up During Hurricane Rita

For days after the storm, inmates in Beaumont lived without A/C, electricity or hot meals. Press releases kept saying everything inside was fine. Guards and prisoners agree — that was nothing but B.S.

**By Chris Vogel**

Published: March 6, 2008



Ilana Kohn

When inmates finally got to the shower, the water was full of debris.

Ilana Kohn

Relatives were getting different stories from inmates than from prison officials.

Subject(s): <u>Federal Bureau of Prisons, Hurricane Rita, Beaumont prison cover-up, Nationwide lawsuits</u>

As Hurricane Rita thundered towards him, Garrett Deetz lay terrified and confused on his bunk, locked up inside a cell at the United States Penitentiary in Beaumont.

For the past two days, he and about 1,300 other maximum-security inmates had watched and listened to news coverage on television and radio as the residents of Jefferson County followed a mandatory evacuation order and fled their homes in anticipation of one of the fiercest storms in American history.

The images of destruction and suffering in New Orleans that played over and over on national TV in the wake of Hurricane Katrina less than a month earlier were still fresh in Deetz's mind. And now Rita, which weather experts were touting as even

## Most Popular

Most Viewed    Most Commented    News

**Barack Obama and Me**
It was the year 2000 and I was a young hungry reporter in Chicago covering a young hungry state legislator

**Mescaline on the Mexican Border**
Texas is the only state in the country where peyote is sold legally. Really.

**Save Lobo: A Siberian Husky Mix is Sentenced to Die**
Why? Because he's big and intimidating and because one family complained about him over and over again

**Fish Frenzy at Tokyo One**
Pile your plate with scads of sashimi at this new all-you-can-eat Japanese buffet

**Little Bitty Burger Barn**
"It's okay to be little bitty in the big city" is an apt slogan for this new burger joint, where sliders rule

"Most Popular" tools sponsored by:

Blogs

**Do We Finally Have a Republican Candidate Who Can Cure Bird Flu?**
11:42AM 03/05/08

**Reverberations: Thee Headcoatees, The Love Me Nots, The Black Hollies and L.A.**

more intense, with winds blasting across the Gulf of Mexico at 175 miles-an-hour, was heading for him.

Inside his cage, Deetz and his cellmate couldn't understand why the warden had not moved them to safer ground.

"We kept hearing on the news that everybody needed to get out," says Deetz, "and I kept telling my cellie, 'Bro, they've got to get us out of here; they're saying everyone has to go. There's no way they can just leave us here.'"

But no one inside the pen was going anywhere.

It was around 4 a.m. on September 24, 2005, when Hurricane Rita plowed into the Beaumont area. By then, the storm had weakened some, dropping from a Category 5 to a Category 3 hurricane, but winds still roared at more than 110 miles per hour as sheets of rain fell from the predawn sky.

Suddenly, the lights inside Deetz's cell flickered and went completely dark as he heard the air-conditioning system grind to a halt. All power was gone. Deetz's cellmate had just taken a bowel movement, but the toilet would not flush. The plumbing was shot. A garbage bag held the only drinking water available. Guards had handed out the plastic bags before the storm, telling inmates to fill them with tap water in case the hurricane knocked out the sewer and water systems. There wasn't a scrap of food in Deetz's cell.

At the bottom corners of the only window in the third-floor cell, water was streaming in — not enough to cause flooding, but enough so that everything in the room including Deetz's mattress, sheets and clothes was getting soaked.

"The window was shaking hard and you could hear the wind," says Deetz. "Even the walls were shaking. It was terrifying. I thought the window was going to blow out and the water was going to come in and we were going to die in our cell."

After the storm, Deetz heard inmates crying out for help. But no one, he says, was there to answer. Deetz peered out his window, and saw nothing but the devastated landscape.

"It was like an Armageddon movie," he says. "I remember thinking, 'Beaumont is gone. There is no

**Slumlords**
10:45AM 03/05/08

. **Aeros Come from Behind and Best the Providence Bruins**
11:13AM 03/05/08

. **Perchance to Make Tortillas at a Tex-Mex Restaurant**
06:06AM 03/05/08

**Be Social**



American Gangster
Amy Sillman: Suitors...
birth defects  Bob Dylan
Christmas Tree-O

What we are writing about

**Continental Club  Houston art**
Houston local music  **Houston music stores**
Houston Rockets  **Houston theater**
I'm Not There  illegal immigrants  Main Street Theater
McGonigel's Mucky Duck  Meridian  Perspectives 158:...
players' scoring averages  Proletariat  Rudyard's
Rumors  Sig's Lagoon  Somerville  Sound Exchange
toxic industrial...  Toyota Center  Turkeys of the Year
Verizon Wireless Theater  Warehouse Live  Wii

Recent Articles        Related Articles

**Recent Articles By Chris Vogel**

**Critics question realtor Wayne Stroman's timeshare resale business**
The Getaway

**National Features**

| **Seattle Weekly** | **Miami New Times** |
| --- | --- |
| Country and Northwestern | The Accidental Hit Man |
| Forget grunge. When it comes to music, Seattle's a cow town. | But at least there was no "bitchy, little-boy attitude." |
| By Brian Barr | By Tamara Lush |
| **Village Voice** | |
| Buying Gracie Mansion | |
| Meet John Catsimatidis, the next billionaire mogul who wants to be NYC mayor. | |
| By Graham Rayman | |

Beaumont. And we're stuck in this cell, with bars and a steel door. What do we do?' That was the thing that scared me the most. Nothing compares to that feeling of looking out and not seeing anyone anywhere."

Meanwhile, Deetz's mother, Judith, was frantically phoning the prison to find out if her son was okay. She says it took her several tries to get someone to answer, but finally an official taking calls told her the inmates had all been moved out before the hurricane hit. Judith felt relieved. And she was not alone. Around the same time, many wives, mothers and loved ones desperate for news were calling a Federal Bureau of Prisons information line. They say operators told them that though the inmates had not been evacuated, they were assured that everyone was safe and well cared for.

Newspapers reported the same story. Bureau of Prisons spokesman Mike Truman, for instance, told the *Houston Chronicle* four days after the storm that inmates had portable toilets and were getting two hot meals and one cold meal a day.

But now, following a *Houston Press* investigation, new details are emerging that suggest none of that was true at the maxium security prison. According to Deetz and other inmates, conditions in the days and weeks following Hurricane Rita were medieval.

As temperatures hovered around 100 degrees, Deetz and his cellmate were locked up for weeks without any ventilation or escape from the rising tide of urine and feces accumulating in their cell. For two days, they did not receive food, and when supplies finally began to trickle in, there was nothing but peanut butter sandwiches on moldy bread and stale potato chips. Deetz claims he did not get a hot meal for about a month. The small bottles of water handed out were simply not enough to combat the intense dehydration Deetz suffered as he sweat uncontrollably. The paint on the walls began to peel off, and prisoners begging for help and screaming out for someone to open their food slots so they could get some air had trouble breathing due to the humidity.

"We were helpless," says Deetz. "It was the worst thing I've ever been through my entire life."

Asked to respond to allegations in this story, Bureau of Prisons spokeswoman Traci Billingsley in Washington, D.C., and Deborah Denham, executive assistant at the South Central Regional Office in Dallas, declined to comment, citing pending litigation.

In all, scores of inmates including Deetz say they were deprived of nearly every basic human need for several weeks, including food, water, sleep, medicine, clean clothes, showers and flushing toilets.

Independently, the president of the local chapter in Beaumont of the American Federation of Government Employees, who represents the federal corrections officers, backs up most of the inmates' claims, telling the *Houston Press* that conditions inside the penitentiary after Rita were the worst he'd ever endured and that the Bureau of Prisons was to blame.

All the while, the outside world knew nothing of what was happening. Understandably, people believed what prison officials were reporting, that everyone was okay. No one knew that inmates were suffering and that not everyone was receiving proper medical care. Even after the status quo had been restored,

still no one knew, as prison officials did all they could to keep the conditions quiet by allegedly threatening inmates and discouraging them from seeking justice.

But two years later, thanks to a class-action lawsuit filed by an Ohio civil rights attorney on behalf of more than 400 current and former inmates at USP Beaumont, all that is about to change.

Attorney Norman Sirak is a bowling ball of a man with wispy, Einstein-like gray hair. He works in Canton, Ohio, alongside his wife, who escaped from the Communist regime in Poland as a child, and his paralegal, who is an ex-con.

Sirak is a self-described liberal and hippie who went to law school at American University in Washington, D.C., where he protested against the Vietnam War.

For many years, Sirak made a healthy living working in the securities field, filing registrations for small companies. Then one day about seven years ago, a client of his who had gone to prison for securities fraud told Sirak about some problems he believed existed in the Ohio parole system. It was then that Sirak's legal career took a turn. He filed a class-action lawsuit against the state's parole board, a case which he is still fighting and is preparing to submit to the U.S. Supreme Court. Sirak has also launched separate class-action cases against the Pennsylvania parole board and the Texas parole board. In the Texas case, the United States District Court for the Western District of Texas dismissed the case and Sirak is currently appealing that decision to the U.S. Court of Appeals for the Fifth Circuit.

"Finally I am doing what I think I was always meant to do," he says.

It started out as just another day last August inside the cramped office where Sirak was working on his parole board cases when he opened up a letter from an inmate at Beaumont. The note was from Kelvin Andre Spotts, a prisoner inside the federal penitentiary, explaining how he had filed a pro se lawsuit on behalf of dozens of inmates concerning poor treatment and conditions during Hurricane Rita. A judge had denied class-action status to Spotts's case and now he was looking for an attorney to pick up the pieces. Two years earlier, Spotts had read an article in a legal magazine about Sirak's work for prisoners' rights, and he had held on to it ever since.

Time was of the essence, and Sirak immediately jumped on the case.

"We had a very hectic first five or six weeks," says Sirak, "trying to figure out what happened and to get as many people as we could to join. Because we had to beat a deadline."

Before inmates could join the lawsuit, says Sirak, they first had to exhaust their administrative remedy within the federal prison system. That meant they had to file a tort claim within two years of the incident in question. The problem, Sirak says, is that prison officials at Beaumont were trying to keep inmates from filing their claims, and the two-year statute of limitations was almost up.

"It was a real big push to get everyone to file their claim," says Sirak. "But somehow we got it done."

Sirak put an advertisement in the *Beaumont Enterprise* trying to acquire clients. In one day, he says, the

ad drew in almost 70 plaintiffs. To date, Sirak is representing 426 inmates in the lawsuit.

Spotts, who is serving a life sentence at the penitentiary in Beaumont, is the lead plaintiff and Sirak's liaison to the majority of his clients. When the *Press* asked for an interview with Spotts, Warden John B. Fox denied the request, citing vague reasons of "safety and security considerations."

Sirak, too, has had his share of problems dealing with the prison in Beaumont. In one instance, while he was trying to arrange a meeting with Spotts, the warden's office would not answer his calls.

"When we'd call," says Sirak, "their caller ID identified us as the Sirak law firm. So finally we figured out how to stop displaying our ID, and only then would they answer the telephone. You know, we're experienced people at this. We've been going into prisons in Pennsylvania, Ohio and Texas; it's not like we're neophytes here. But this was like going to school all over again. They've thrown every rule and regulation they can at us."

Sirak spent months working on the initial complaint.

"I looked into Hurricane Rita and what makes up a hurricane," he says. "Then I did research on Hurricane Katrina, because Katrina should have been a message and a lesson, a look at what can happen."

In the wake of Katrina, the administrators at Templeman III jail in Orleans Parish faced national outrage over their handling of the crisis. According to Human Rights Watch, about 600 inmates were locked inside their cells for four days without food, water, electricity or flushing toilets while floodwater surged up to their chests. Unlike other jail officials at the time, Orleans Parish Sheriff Marlin Gusman risked the lives of his prisoners by not calling for help in evacuating the jail until it was almost too late.

Sirak also examined how the Texas Department of Criminal Justice dealt with Hurricane Rita. The state has several prisons in Beaumont very near the federal complex.

Two days before the storm hit, Jefferson County Judge Carl Griffith issued a mandatory evacuation order. Originally, forecasters were predicting Rita would strike to the south and west of Beaumont. Texas prison officials had already begun evacuating facilities south of Beaumont, but as the hurricane shifted, so did the state's evacuation plans.

Bumper-to-bumper traffic on the highways full of fleeing residents prevented the state's buses from getting to the Beaumont prisons in time. So state prison officials called in the U.S. Marshals Service, which airlifted more than 1,000 inmates to other prisons across Texas. The remaining prisoners were sent to the Stiles unit, the sturdiest of the three state prisons in Beamont, to weather the storm. Days after Rita passed, many of the inmates at Stiles were then moved to other, better-equipped facilities.

"It was very helpful to see how Texas responded," says Sirak. "They evacuated people before and after the hurricane and showed they took the duty to protect the people they were responsible for seriously. TDCJ did the right thing, and this lawsuit is going to make a bunch of them smile."

The federal prison complex in Beaumont is comprised of four units: a prison camp, a low-security facility, a medium-security institution and the maximum-security penitentiary. In the lawsuit, Sirak states that both the camp and the prison for low-security offenders were evacuated before Hurricane Rita, and inmates from the medium facility were moved out shortly after the storm. It is the penitentiary, or maximum-security facility, that is the subject of the lawsuit.

The next step for Sirak was to determine exactly what happened.

"I had to figure out day by day and week by week what did the inmates endure," Sirak says. "And I did that by reading their letters, drafting questionnaires and then sending it all back to Kelvin Spotts and asking him if there's anything wrong and so forth. I would always get everything corroborated by several inmates before I put it in the complaint."

Sirak has constructed a timeline based on all of his information.

According to the lawsuit:

On the eve of the hurricane, guards moved inmates on the lowest floor to higher levels, causing some overcrowding in cells. Then they passed out garbage bags for prisoners to fill with water and locked everyone up. After the storm hit, the building was left without plumbing or electricity to run the lights or the air conditioning. For the first three days, inmates received no food and had to drink nonpotable water.

Starting on October 1, inmates began receiving one liter of fresh water and three peanut butter sandwiches a day. Some inmates began experiencing constipation from eating only peanut butter. They still were not allowed out of their cells, and the electricity and plumbing did not work. After two weeks, prisoners were allowed to shower, but the water was brown and filled with debris that stung. Subsequently, inmates experienced rashes and boils on their skin and were not given medicine to treat the problems. After showering, they had to put back on the same sweaty clothes they had been living in for weeks because no clean clothes were provided.

It was not until a month after the hurricane that the electricity was fully restored and the inmates were taken off lockdown and allowed out of their cells for more than a few minutes.

"This was totally senseless," says Sirak. "I think that this mentality is on par with the mentality of the people who ran Auschwitz and all those death camps in Poland. That's honestly how bad I think this is."

It's been more than two years since Hurricane Rita blew through Beaumont, but the corrections officers' union president, Isaac Ortiz, is still storming over what went down inside the prison.

He, along with several hundred other staff, was forced to stay inside the federal complex with his prisoners and ride out both the squall and the terrible conditions that followed.

Ortiz is not part of Sirak's lawsuit. In fact, the two have never spoken.

"When they decided not to evacuate," says Ortiz, "they risked everybody's life."

Ortiz has been working at the Beaumont facility for 12 years. He likes his job, always has, but the conditions after Rita were the worst he says he has ever worked through.

In the days before the storm, Ortiz says that then warden Tim Outlaw and Regional Director Gerardo Maldonado, stationed in Dallas, were aware Rita was coming in as a Category 5 with 100 mile-an-hour winds and surge waters expected to reach 20 feet, which would all but cover the complex's tallest housing unit. In preparation, Ortiz says, officials ordered that the tall perimeter lights be lowered to keep them from toppling and that all vehicles near the perimeter be moved to prevent the winds and water from lifting them up and smashing them against the fence line.

The decision not to evacuate came from management at the South Central Regional office in Dallas and the Central Office in Washington, D.C., says Ortiz.

"The reason they gave us was that they thought the facilities would hold up," he says. "And therefore, they felt like they did not have to evacuate."

Jeffrey Schwartz runs a nonprofit training and research criminal justice consulting group in California called LETRA. Following the 2005 hurricane season, the Louisiana Department of Corrections and the National Institute of Corrections, a division of the U.S. Department of Justice, commissioned him to write the after-action incident report for how Louisiana's departments of safety and corrections responded to Katrina and Rita.

"Every major prison has evacuation plans," says Schwartz. "No one is perfectly prepared for everything, and while you can't judge just on the outcome, the real question is, 'Did you reasonably well prepare for predictable emergencies?' If the answer is no, well, there just isn't any good excuse."

The Beaumont federal penitentiary was never evacuated, and in not doing so, says Ortiz, the Federal Bureau of Prisons violated its own emergency preparedness guidelines.

"It's in their policy that when an emergency like this comes, they're supposed to evacuate," he says. "They have evacuation plans in their own contingency plan, and they violated that. You have to hold the entire Bureau of Prisons accountable. They had the means and they had the budget for emergencies...(but) they made the decision and they put us in harm's way when they didn't have to."

In light of the decision not to vacate, it would make sense to stock up on emergency and survival supplies. But according to Ortiz, hardly a finger was lifted.

"They did not anticipate buildings or the fences holding up," says Ortiz, "yet we were still going to be there. And they did not have supplies, food, water or generators. They didn't have any of that. They anticipated that they had enough food in their warehouse that they could manage for a couple of days, but when you lose power, you can't cook anything."

Ortiz says prison officials did not request additional generators or food for inmates or the staff. In fact, if Ortiz and his colleagues had not brought supplies to the facility from home the night before the hurricane, he says the officers would have had nothing.

"What (the BOP) did do ahead of time," he says, "was they had people with buses standing by in Bastrop just before the hurricane came to come in and get the inmates. If they lost the (prison) structure in the hurricane, they were going to drive in and pick up what inmates were left surviving and then take them wherever."

Schwartz says inmates are sometimes prone to exaggerate the truth, but union leaders like Ortiz are as solid as they come.

"What the union is unlikely to do," says Schwartz, "is invent facts that most of their own staff know are not true because their own membership would be very put off."

When Hurricane Rita struck the prison, Ortiz said he felt the walls shake as the rain pounded the building.

"We thought we were going to die," he says. "It was very traumatic for all the staff and the inmates. It was insane."

However, it was after the hurricane that things began to get even more bungled. According to the January/February 2006 American Federation of Government Employees union newsletter, *The Government Standard*, "Miscommunication and miscues marked the agency's response in the days following the storm. BoP officials turned away emergency generators. Other supplies offered by the National Guard were also turned away initially by management, only to be redirected back to Beaumont."

Ortiz remembers the first days after Rita with disgust.

"I don't understand why they did that," he says. "In those initial couple of days, there wasn't any food or water at all."

Ortiz corroborates most of the claims made by inmates and alleged in Sirak's lawsuit, although his timeline is somewhat shorter.

The power went out for about a week, he says, and many of the generators that were later brought in did not start at first and didn't work properly. Inmates were locked in their cells for about three weeks before the facility was once again deemed secure.

"The facilities are built to have air conditioning," says Ortiz, "but the priority was energy was for the lights in the unit and power for the alarms, so the air was very rare. There's no windows we can use to ventilate the buildings, and because of the humidity, the floors were sweating and the walls were wet. You can't really sleep in heat like that. They went for three or four days without any sleep. It was very stressful for the people at the penitentiary."

Only bag lunches were served to inmates, says Ortiz, and there was a serious shortage of water.

"That's why we couldn't use the toilets for two or three weeks," he says.

Instead, corrections officers collected the plastic bags that inmates had been given to hold feces and

Case 1:08-cv-00044-CKK    Document 10-4    Filed 04/29/2008    Page 10 of 14

urine.

"It's not healthy," Ortiz says. "It's disgusting. And with the heat, oh, the smell."

As an added insult, the Bureau of Prisons refused to pay officers stranded at the prison any overtime, despite the fact they were working 24-hour shifts for more than a week before reinforcements arrived. Ortiz filed a grievance on the union's behalf just after the hurricane, but says he has not yet heard back or seen a nickel in overtime pay.

Ortiz also says that the prison is no better prepared than it was in 2005.

"We had another hurricane that came by this year," he says, "and they dropped the ball on that one. They didn't do any emergency procedures. They're no better prepared today. They've already said that if another hurricane comes, they will not evacuate."

As for what happened with Rita, Ortiz says the Bureau of Prisons "did jeopardize [inmates'] safety. We did put them in harm's way."

Rosalind Burbank Joseph was worried sick. For try as she might from her home in Albany, New York, she had trouble finding out in the days before Hurricane Rita struck what was happening with her husband, an inmate at Beaumont's federal penitentiary.

This was posted on the Bureau of Prisons Web site two days before the storm:

*"Hurricane Rita is being closely monitored, and all necessary precautions are being taken to ensure the safety and well-being of staff and the Bureau's inmate population. Emergency preparations and plans are in place, but we do not release the status of possible actions related to those plans before they occur."*

Frustrated, Joseph began trying to contact the prison itself.

"I called several times before the hurricane," she says. "The person at the prison would not give me very much information. He did say that they were not going to evacuate. I asked to speak to the warden, but that didn't work."

Then the hurricane hit, and for days all Joseph could do was wait and worry.

The Bureau of Prisons had set up an information line through the South Central Regional Office in Dallas for people to call to get information about inmates affected by the storm. Joseph called in within 36 hours after Rita passed.

"They kept reassuring me that everyone was perfectly fine and they were being treated even better than the people out in the free world," Joseph says.

But Joseph says she soon learned this was a lie.

"One thing the prison did get running quickly were the telephones," she says, "and my husband was able

to call me three days after the hurricane. He told me that there was no water, it was extremely hot, it smelled terrible and it was just horrible inside. And during the day, I had been calling the number the BOP was providing for information and they were telling me the opposite, that they were getting hot meals, showers and that the conditions were good."

Likewise, newspapers quoting Bureau spokesmen in the days following the hurricane reported that generators were working and that inmates were getting hot meals and plenty of bottled water and ice.

Union president Isaac Ortiz says it was all a cover-up.

"It was B.S.," he says. "Total B.S. But see, the public relations person, they get a speech or whatever information they can give to the public, and it's already been screened before they tell anybody. And they're not going to say, 'We failed,' or 'We failed to respond.' They're not going to say they failed at anything. They're going to say everything is fine...I mean, this is Federal Bureau of Prisons, they don't tell on themselves."

According to Sirak, this was just one of several cover-ups.

He alleges that the prison suddenly began charging inmates $3 for medical attention whereas before the storm the same care had been free. Sirak claims the reason was to keep inmates from seeking medical help and to conceal injuries inflicted during and after the hurricane, in order to bury any proof that inmates were being treated poorly.

"Ajivin," who says he cannot use his real name because of the rules of the halfway house where he lives in Connecticut, claims he saw firsthand the lack of medical care after Hurricane Rita.

"Everyone was mad and kicking the doors," he says, "and people had medical problems and medical would come like once a day, maybe. And [the staff] didn't have the right medicines."

Ajivin says his cellmate had diabetes and was used to getting insulin shots and having his blood sugar checked twice a day.

"He got his insulin a day after (Rita hit), but he didn't get it every day," says Ajivin. "I was giving him the little bit of food that I did get, trying to keep his pressure up. Because it kept dropping. I didn't even eat, I fasted about three and a half days, giving him my peanut butter to keep his pressure up. The storm was nothing; it was the aftermath that was horrible. I knew his pressure was dropping because he kept getting the shakes and I kept telling him, 'Hold on, hold on.'"

After about two weeks, says Ajivin, inmates emerged from their cells for the first time and were allowed to shower.

"Everybody looked crazy," he says. "Everybody grew hair all over, their eyes were wide open, looked like they were starving, stinking, people had skin rashes from the feces. I was like, 'Man, I can't believe this.'"

The shower water, he says, "stung and was brown and smelly. But we had no real choice; either take it or don't take a shower at all. And then we had to put on the same clothes again."

He and other inmates say the only medicine they received was a couple of aspirin.

In the lawsuit, Sirak claims that medical staff refused to perform any diagnosis on inmates with complaints, only offering over-the-counter drugs to treat symptoms and ignoring the underlying causes.

"I think that the medical staff was ordered from above to do this," says Sirak, "to show that everybody is happy and there's no problems here. Their thinking is that if they can't point to any diagnostics, then there's no evidence of any harm happening. They were trying to kill the evidence at the source."

It was about a year and a half after Hurricane Rita that Garrett Deetz decided to try to seek justice. So, he went to the prison's law library, downloaded the proper administrative tort claim to file against the Bureau and filled it out.

The way it works, according to Deetz, is that inmates file the form with the regional office, whose lawyers investigate the claim and then make a decision.

As per the prison's rules, Deetz gave the form to a corrections officer, whose job is to look over all legal mail, who then was supposed to put it in the outgoing mail. Time went by, but Deetz never received an answer.

"A lot of the times they weren't putting them in the mail," says Deetz. "They said they lost my first tort claim, so I had to file another one."

Sirak says Deetz's story is quite common, another example of the Bureau of Prisons trying to silence inmates and cover-up what happened after Hurricane Rita.

According to the lawsuit, prison officials tried to keep inmates from accessing the legal library to obtain the proper tort forms. Then, when and if a prisoner did get the paperwork, staff held the form and refused to send it out.

Enrico Diaz Hawkins is an inmate at the federal facility in Pollock, Louisiana. He was moved there from Beaumont after the hurricane. In a letter he mailed to Sirak, Hawkins detailed the hurdles he encountered.

"Immediately after the hurricane," Hawkins writes, "many of us inmates questioned the legality of our safety, sanitation, and environmental conditions. We were told that all of the administrations actions were legal and discouraged from pursuing the issue any further with the threat of 'Diesel Therapy'...and the implied threat of bodily harm."

"Diesel therapy," an inmate term, according to Sirak, is when an inmate is shipped to one facility after another, with his personal property never catching up to him. It is considered a severe punishment.

"I personally tried to file an administrative remedy form about a month after Hurricane Rita," writes Hawkins, "and was told by my counselor...and my unit manager...that they lost the form and that it was in my best interest not to pursue the matter any further...I was already stressed out from the inhumane conditions that I was forced to suffer through during the hurricane and its aftermath and I was put under

further duress by the implied threat from those in authority over me so out of fear and prudence I decided to leave the issue alone until I was far away from USP Beaumont."

Sirak alleges in the lawsuit that prison officials punished inmates by taking them off a good prison job or transferring them to a cell with an inmate with an anger management problem to make their lives more difficult. Sirak also states that prison staff invaded cells and took inmates' legal papers as well as instituted lockdown during which time inmates could not mail letters.

"All of this was done under the radar screen," says Sirak. "For example, no one can argue the BOP has the right to take a person from one cell to another. On its face it's neutral. And all the record shows is the transfer, not that the person's new cellmate is an animal from hell. And that's what's so insidious. They're very adept at doing these things that leave no trace of prejudice."

When Deetz finally was able to submit his tort claim 21 months after the hurricane, he listed the Bureau's failure to evacuate, the dehydration, the accumulation of feces in his cell, the inability to bathe for weeks, the unbearable heat and the fear that he had been left, locked up in his cell, to die.

Three months later, he received a letter from Jason Sicler, Regional Counsel for the Bureau in Dallas. In his letter, Sicler denied all of Deetz's contentions.

"An investigation into your allegations could not substantiate your claim," Sicler wrote. "The review of this matter revealed FCC Beaumont (USP) staff took appropriate measures to alleviate the conditions caused by the natural disaster. All available supplies were issued to both staff and inmates as they became available...Therefore, there is no evidence you sustained any personal injury or property loss caused by the neglect or wrongful act or omission of any Bureau of Prison employee...."

Deetz couldn't believe it.

"I was like, 'That's crazy,'" says Deetz. "They denied everything. It makes you think, 'They screwed us and they're going to get away with it.' It makes you think, 'They're the federal government and you can't beat them.'"

"Thank God for Norman's lawsuit."

chris.vogel@houstonpress.com

Show Pages

Write Your Comment

Problem With the Site? | RSS | Site Map
©2008 Village Voice Media All rights reserved.

3/5/2008 1:14 PM

# __EXHIBIT D__

Memo to Penitentiary Inmates, February 22, 2008



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Complex*

P. O. Box 26035
Beaumont, Texas 77720

February 22, 2008

MEMORANDUM FOR ALL STAFF AND INMATES
                 FEDERAL CORRECTIONAL COMPLEX
                 UNITED STATES PENITENTIARY
                 BEAUMONT, TEXAS

FROM:         John H. Fox, Complex Warden
                 Federal Correctional Complex, Beaumont, Texas

SUBJECT:      FCC Beaumont (USP) - Program Change

On Thursday, February 21, 2008, it was announced that
USP Beaumont will undergo a program change and begin housing
primarily medium security level inmates. In the near future, the
Designation and Sentence Computation Center will begin the
process of designating our current high security level inmates to
other high security level institutions. Inmates will be
designated and transferred to other institutions based upon their
security and programming needs, as well as available bed space.
In most cases, medium security level inmates currently within our
population will remain at USP Beaumont. In addition, we will
begin receiving medium security inmates as we rebuild our
population.

At this time, I cannot give you a specific time as to when this
transition will occur. However, I anticipate the process to be
completed within the next several months.

As additional information becomes available, I will keep you
informed. Institution staff will be making routine rounds to
address your issues and concerns.

Sensitive but Unclassified

# **EXHIBIT E**

List of Plaintiff Residences as of April 28, 2008

## Allenwood

| Clifton | Adianshingh | 06314-088 | Allenwood |
|---------|-------------|-----------|-----------|

## Atlanta USP

| Ossie | Trader | 32019-066 | Atlanta USP |
|-------|--------|-----------|-------------|

## Atwater USP

| William E. | Armstrong | 76018-011 | Atwater USP |
|------------|-----------|-----------|-------------|
| Curtis | Greer | 20313-179 | Atwater USP |
| Wallace | Love | 13239-026 | Atwater USP |
| Terryonto | McGrier | 02469-087 | Atwater USP |
| Jackie Lee | Pullum | 60433-080 | Atwater USP |
| Nathaniel | Reed | 02844-095 | Atwater USP |
| Eric D. | Thomas | 70222-079 | Atwater USP |
| Rodney Lee | Thompson | 29247-179 | Atwater USP |
| Antone | White | 16047-016 | Atwater USP |
| Freddie J. | Whitmore | 27118-048 | Atwater USP |
| Rayah Markieth | Williams | 32487-177 | Atwater USP |
| Jimmy D. | Womack | 56187-080 | Atwater USP |

## Beaumont Low FCI

| | | | |
|---|---|---|---|
| Ezequiel G. | Cervantes | 09671-079 | Beaumont LOW FCI |
| Mark | Edwards | 24328-077 | Beaumont LOW FCI |
| Johnny D. | Hensley | 87864-012 | Beaumont LOW FCI |
| Tyronne | Jackson | 10332-078 | Beaumont LOW FCI |
| Greg C. | Laxey | 09953-078 | Beaumont Low FCI |
| Rogge | Leslie | 13915-004 | Beaumont LOW FCI |
| David | Rangel | 83638-079 | Beaumont LOW FCI |
| Shawn | Rogers | 03723-007 | Beaumont LOW FCI |
| Delmar Anton | Zeigler | 13897-064 | Beaumont LOW FCI |

## Beamont Medium

| | | | |
|---|---|---|---|
| Marcus | Arnold | 11704-078 | Beaumont Medium |
| Frankie Dean | Billings | 06145-078 | Beaumont Medium |
| Paul | Brewer | 10227-078 | Beaumont Medium |
| Victor Hugo | Calderon-Miranda | 11404-180 | Beaumont Medium |
| Gregorio V. | Castro | 11261-179 | Beaumont Medium |
| Joseph | Colone | 09915-078 | Beaumont Medium |
| Darrell Thomas | Cribbenden | 98731-079 | Beaumont Medium |
| Shannon | Darr | 18389-077 | Beaumont Medium |
| Daniel | Davis | 14306-179 | Beaumont Medium |
| William | Dean | 56046-180 | Beaumont Medium |
| Sharkey | Elam | 99695-024 | Beaumont Medium |
| George | Escamilla | 54920-146 | Beaumont Medium |
| Ricky | Estrada | 56534-180 | Beaumont Medium |
| Bilal | Farahkhan | 72541-079 | Beaumont Medium |
| Darrell | Gittenden | 98731-079 | Beaumont Medium |
| Nelson | Gonzalez | 03792-131 | Beaumont Medium |
| Ronnie | Harris | 66413-079 | Beaumont Medium |
| Brandon | Henderson | 03254-078 | Beaumont Medium |
| Julio Cesar | Hernandez-Pineda | 82937-079 | Beaumont Medium |
| Willie | Holloway | 03667-180 | Beaumont Medium |
| David | Martinez | 45066-079 | Beaumont Medium |
| Anthony | Miller | 33648-048 | Beaumont Medium |
| Vega Aljandro | Morales | 14368-179 | Beaumont Medium |
| Benjamin | Navejar | 43691-080 | Beaumont Medium |
| Corey | Nixon | 26981-177 | Beaumont Medium |

| James | Olinde | 26824-034 | Beaumont Medium |
| QueGeraldo | Ortiz | 23696-180 | Beaumont Medium |
| Jaime | Phillips | 12804-179 | Beaumont Medium |
| Julio | Pineda | 82937-079 | Beaumont Medium |
| Terrance | Powell | 27259-180 | Beaumont Medium |
| Keith | Quinn | 86558-011 | Beaumont Medium |
| Leslie | Redmond | 31204-177 | Beaumont Medium |
| Clifton | Rivers | 36491-180 | Beaumont Medium |
| Rene | Rodriguez | 11185-040 | Beaumont Medium |
| Les | Rogge | 13915-004 | Beaumont Medium |
| Tremayne | Scoggins | 22554-009 | Beaumont Medium |
| Welton | Scott | 11400-083 | Beaumont Medium |
| Keith | Sheel | 07224-043 | Beaumont Medium |
| Monty M. | Shelton | 10426-078 | Beaumont Medium |
| Patrick | Sneed | 27674-177 | Beaumont Medium |
| Keith | Steel | 0722-4043 | Beaumont Medium |
| Gilardo | Valarde | 10887-039 | Beaumont Medium |
| Rafael M. | Vasquez | 85731-080 | Beaumont Medium |
| Terrance | Washington | 03038-095 | Beaumont Medium |
| Danny | White | 05267-078 | Beaumont Medium |
| Joe L. | Wigfall | 30499-177 | Beaumont Medium |

## Beaumont USP

| Billy | Aguero | 08466-059 | Beaumont USP |
| Joe L. | Alvardo | 11079-081 | Beaumont USP |
| DeShawn | Andrews | 44998-079 | Beaumont USP |
| Lionel W. | Armstrong | 37023-053 | Beaumont USP |
| Frederick | Asberry | 29141-077 | Beaumont USP |
| Craig | Baldwin | 27003-034 | Beaumont USP |
| Arthur | Banks | 28253-034 | Beaumont USP |
| Lloyd | Battles | 15809-179 | Beaumont USP |
| Jose | Baza | 80363-011 | Beaumont USP |
| Ron | Bembrey | 31292-177 | Beaumont USP |
| Danny | Bishop | 35696-180 | Beaumont USP |
| Eladio L. | Bouza | 29645-198 | Beaumont USP |
| William Marcell | Boyce | 03336-088 | Beaumont USP |
| Phillip Michael | Brady | 14929-037 | Beaumont USP |
| Johnny | Brazile | 08439-062 | Beaumont USP |
| Robert W. | Brewer | 79900-012 | Beaumont USP |
| Marion | Bridges | 40798-133 | Beaumont USP |
| Louis S. | Brown | 06478-043 | Beaumont USP |
| Omar Andre | Bulah | 85299-020 | Beaumont USP |

| Solomon T. | Burton | 04118-063 | Beaumont USP |
|---|---|---|---|
| Richard | Caparella | 52564-004 | Beaumont USP |
| Matsuda N. | Carter | 13155-007 | Beaumont USP |
| Fred Nimoy | Ceasar | 24508-179 | Beaumont USP |
| Ruben | Chapa-Ibarra Sr. | 64530-080 | Beaumont USP |
| Jamison Shawn | Charles | 05020-078 | Beaumont USP |
| Donald | Churchill | 27879-177 | Beaumont USP |
| Thomas | Ciprano | 23148-034 | Beaumont USP |
| Mark A. | Clark | 26409-077 | Beaumont USP |
| Wendell Alboyd | Cornett | 04675-081 | Beaumont USP |
| Glen H. | Cotton | 29234-077 | Beaumont USP |
| William | Daniels | 14748-056 | Beaumont USP |
| Michael De Angelo | David | 24604-077 | Beaumont USP |
| Robert T. | Day | 30797-177 | Beaumont USP |
| Bernadino | Delgado | 28273-177 | Beaumont USP |
| Joseph | Deveau | 02996-049 | Beaumont USP |
| Russell V. | Dinovo | 19736-038 | Beaumont USP |
| Richard T. | Dorman | 13386-057 | Beaumont USP |
| Chris | Drew | 04511-112 | Beaumont USP |
| Samuel P. | Edmondson | 05102-010 | Beaumont USP |
| John E. | Edwards | 45100-079 | Beaumont USP |
| Michael Dean | Faver | 04920-081 | Beaumont USP |
| Darron | Fields | 24511-077 | Beaumont USP |
| David Lee | Fisher | 55967-066 | Beaumont USP |
| Donnell Bartholo | Ford | 09934-424 | Beaumont USP |
| Charles Edwin | Fortes | 10190-158 | Beaumont USP |
| Kenneth C. | Fragoso | 265-20079 | Beaumont USP |
| Orenthel J. | Francois | 10462-078 | Beaumont USP |
| Gabrial | Garcia | 15130-180 | Beaumont USP |
| Everildo | Garcia | 40677-018 | Beaumont USP |
| David A. | Gish | 44530-179 | Beaumont USP |
| Luis | Gonzalez | 04434-078 | Beaumont USP |
| Arandal | Goodley | 76598-080 | Beaumont USP |
| James Earl | Goolsby | 21248-009 | Beaumont USP |
| Brian | Hardwick | 03330-089 | Beaumont USP |
| Willie Henry | Harrison | 79293-079 | Beaumont USP |
| Malcolm | Hartzog | 02391-043 | Beaumont USP |
| Earl Ellis | Hawkins | 25412-077 | Beaumont USP |
| Edgar Lee | Hayes | 34618-118 | Beaumont USP |
| Cedric | Henderson | 56390-080 | Beaumont USP |
| Jason | Hernandez | 07031-078 | Beaumont USP |
| Curley  B. | Hicks | 97752-079 | Beaumont USP |

| Jerry Joesph | Higdon | 11167-002 | Beaumont USP |
|---|---|---|---|
| Michael L. | Hill | 27023-177 | Beaumont USP |
| Richard | Hodges | 29736-177 | Beaumont USP |
| Michael | Holmes | 07030-078 | Beaumont USP |
| Leon | Holt | 11022-007 | Beaumont USP |
| Christopher | Hopson | 21763-051 | Beaumont USP |
| Harold | Howard | 13349-007 | Beaumont USP |
| Terrence | Howard | 28602-034 | Beaumont USP |
| Odis | Jackson | 15806-179 | Beaumont USP |
| Donald | Jackson | 25664-077 | Beaumont USP |
| Joseph | Jackson | 33186-007 | Beaumont USP |
| Steven | Jackson | 06274-156 | Beaumont USP |
| Travis | Jacobs | 15648-064 | Beaumont USP |
| Anthony | James | 56700-097 | Beaumont USP |
| Cleveland A. | James | 49320-004 | Beaumont USP |
| Allen | Jett | 32325-037 | Beaumont USP |
| Bernard | Johnson | 22000-016 | Beaumont USP |
| Stanley J. | Johnson | 98687-131 | Beaumont USP |
| Samual L. | johnson | 10097-180 | Beaumont USP |
| Benjamin | Jones | 52366-066 | Beaumont USP |
| Charles Gregory | Jones | 19935-039 | Beaumont USP |
| Leonard T. | Jones | 09022-014 | Beaumont USP |
| Odell | Jones Jr. | 95923-071 | Beaumont USP |
| Anthony G. | Joyner | 18548-050 | Beaumont USP |
| Joe L. | Kelly | 21350-009 | Beaumont USP |
| Henry G | Laffoon | 32074-177 | Beaumont USP |
| Jorge | Levario | 03942-051 | Beaumont USP |
| Curtis | Lindsey | 72793-079 | Beaumont USP |
| John | Lockett | 75159-079 | Beaumont USP |
| Gary | Lott | 14256-064 | Beaumont USP |
| Dolandon V. | Mack | 23050-009 | Beaumont USP |
| Michael A. | Mahone | 04430-036 | Beaumont USP |
| David | Marquez | 10895-097 | Beaumont USP |
| Ameein R. | Martin | 70881-004 | Beaumont USP |
| James D. | Martinez | 30493-037 | Beaumont USP |
| Robert B | Martinez | 27063-051 | Beaumont USP |
| Steven | Mcclarty | 81028-008 | Beaumont USP |
| David | McClurre | 24642-079 | Beaumont USP |
| Kevin | McDonald | 96795-011 | Beaumont USP |
| Gregory L. | Miles | 22717-077 | Beaumont USP |
| Charles | Montgomery | 25433-018 | Beaumont USP |
| Bernard | Montgomery | 53653-146 | Beaumont USP |
| Edward | Moore | 19707-056 | Beaumont USP |

| Brian J. | Moroney | 23901-038 | Beaumont USP |
|---|---|---|---|
| Anthony W. | Morris | 03060-031 | Beaumont USP |
| Carl | Morrisset | 05945-003 | Beaumont USP |
| Harry R. | Nelson | 01142-000 | Beaumont USP |
| Gregory | Nesbit | 68746-004 | Beaumont USP |
| Michael | Neugebauer | 16761-045 | Beaumont USP |
| Michael J | Noil | 25331-034 | Beaumont USP |
| Cruz | Nunez | 32314-013 | Beaumont USP |
| Steven | Patrick | 81028-008 | Beaumont USP |
| Eugene P. | Patterson | 36755-118 | Beaumont USP |
| William | Peay | 03533-007 | Beaumont USP |
| Charles Anthony | Perry | 14375-064 | Beaumont USP |
| James | Pickett | 32698-077 | Beaumont USP |
| John M. | Pope | 43067-180 | Beaumont USP |
| Raphael F. | Porche | 02860-095 | Beaumont USP |
| Raul | Ramirez | 44222-079 | Beaumont USP |
| Orlando | Randall | 10670-078 | Beaumont USP |
| Raul | Rangel | 39518-180 | Beaumont USP |
| Arthur Charles | Reader | 06769-078 | Beaumont USP |
| Sylvester | Reid | 50013-004 | Beaumont USP |
| Luis | Reyes | 50411-066 | Beaumont USP |
| Donald | Richardson | 01523-164 | Beaumont USP |
| Charles Pernell | Riddick | 48826-066 | Beaumont USP |
| Harry L | Riddick | 48116-066 | Beaumont USP |
| Michael H. | Roberson | 60656-080 | Beaumont USP |
| Ernest Edward | Robertson | 02659-095 | Beaumont USP |
| Miguel Anthony | Rocha | 83176-079 | Beaumont USP |
| Christopher | Rodgers | 42910-060 | Beaumont USP |
| Jose Abel | Rodriquez | 18162-180 | Beaumont USP |
| James | Roland | 32698-077 | Beaumont USP |
| Francisco | Saldana | 49160-004 | Beaumont USP |
| Garrie | Samuels | 27012-077 | Beaumont USP |
| Samual | Sanchez | 04949-070 | Beaumont USP |
| Paul | Santivanez | 91551-080 | Beaumont USP |
| Jeff A. | Saunders | 36208-004 | Beaumont USP |
| Earl McRae | Scales | 14406-057 | Beaumont USP |
| Richard A. | Schaffer | 18373-047 | Beaumont USP |
| Reginald | Sharp | 13515-179 | Beaumont USP |
| Keith Lamar | Shepard | 13275-051 | Beaumont USP |
| Ramon Laroi | Shorter | 97558-079 | Beaumont USP |
| Jermaine Jerrell | Sims | 34263-083 | Beaumont USP |
| Robert J | Smallwood | 42708-080 | Beaumont USP |

| | | | |
|---|---|---|---|
| Richard Allen | Smith | 03666-087 | Beaumont USP |
| Cedric | Smith | 07790-035 | Beaumont USP |
| Joshua | Smith | 21727-057 | Beaumont USP |
| Gilbert S. | Soza | 57503-180 | Beaumont USP |
| Tairone Traniel | Stanford | 07316-078 | Beaumont USP |
| Michael | Starnes | 11642-042 | Beaumont USP |
| Robert | Steen | 12695-180 | Beaumont USP |
| Terry Earl | Stewart | 46272-080 | Beaumont USP |
| Brenson | Stovall | 34009-077 | Beaumont USP |
| Robert Kyle | Sturdy | 18616-077 | Beaumont USP |
| Anthony L. | Stutson | 18418-001 | Beaumont USP |
| Michael Hugh | Surrell | 29493-177 | Beaumont USP |
| Bruce A. | Taylor | 09794-078 | Beaumont USP |
| Theodore T. | Taylor | 04625-003 | Beaumont USP |
| Plutarco | Tello | 11583-045 | Beaumont USP |
| Darrell | Theodore | 28382-034 | Beaumont USP |
| Jerry Wayne | Thomas | 33934-086 | Beaumont USP |
| Keith | Thomas | 22987-009 | Beaumont USP |
| Leonard T. | Tom | 817755-008 | Beaumont USP |
| Joe L. | Traylor | 03532-079 | Beaumont USP |
| Warren Lee | Underwood | 57245-097 | Beaumont USP |
| Roberto | Urbina | 39608-180 | Beaumont USP |
| Baldemar Sambrano | Villarreal | 03367-078 | Beaumont USP |
| Henry L. | Wallace | 31038-007 | Beaumont USP |
| Marnail | Washington | 11175-002 | Beaumont USP |
| William | Washington | 65149-061 | Beaumont USP |
| Bryan L | Wilson | 55118-079 | Beaumont USP |
| William | Wise | 11356-007 | Beaumont USP |
| Anthony | Woodland | 07927-043 | Beaumont USP |

## Beckley FCI

| | | | |
|---|---|---|---|
| John | Burton | 15696-058 | Beckley FCI |
| Ernest G. | Humphries | 21395-057 | Beckley FCI |
| Burton Little | John | 15696-058 | Beckley FCI |

## Big Sandy USP

| | | | |
|---|---|---|---|
| Rodolfo | Cuellar | 25755-077 | Big Sandy USP |
| Emile | Dixon | 06411-041 | Big Sandy USP |
| Juan P. | Esquivel | 33321-077 | Big Sandy USP |
| Juan | Estrada Jr | 43539-080 | Big Sandy USP |
| Darrell | Evans | 21232-039 | Big Sandy USP |
| Jaime N. | Gomez | 48323-054 | Big Sandy USP |
| Bryan | Maxwell | 50539-079 | Big Sandy USP |
| Luis | Moreno | 71492-079 | Big Sandy USP |
| Ras | Rahim | 54889-019 | Big Sandy USP |
| Peter | Simpson | 50611-053 | Big Sandy USP |
| Taylor | Taurus | 56195-004 | Big Sandy USP |
| Lan Ngoc | Tran | 38262-053 | Big Sandy USP |
| James R. | White | 87785-079 | Big Sandy USP |
| Chacy S. | Williams | 65479-061 | Big Sandy USP |

## Brooklyn MDC

| | | | |
|---|---|---|---|
| Andres | Aquiar | 37249-053 | Brooklyn MDC |

## Canaan USP

| | | | |
|---|---|---|---|
| Donnell | Joseph | 01534-112 | Canaan USP |

## Coleman I

| | | | |
|---|---|---|---|
| Byron Shane | Chubbuck | 07909-051 | Coleman I |
| Darren | Edeker | 06015-017 | Coleman I |
| Steve | Foster | 90808-011 | Coleman I |
| Richard | Galicia | 07709-097 | Coleman I |
| Rico Wayne | Garcia | 99521-011 | Coleman I |
| Sammy | Garcia | 49058-180 | Coleman I |
| Raynard H. | Hopkins | 14079-064 | Coleman I |
| William | McCoy | 08220-056 | Coleman I |
| Kirk | Pryor | 16835-058 | Coleman I |
| Willie Joe | Spence | 11230-007 | Coleman I |
| Alex | Wong | 37985-053 | Coleman I |

## Coleman I USP

| | | | |
|---|---|---|---|
| Henry L. | Green | 09949-035 | Coleman I USP |
| James | Herbert | 04134-078 | Coleman I USP |
| Rafael A. | Herrera | 21027-077 | Coleman I USP |
| Herbert | James | 04134-078 | Coleman I USP |
| Juan | Reyes | 07371-040 | Coleman I USP |

## Coleman II

| | | | |
|---|---|---|---|
| William | Abbott | 10442-002 | Coleman II |
| Lukel Anthony | Beckford | 26117-037 | Coleman II |
| Jason | Bell | 21876-057 | Coleman II |
| Grayling | Bolston | 55704-019 | Coleman II |
| Reginald | Boxley | 71875-004 | Coleman II |
| Christopher M. | Brown | 10980-035 | Coleman II |
| Richard D. | Brown | 11923-040 | Coleman II |
| Jessie L. | Cage | 22766-034 | Coleman II |
| Damon Anthony | Causey | 24328-034 | Coleman II |
| Michael | Couran | 42666-018 | Coleman II |
| Perry | Johnson | 33609-018 | Coleman II |
| Darren | Mozingo | 26032-177 | Coleman II |
| Douglas L. | Perry | 05841-043 | Coleman II |
| William | Rogers | 33495-018 | Coleman II |
| David | Webb | 21291-009 | Coleman II |
| Adam T. | Williams | 06718-027 | Coleman II |

## Eden Cl

| | | | |
|---|---|---|---|
| Genaro-Parez | Castillo | 58293-080 | Eden Cl |

## Edgefield FCI

| | | | |
|---|---|---|---|
| Richard | Griego | 08906-081 | Edgefield FCI |

## Fairton FCI

Akim Jamal      Betsey       12094-052   Fairton FCI

## Florence High USP

Jose-Cruz       Quinlan      09256-069   Florence High USP

## Forest City Medium

| Donovan | Hickman | 05891-043 | Forest City Medium |
| Adam E. | Martin  | 39706-180 | Forest City Medium |
| Jesus   | Vargas  | 14039-026 | Forest City Medium |

## Hazelton USP

| Steven    | Martinez | 45757-019 | Hazelton USP |
| Timnah K. | Rudisill | 16854-058 | Hazelton USP |
| Gary T.   | Wade     | 19578-038 | Hazelton USP |

## Houston CCM

Marcus         Roberts       70033-079   Houston CCM

## In Transit

Darryl         Wilkes        55522-083   IN TRANSIT

## Jesup FCI

| George A. | Rohlsen | 01308-094 | Jesup FCI |
| Ronald    | Tillman | 85375-071 | Jesup FCI |

## Lee USP

| | | | |
|---|---|---|---|
| John B. | Gary | 96921-071 | Lee USP |
| Donnell | Graves | 79208-079 | Lee USP |
| Terrell | | | |
| Christopher | Richardson | 11412-035 | Lee USP |

## Lewisburg USP

| | | | |
|---|---|---|---|
| Harold | Jackson | 06811-424 | Lewisburg USP |
| Derrick Lamont | Smoote | 04873-028 | Lewisburg USP |

## Manchester FCI

| | | | |
|---|---|---|---|
| Randall | Midkiff | 23193-016 | Manchester FCI |

## McCreary USP

| Donnie | Alexander | 59920-079 | Mccreary USP |
| John Patrick | Brennick | 21203-038 | Mccreary USP |
| Donald | Chew | 13080-007 | Mccreary USP |
| Walter | Compton | 73124-012 | Mccreary USP |
| Richard | Cruz | 60692-079 | Mccreary USP |
| Bennie | Floyd | 11978-007 | Mccreary USP |
| Nakai | Gregory | 48686-008 | Mccreary USP |
| Jaime | Guerrero | 79072-079 | Mccreary USP |
| Juan | Herrera | 95092-080 | Mccreary USP |
| Larry E. | Herrera | 99686-111 | Mccreary USP |
| Shaheem | Johnson | 19138-057 | Mccreary USP |
| Ray | McAllister | 28856-180 | McCreary USP |
| Calvin | McIntosh | 26855-177 | Mccreary USP |
| Jon Wesley | Merritt | 05800-017 | Mccreary USP |
| Gregory | Nakai | 48686-008 | McCreary USP |
| Ha T | Nguyen | 28151-034 | Mccreary USP |
| Everett Earl | Parker | 01574-095 | McCreary USP |
| Cory Lee | Parton | 12281-052 | McCreary USP |
| Michael | Perez | 91508-080 | Mccreary USP |
| Andre J. | Pinkston | 12783-026 | Mccreary USP |
| Trint Lamar | Powell | 15936-058 | Mccreary USP |
| Eurique | Ramirez | 53450-146 | Mccreary USP |
| Jimmy | Ramos | 58020-080 | Mccreary USP |
| Joseph | Randall Jr. | 22594-009 | Mccreary USP |
| Roberto | Riojas | 71509-079 | Mccreary USP |
| Lopez | Roberto | 12999-180 | Mccreary USP |
| Herbert | Rozier | 55725-004 | Mccreary USP |
| Daniel | Spence | 32723-037 | Mccreary USP |
| Kelvin Andre | Spotts | 05613-088 | Mccreary USP |
| Mario | Ugalde | 39890-180 | Mccreary USP |
| Adrian | Vasquez | 31895-180 | Mccreary USP |
| Michael R. | Waggoner | 44210-008 | Mccreary USP |

## Memphis FCI

| Curtis | Hardy | 01102-043 | Memphis FCI |

## Minneapolis CCM

| Curtis J. | LaVallie | 08424-059 | Minneapolis CCM |

## Montgomery CCM

| Willie Jermaine | Barnes | 07706-003 | Montgomery CCM |

## New Orleans CCM

| Anthony S. | Taylor | 12191-035 | New Orleans CCM |

## Oklahoma City FTC

| Antonio | Bouce | 11055-171 | Oklahoma City FTC |
| Anastacio | Cantu | 19200-179 | Oklahoma City FTC |
| Fredrick | Cooper | 20968-009 | Oklahoma City FTC |
| Ronald | Fleming | 14586-076 | Oklahoma City FTC |
| Michael | Jackson | 15083-064 | Oklahoma City FTC |
| William Ivon | Turner | 88328-024 | Oklahoma City FTC |

## Otisville FCI

| Ricky | Battle | 33139-007 | Otisville FCI |
| Marcus J | Lewis | 54567-083 | Otisville FCI |

## Pekin FCI

| Kipley J. | Holbrook | 17714-047 | Pekin FCI |

## Pollock USP

| Omar | Avila | 21140-424 | Pollock USP |
| Christopher | Black | 95001-071 | Pollock USP |
| L.C. | Brooks | 03553-095 | Pollock USP |
| Robert | Dorsey | 47454-066 | Pollock USP |
| Calvin | Dyess | 03713-088 | Pollock USP |
| Brian | Edwards | 69122-079 | Pollock USP |
| George | Harrison | 20467-016 | Pollock USP |
| Enrico D. | Hawkins | 50530-019 | Pollock USP |
| Charles H. | Jackson | 01125-112 | Pollock USP |
| Oscar | Longoria | 14563-424 | Pollock USP |
| Nadir M. | Mahdi | 56528-066 | Pollock USP |
| Donte T. | McFarland | 18900-112 | Pollock USP |
| Willliam | Mercer | 15996-016 | Pollock USP |
| Omar | Moreno | 69786-080 | Pollock USP |
| Andra | Routt | 60985-079 | Pollock USP |
| Patrick | Stewart | 15744-064 | Pollock USP |
| Jules L. | Williams | 34444-037 | Pollock USP |
| Nobel John | Williams | 24113-180 | Pollock USP |

## Released

| | | | |
|---|---|---|---|
| Ricardo | Aguilar-Mexicano | 09189-085 | Released |
| Daniel | Anderson | 11633-052 | Released |
| Gregory | Berry | 20993-039 | Released |
| Purvis Ray | Cartwright | 59478-079 | Released |
| Garrett | Deetz | 43611-008 | Released |
| Maurice M. | Fife | 32191-007 | Released |
| Charles E. | Gibson | 26166-016 | Released |
| Robert | Hill | 04084-180 | Released |
| Inocencio | Huerta | 44518-079 | Released |
| Clarence | Hunter | 04094-180 | Released |
| Matsukata | Keeling | 27964-034 | released |
| Steven Curtis | Lewis | 03801-078 | Released |
| Anthony J. | Lucas | 30893-013 | Released |
| Noel R. | Martin | 39461-180 | Released |
| Michael Dean | Mason | 02027-078 | Released |
| Sirus | MCDaniel | | Released |
| David C. | McDonald | 04950-033 | Released |
| Marcus Don | Paul | 14913-047 | Released |
| Najac | Paul | 04970-088 | Released |
| Angel A. | Ramirez | 34148-179 | Released |
| Roy E. | Robertson | 14226-031 | Released |
| Jose | Rodriguez-Garcia | 13430-198 | Released |
| Willie May | Sanders | 28763-177 | Released |
| Shawn L. | Stone | 44824-008 | Released |
| Gregory S. | Tolley | 04181-046 | Released |
| John Lasoya | Vela | 27131-180 | Released |
| Samuel L. | Webb | 12352-014 | Released |
| Kenneth | Wheeler | | Released |

## Sacramento CCM

| | | | |
|---|---|---|---|
| Vincent | Humphrey | 06307-097 | Sacramento CCM |

## San Antonio CCM

| | | | |
|---|---|---|---|
| Lonnie | Hines | 42618-080 | San Antonio CCM |

## Sheridan FCI

| Michael | Grigg | 05832-085 | Sheridan FCI |
|---|---|---|---|

## Terre-Haute USP

| Jeffrey | Briscoe | 11736-078 | Terre-Haute USP |
|---|---|---|---|
| David Lee | Jackson | 13567-039 | Terre-Haute USP |

## Three Rivers SCI

| Michael | Ellison | 15256-180 | Three Rivers SCI |
|---|---|---|---|
| Duran | Riley | 20305-179 | Three Rivers SCI |

## Tuscon FCI

| Marvin | Hendricks Jr | 04886-196 | Tuscon FCI |
|---|---|---|---|

## Tuscon USP

| Warnell | Reams | 33164-007 | TUSCON USP |
|---|---|---|---|
| Jamie C. | Sherrod | 19305-076 | TUSCON USP |
| Kelvin D. | Smith | 01420-000 | TUSCON USP |
| Larry | Ward | 26037-044 | TUSCON USP |
| Marco A. | Woodson | 06166-007 | TUSCON USP |

## Victorville USP

| Mario R. | Baker | 03618-061 | Victorville USP |
|---|---|---|---|
| Sean Deqince | Brown | 62260-079 | Victorville USP |
| Johnny | Green | 79344-079 | Victorville USP |
| Kerry D. | Laury | 24149-077 | Victorville USP |
| Oscar | Martinez | 26438-179 | Victorville USP |
| Gregory F. | Nixon | 09899-078 | Victorville USP |
| Arturo | Villarreal | 40823-115 | Victorville USP |
| Kieron | Webber | 57489-053 | Victorville USP |
| THomas | Wesson | 02870-424 | Victorville USP |
| Steven | Wooldridge | 05381-010 | Victorville USP |

# Yazoo City FCI

| | | | |
|---|---|---|---|
| Jose Mendosa | Baena | 77382-079 | Yazoo City FCI |
| Robert | Crisostomo | 28997-180 | Yazoo City FCI |
| Asencion | Garza | 56840-079 | Yazoo City FCI |
| Baena Jose | Mendoza | 77382-079 | Yazoo City FCI |
| Nicholas | Pablo | 08658-085 | Yazoo City FCI |
| Roy | Pedroza | 11207-179 | Yazoo City FCI |
| Crisostomo | Robert | 28997-180 | Yazoo City FCI |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Kelvin Andre Spotts, et al.                    Case No. 1:08-cv-00044

      Plaintiffs                          Judge Kollar-Kotelly,
                                   Colleen

     v.
                                     **Order**

United States of America

      Defendant


Defendant has filed a Motion pursuant to Fed.R.Civ.P. 12(b)(3) and 28 U.S.C. § 1404 (a), seeking to transfer this case to the Eastern District of Texas. Plaintiffs have demonstrated that the tortious act of omission complained of occurred within this District and, accordingly, venue is proper in the District of Columbia, thus satisfying 28 U.S.C. § 1402 (b), where the United States of America is named as a Defendant. Defendant has not carried its burden of proof, as required under 28 U.S.C. § 1404 (a), to show that this District is inconvenient. Accordingly, Defendants' Motion is denied.


     IT IS SO ORDERED.


                           _____
                           District Judge